**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE HEXO CORPORATION
SECURITIES LITIGATION

No. 1:19-cv-10965-NRB

<u>JURY TRIAL DEMANDED</u>

**CORRECTED FIRST AMENDED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

NATURE OF THE ACTION ..................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 13

PARTIES .................................................................................................................. 13

    SUBSTANTIVE ALLEGATIONS ................................................................ 18

        A.      Background ............................................................................. 18

        B.      The Historic and Transformative SQDC Agreement ................. 19

        C.      The Class Period Begins: HEXO Conducts the Offering and the Company's Shares Debut on the NYSE American Exchange .............................................................................. 21

        D.      At the Time of the Offering, the SQDC Was Purchasing Minimal Product from HEXO, But the Guarantee of the "Take or Pay" Feature Comforted the Market ......................... 22

        E.      HEXO Represents That the Newstrike Acquisition Will Help Drive FY2020 Net Revenues of C$400 Million and 4Q2020 Net Revenues of C$26 Million ................................... 24

        F.      HEXO's Chief Financial Officer Resigns ............................... 27

        G.      Analysts Continue To Echo the Critical Importance of the SQDC Agreement and Note Management's Confidence in HEXO's FY2020 $C400 Million Net Revenue Guidance ...................... 27

        H.      Despite Weak Demand, HEXO Reveals It Will Not Enforce the "Take or Pay" Feature in 3Q19, But Mitigates Market Concern Nonetheless ................................................ 29

        I.      HEXO's Co-Founder Resigns ................................................ 31

        J.      HEXO's Second Post-Offering CFO Resigns ......................... 31

        K.      Three Days After Its Second CFO Resignation, HEXO Shocks the Market By Pulling Its FY2020 Net Revenue Guidance And Slashing 4Q2019 Net Revenue Guidance ..................... 32

        L.      Desperate For Cash, HEXO Begins A Spate of Offerings ...................... 35

        M.      HEXO Fires 20% of its Workforce, Including Its Chief Manufacturing Officer and Chief Marketing Officer .............................. 35

        N.      HEXO Reports Dismal Fiscal 2019 Results ........................... 36

O.     At Least *Four Months* After Learning That The Niagara Facility Was Producing Cannabis Without A License, HEXO Discloses This To Investors ...................................... 39

P.     HEXO Announces Poor 1Q19 Financial Results – And Again Takes A Large Inventory Impairment ............................................ 39

Q.     HEXO's Financial Disarray Continues As it Restates Its FY2019 Financial Statements and Announces That It Understated Its FY2019 Inventory Impairment ....................................... 40

R.     The Market Further Realizes that the Newstrike Acquisition Was A Bust, And Takes HEXO To Task for it .................... 41

S.     HEXO Scrambles For Cash With Four Offerings In Five Months ................................................................................................ 42

T.     HEXO's Auditor Abruptly Resigns ........................................................ 43

U.     Defendant Director Bourque Suddenly Resigns From The HEXO Board ............................................................................................ 43

V.     The Market Learns More As HEXO Delays Filing Its 2Q2020 Interim Financial Statements, Announces Another Huge Inventory Impairment, And Admits That the Second and Third Year SQDC Agreement Expectations Were Unlikely ............................................................................................. 44

W.     The Full Truth Is Finally Revealed ....................................................... 45

MATERIAL MISSTATEMENTS AND OMISSIONS UNDER THE SECURITIES ACT .......................................................................................... 45

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS UNDER THE EXCHANGE ACT ........................................................................ 48

Presumption of Reliance: Fraud on the Market ......................................................... 86

Additional Scienter Allegations/Falsity Allegations for Exchange Act Claims ......................... 87

Loss Causation / Economic Loss ............................................................................ 87

CLASS ACTION ALLEGATIONS ........................................................................ 92

CAUSES OF ACTION ....................................................................................... 93

COUNT I ...................................................................................................... 93

     Violations of Section 11 of the Securities Act Against All Defendants .......................... 93

COUNT II..............................................................................................................95

    Violations of Section 12(a)(2) of the Securities Act Against HEXO, the
        Underwriter Defendants, and the Securities Act Individual
        Defendants ...............................................................................95

COUNT III .............................................................................................................96

    Violations of Section 15 of the Securities Act Against the Securities Act
        Individual Defendants ..............................................................96

COUNT IV ..............................................................................................................97

    Violation of Section 10(b) of the Exchange Act And Rule 10b-5
        Promulgated Thereunder Against The Exchange Act Defendants ......................97

COUNT V ..............................................................................................................101

    Violation of Section 20(a) of the Exchange Act Against the Exchange Act
        Individual Defendants ............................................................101

PRAYER FOR RELIEF ........................................................................................102

JURY TRIAL DEMANDED ..................................................................................103

Lead Plaintiffs Timothy Sweeney and John Medley ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, and analyst reports of Hexo Corporation ("HEXO" or the "Company"). Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      HEXO is a Canadian company that produces and distributes branded cannabis products. The Company caters to both the medical and recreational (adult-use) cannabis markets with its Hydropothecary (medical) and HEXO (adult-use) brands. At all times relevant, HEXO represented that the adult-use cannabis market was a significant future revenue driver for the Company, and that the cannabis industry was a rapidly growing global market with an estimated value of US$250 billion.

2.      This is a securities class action brought on behalf of persons and entities (the "Class") that purchased or otherwise acquired HEXO securities between January 23, 2019 and March 30, 2020, inclusive (the "Class Period") on the New York Stock Exchange ("NYSE") or NYSE American exchange, including pursuant or traceable to HEXO's January 25, 2019 Initial Public Offering of 8.8 million shares (the "Offering"), and were damaged thereby. Plaintiffs seek to pursue remedies for Defendants' alleged violations of the federal securities laws during the Class Period under the Securities Act of 1933 ("Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act"). The Securities Act claims herein are alleged

separately from the Exchange Act claims and do not sound in fraud.

3.      First, the Securities Act Defendants (defined *infra*) made material misstatements and omissions of material fact in HEXO's Offering documents about the Company's purportedly transformative five-year supply contract (the "SQDC Agreement") with the Canadian Government's Societe Quebecoise du Canabis ("SQDC"), including a key "take or pay" feature of the contract which purportedly guaranteed substantial revenue to HEXO even if demand for cannabis did not support the SQDC's annual purchase volume commitments.  The SQDC Agreement was by far HEXO's largest and most important supply contract, and the Company valued it at over $1 billion dollars.

4.      Second, throughout the Class Period, the Exchange Act Defendants (defined *infra*) materially misled investors about the SQDC Agreement and HEXO's business and financial prospects.  This included materially misrepresenting to investors (i) the guaranteed nature of the SQDC Agreement; (ii) that HEXO could "confidently" achieve FY2020 net revenue of C$400 million (or more) due largely to the SQDC Agreement; and (iii) that HEXO had completed an important acquisition of Newstrike Brand, Ltd. ("Newstrike") – purportedly based on "substantial" due diligence – to boost its production capacity and achieve the lofty guidance it trumpeted.  During the Class Period, the Exchange Act Defendants also reported inflated inventory figures purportedly to support product demand, largely due to the SQDC Agreement, and failed to timely disclose known licensing issues at a key production facility (the "Niagara Facility") acquired through the Newstrike deal.

5.      The truth about HEXO slowly unraveled through a series of Class Period disclosures.  First, HEXO revealed in June 2019 that, despite weak demand, the Company would not enforce the key "take or pay" feature of the SQDC Agreement that quarter.  HEXO CEO,

Defendant Sebastien St. Louis, nevertheless mitigated market concern by reassuring investors that the SQDC would still satisfy its "guaranteed" first-year purchase volume commitment (albeit one or two months late), and that the Company was still confidently on track to meet its C$400 million (or more) net revenue FY2020 guidance.

6.     Second, in October 2019, HEXO shocked the market by abruptly pulling the C$400 million net revenue guidance it was so confidently touted for months.  HEXO further revealed that it was laying off 200 employees, including key executives, due to weak demand; that its (second) CFO abruptly resigned; that it was taking an inventory impairment (the first of many); and that it had to suspend operations at the Niagara Facility.

7.     Third, in November 2019, HEXO disclosed that it would shutter the Niagara Facility altogether due to weak demand.  HEXO further revealed that part of the Niagara Facility was operating unlicensed – a fact known to the Company since at least July 2019.

8.     Fourth, from December 2019 through March 2020, HEXO disclosed a financial restatement; a series of increasing inventory impairments; that its long-time auditor abruptly resigned; that it was taking a massive impairment loss related to the Niagara Facility (which it was now selling off); and a tremendous loss for 2Q2020 of almost C$300 million.

9.     Finally, on March 30, 2020, HEXO revealed the full truth – that the SQDC Agreement was not the guaranteed revenue driver HEXO had long trumpeted.  In fact, HEXO never had any intention to enforce the key "take or pay" feature in the SQDC Agreement, and, as of January 17, 2020, the Company had absolved the SQDC of its "guaranteed" first-year volume purchase commitment.

10.     Plaintiffs and the Class sustained hundreds of millions of dollars in damages as a result of the material misrepresentations alleged herein.

11.     On April 11, 2018, prior to the start of the Class Period, HEXO announced that it had reached the binding and historic SQDC Agreement to provide the Province of Quebec with over 200,000 kilograms of cannabis product for the first five-years following cannabis legalization in Canada in 2018 – with a valuable option to supply the SQDC with cannabis for an additional year.   Following legalization, the SQDC intended to sell and distribute adult-use cannabis through SQDC-run shops as well as through online sales.

12.     The SQDC Agreement was by far the largest supply agreement awarded by the SQDC to any cannabis company, and HEXO repeatedly touted it to the market as a guaranteed and substantial revenue driver for the Company.   Notably, HEXO stated that the SQDC Agreement represented "approximately $1 billion in estimated potential revenue to the Company", and that it was "the largest forward supply agreement in the history of the cannabis industry in Canada, based on [guaranteed] year one volume."   HEXO also represented to investors that the SQDC Agreement – and the Company's special relationship with the SQDC – set HEXO apart from its competitors at the critical inception of cannabis legalization in Canada.

13.     HEXO repeatedly emphasized the massive annual purchase volumes under the SQDC Agreement.   According to HEXO, the SQDC Agreement required the SQDC to purchase 20,000 kg of cannabis from the Company during the first year following legalization.[1] The SQDC was expected to purchase increased volumes of 35,000 kg and 45,000 kg in years two and three, respectively, and volumes for the final two years would be based on the volumes in the initial three years.   At a price of $5.45 per gram or $5,450 per kilogram (as of the start of the SQDC Agreement), 20,000 kg reflected over $100 million in estimated revenues for HEXO in

---

[1] Canada legalized recreational cannabis use on October 17, 2018 under the "Cannabis Act". Accordingly, the first year of the SQDC Agreement was October 17, 2018 through October 17, 2019.

year one of the SQDC Agreement alone.

14.     Importantly, HEXO also repeatedly touted that the SQDC Agreement had a key "take or pay" feature – meaning that even if the rollout of recreational cannabis in Quebec went slower than forecast, or if the demand for cannabis was not as strong as anticipated, the SQDC still had to "take" the entire annual supply commitment or "pay" HEXO even if it didn't.  This insurance feature guaranteed substantial revenues to HEXO in either case.   The market understood the "take or pay" feature as a clear "win / win" scenario for HEXO that provided what one market commentator called a substantial "floor" for HEXO's revenues.  Unbeknownst to HEXO investors, however, the Company never had any intention of enforcing the "take or pay" feature, and, as such, did not have any guaranteed floor of revenue.

15.     On January 25, 2019, HEXO filed a prospectus with the SEC (the "Prospectus") stating that it was conducting an Initial Public Offering of 7.7 million HEXO shares (ultimately, 8.8 million with the underwriters' over-allotment) to be listed in the U.S. on the NYSE American exchange at $5.15 or C$6.50 per share.[2]  In the Prospectus, Defendants highlighted the five-year SQDC Agreement and specifically its "take or pay" feature to excite investors about the Offering and to justify the pricing of HEXO shares.

16.     By the time of the Offering, HEXO had been delivering product to the SQDC for over three months.  Notably, the Prospectus reported 1Q2019 cannabis sales figures showing that the SQDC accounted for 90% of HEXO's Quebec sales.[3]  The Prospectus also reported that Quebec sales (HEXO also has contracts in several other Canadian provinces) accounted for the

---

[2] All references to Canadian dollars are to "C$_".  In HEXO's SEC filings, press releases, and conference calls, all references are to Canadian dollars unless otherwise noted.

[3] HEXO's fiscal year runs from August 1 to July 31.  Thus, HEXO's 1Q2019 ran from August 1, 2018 through October 31, 2018.  This was the last complete quarter before the January 25, 2019 Offering, although the 2Q2019 had only six days remaining.

majority of HEXO's overall sales, demonstrating the materiality of the SQDC Agreement.

17.      At the time, the SQDC was only ordering an average of 840 kg of cannabis per month; thus, to meet its 20,000 kg contractual commitment for year one, the SQDC would have had to ramp up orders by ***approximately 140%***.  However, whether the SQDC ramped up orders was not a major concern to the market because, as HEXO represented, the "take or pay" feature of the SQDC Agreement provided revenue insurance even if demand was soft.  On January 30, 2019, HEXO successfully closed the Offering, raising approximately C$58 million from investors.

18.      Approximately two months later, in a March 13, 2019 press release, HEXO announced that it would acquire Newstrike, another publicly traded Canadian cannabis company, in an all-stock transaction.  Investors were led to believe that this acquisition was necessary to support demand, largely due to the SQDC Agreement, and that the acquisition was based on "substantial" due diligence.  One of the cannabis growing facilities HEXO acquired with Newstrike was the Niagara Facility.  HEXO touted the Niagara Facility as a key part of the acquisition as that facility comprised approximately 90% of Newstrike's production capacity, and would account for approximately 40% of HEXO's production capacity when the deal closed.

19.      Importantly, HEXO further represented to investors that the Newstrike acquisition would give the Company the production "capacity boost" it needed to generate over C$400 million in net revenue in FY2020 (which spanned August 1, 2019 through July 31, 2020).  In its March 13, 2019 press release, HEXO stated that "[b]ased on the completion of the [Newstrike] Transaction, for fiscal 2020, HEXO estimates net and gross revenues from the sale of cannabis in Canada will be in excess of $400 million and $479 million respectively."

20.      From this moment on, HEXO CEO Defendant Sebastien St. Louis repeatedly and

confidently emphasized the Company's C$400 million FY2020 net revenue guidance – even stating on March 14, 2019 that such guidance was "conservative" and that "we'll do that or better." Defendant St. Louis stressed this lofty guidance in unusually strong terms due largely to the guaranteed nature of the SQDC Agreement and the production boost afforded by the Newstrike deal. Because HEXO's revenue guidance was largely based on a *fait accompli*, the market put great stock in management's bullish statements. For example, on March 15, 2019, Roth Capital securities analyst Scott Fortune stated that "management is confident in its execution…to ramp up FY20 revenues guiding to a targeted $400 million."

21.     On June 13, 2019, Defendant St. Louis surprised the market by disclosing that, despite weak product demand, HEXO would not enforce the key "take or pay" feature of the SQDC Agreement that quarter. Instead, Defendant St. Louis claimed that HEXO "value[d] [its] relationship with the SQDC more than the few million dollars in revenue we could get this quarter". This disclosure was disingenuous at best as HEXO's relationship with the SQDC had not changed since the Company signed the SQDC Agreement, and the "take or pay" feature was specifically designed to protect the Company against weak demand. Unbeknownst to investors, HEXO had no intention of ever enforcing the "take or pay" feature.

22.     Defendant St. Louis was quick to mitigate investor concern about the "take or pay" feature by representing that the SQDC would still fulfill its 20,000 kg first-year contractual obligation by calendar-end 2019 (rather than by October 17, 2019). In other words, Defendant St. Louis led the market to believe that enforcing the "take or pay" feature now would be short sighted because the SQDC's contractual obligations would be fulfilled just two months later than originally anticipated.

23.     HEXO further tempered its negative June 13, 2019 disclosure by confidently

reiterating that the Company "remains on-track ramping up to C$400 million net revenue in fiscal 2020." In that regard, Defendant St. Louis confirmed on a June 13, 2019 earnings call that HEXO was going to double its 4Q2019 ([May 1 through July 31, 2019) net revenue of C$12.9 million to approximately $C27 million in Q42019. His statement was definitive: "***We're going to reach [that] target***."

24.     After Defendant St. Louis' disclosure that HEXO would not enforce the "take or pay" feature that quarter, HEXO stock fell 8% from a June 12, 2019 closing price of $6.45 per share to a June 13, 2019 closing price of $5.90. Had investors known the full truth – that HEXO never had any intention to enforce the "take or pay" feature, and that Defendant St. Louis had no basis to claim that the SQDC was going to meet its "guaranteed" first-year purchase commitment – the price of HEXO shares would have dropped much further.

25.     Thereafter, HEXO continued to reassure investors about the guaranteed nature of the SQDC Agreement, and reported increased inventory that presumably would be used to satisfy HEXO's growth-story, which was fueled by the SQDC Agreement. Between 3Q2019 (February 1, 2019 – April 30, 2019) and 4Q2019 (May 1, 2019 and July 31, 2019), as demonstrated by its SEC filings, HEXO's inventory (including inventory sold) skyrocketed from $36.7 million to $86.2 million.

26.     On October 10, 2019, HEXO shocked the market by abruptly pulling the $C400 million net revenue guidance that it had been confidently touting for seven months. Pulling guidance is a rare and draconian step; executives often revise guidance when warranted, but withdrawing it completely is highly unusual, and that is particularly true here where HEXO had

touted guaranteed revenues under the SQDC Agreement for so long.[4]  Also on October 10, 2019, the Company provided preliminary Q42019 revenue results in the range of C$14.5 to C$16.5 million – approximately 40% lower than its previous guidance of C$26 million.

27.     After these October 10, 2019 disclosures, HEXO stock plummeted 35% from an October 10, 2019 closing price of $3.66 per share to an October 11, 2019 closing price of $2.85 per share.

28.     But HEXO's troubles were far from over.  Two weeks later, on October 24, 2019, HEXO announced that it was laying off 200 employees due, in part, to the SQDC's slower than anticipated cannabis retail store rollout.  Among those fired were Arno Groll and Nick Davies, HEXO's Chief Manufacturing Officer and Chief Marketing Officer, respectively.  On this news, HEXO's stock dropped approximately 6.3% on October 24, 2019, to close at $2.52 per share, from a $2.69 per share closing price on October 23, 2019.

29.     On October 29, 2019 – three weeks after HEXO's (second) CFO Defendant Monahan abruptly resigned (on October 4, 2019) – HEXO filed its Annual Report for FY2019. Importantly, HEXO announced a substantial impairment loss on inventory of nearly C$17 million, stemming from "price compression in the market".  This inventory impairment demonstrated that HEXO's earlier reported inventory values were inflated because of a lack of product demand and because cannabis has a limited shelf-life.  CIBC analysts John Zamparo and Krishan Ruthnum noted in an October 29, 2019 report that the "$16MM inventory impairment charge [] result[ed] from costly purchases on the wholesale market in spite of a lack of ability to sell those products."

30.     On October 29, 2019, HEXO also disclosed two other negative developments.

---

[4] *See, e.g.*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3077262 at 22 (withdrawing financial guidance is "rare")

First, that HEXO was suspending operations at its Niagara Facility.  Second, that HEXO had only sold the SQDC **half** (a little over 10,000 kg) of the purportedly contractually obligated 20,000 kg of product in year one.  Thus, the SQDC had only two months to purchase the remaining 10,000 kg from HEXO as Defendant St. Louis represented it would in June 2019.

31.     After these negative October 29, 2019 disclosures, HEXO's stock dropped an additional 5% on October 29, 2019, from a previous-day close of $2.32 per share to $2.25.  HEXO subsequently amended its 2019 Annual Report two times in the next two weeks.

32.     On November 15, 2019, HEXO admitted to growing cannabis in an unlicensed area (Block B) of the previously suspended Niagara Facility.  In HEXO's disclosure, Defendant St. Louis acknowledged that the Company knew about this issue as of July 30, 2019.  Even if the timing of HEXO's discovery is indeed accurate, and that this discovery did not happen earlier when the Company purportedly performed its "substantial" due diligence for the Newstrike deal, HEXO said nothing to investors about this issue for a minimum of four months.

33.     After the November 15, 2019 news, HEXO stock dropped 5% from a previous-day close of $1.89 per share to $1.79 per share.

34.     One month later, on December 16, 2019, HEXO reported its 1Q2020 financial results, including 1Q2020 net revenue of C$14.5 million, another inventory impairment loss of C$25.5 million, and a net EBITDA loss of C$62.4 million.  HEXO's 1Q2020 results also included a concerning reservation of opinion by HEXO's auditors, MNP LLP, as to the characterization of a deferred tax liability.

35.     After market close on January 2, 2020, HEXO restated its 2019 financial statements and its interim results for Q12020.  Specifically, HEXO restated its financial statements because it (i) overstated a deferred tax liability as of the end of FY2019 (July 31,

2019); and (ii) understated its FY2019 inventory impairment by $2.4 million.  HEXO conceded in its restatement that its inventory fell in value earlier than reported, and that the Company should have written off this extra $2.4 million during 4Q2019, not 1Q2020.  The extent of the failure of the SQDC Agreement thus continued to play itself out as the market continued to learn of the extent of HEXO's radically impaired inventory.  After this news, HEXO stock fell from a January 2, 2020 closing price of $1.67 per share to close on January 3, 2020 at $1.57 per share.

36.     At an annual meeting of HEXO shareholders on January 20, 2020, the Company's shareholders voted to retain MNP LLP as the Company's external audit services provider. However, MNP – which had been doing business with HEXO for more than two years – was not interested.  The auditor abruptly resigned 11 days later on January 31, 2020.  Apparently, MNP had clashed with HEXO over the restatement the Company announced on January 2, 2020.

37.     As HEXO's bad news kept coming, the market continued to learn about HEXO's ever-increasing impaired inventory, the apparently unnecessary Newstrike acquisition, and the apparently not-so-guaranteed nature of the SQDC Agreement.  On March 17, 2020, HEXO announced that (i) HEXO was delaying filing its Q22020 interim financial statements; (ii) the Ontario Securities Commission was reviewing the Company's filings; (iii) HEXO was taking another huge inventory impairment – up to a staggering $280 million – because the Company's carrying value of net assets significantly exceeded its market capitalization as of January 31, 2020; (iv) HEXO was selling the Niagara Facility off due to weak product demand; and (v) there were questions as to whether HEXO could continue as a going concern.

38.     After this news, HEXO's stock plummeted an additional 30% from a March 16, 2020 closing price of $.77 per share to close on March 17, 2020 at $.45 per share.

39.     Finally, in a March 30, 2020 Form 6-K, the full truth was revealed.  On that date,

HEXO announced a net loss of C$298.2 million in its fiscal second quarter as of January 31, 2020 – exponentially wider than the loss of C$4.3 million posted in the year-earlier period. HEXO's C$298.2 million net loss included a C$138.3 million impairment loss relating to its Niagara Facility (which was now up for sale) and on other intangible assets acquired from Newstrike, and C$111.9 million relating to a goodwill impairment charge.

40.     Importantly, HEXO also finally came clean with the market about the SQDC Agreement – specifically, that the agreement was far from the guaranteed revenue driver that the Company had touted for so long.  According to HEXO's Form 6-K, "[b]y amendment effective on January 17, 2020, the Company contractually relieved the SQDC of the 1st year obligation to purchase the full 20 tons of the outstanding commitment."

41.     After these adverse disclosures, HEXO stock fell over 35% on March 30, 2020 to close at $.79 per share, after closing on March 27, 2020 at $1.09 per share.

42.     Throughout the Class Period, HEXO was also plagued by a flurry of key management, board, and auditor resignations that were abrupt and highly suspicious, particularly within the context of the material misrepresentations described herein.  On April 30, 2019, Defendant CFO Ed Chaplin resigned.  On July 18, 2019, Defendant and co-HEXO founder Adam Miron abruptly resigned.  On October 4, 2019, then-CFO, Defendant Michael Monahan, abruptly resigned – after only a few months on the job.  On October 24, 2019, HEXO fired 200 people, including Chief Manufacturing Officer Arno Groll, and Chief Marketing Officer Nick Davies.  On January 31, 2020, HEXO's auditor MNP LLP quit.  On February 7, 2020, Director and Defendant Natalie Bourque abruptly left the Company.

43.     As a direct and proximate result of Defendants' misstatements and omissions of material fact, HEXO investors lost hundreds of millions of dollars.

## JURISDICTION AND VENUE

44.     The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §77z-1) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

45.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act, and Section 21 of the Exchange Act (15 U.S.C. § 78aa).

46.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  HEXO traded on the NYSE American and NYSE exchanges during the Class Period.  Both exchanges are located in this District. Several of the Underwriter Defendants (defined below) for the Offering have offices in this District.  Effects of Defendants' misconduct occurred in this judicial district.

47.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiffs**

48.     Lead Plaintiffs Timothy Sweeney and John Medley purchased HEXO securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  Attached as Exhibits A and B are Sweeney and Medley's certifications.

49.     Sweeney is CEO of a company that provides services for the disabled.  Sweeney attended the University of Illinois where he received his degree in accounting.  After college,

Sweeney enrolled at the University of Michigan School of Law where he received his Juris Doctor. Sweeney worked at Pillsbury Winthrop Shaw Pittman (now known as Pillsbury) and eventually became a partner at that firm. While in law school, Sweeney taught accounting courses at the University of Michigan for undergraduate students.

50.     Medley works as an entrepreneur, growing the company that he founded in 1998, TransTech, into one of the leading energy service companies in the United States. Initially, Medley was the President and CEO of TransTech but now serves as Growth Advisor. Medley bought some of his HEXO shares pursuant or traceable to the Offering.

**Exchange Act Defendants**

51.     Defendant HEXO is a Canadian corporation incorporated under the laws of the Province of Ontario with principal executive offices located at 490 Boulevard St-Joseph, Suite 204, Gatineau, Québec, Canada. HEXO is in the business of producing, marketing, and selling cannabis through its wholly owned subsidiary, HEXO Operations Inc., which is a licensed cannabis producer under Canada's Cannabis Act. HEXO's shares trade on the NYSE under the ticker "HEXO".

52.     Defendant Sebastien St. Louis ("St. Louis") is HEXO's President, Chief Executive Officer, and a director and has been since August 2013. Defendant St. Louis co-founded the Company. St. Louis signed the Registration Statement (defined below) and Prospectus, as well as other SEC filings including Form 6Ks and 40Fs, and routinely made statements to investors during earnings calls.

53.     Defendant Ed Chaplin ("Chaplin") was HEXO's Chief Financial Officer at all relevant times until April 30, 2019. Chaplin signed the Registration Statement and Prospectus, as well as other SEC filings including Form 6Ks and 40Fs.

54.     Defendant Michael Monahan ("Monahan") was HEXO's Chief Financial Officer

from May 2019 until his resignation on October 4, 2019.  Monahan signed SEC filings including Form 6Ks and 40Fs.

55.     Defendant Steve Burwarsh ("Burwarsh") was HEXO's Vice President of Strategic Finance and later the Company's Chief Financial Officer from October 2019 through the end of the Class Period.  Burwarsh signed SEC filings including Form 6Ks and 40Fs.

56.     Defendants St. Louis, Chaplin, Monahan, and Burwarsh (collectively referred to as the "Exchange Act Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

57.     The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

58.     HEXO and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants".

**Securities Act Defendants**

59.     Defendant Nathalie Bourque ("Bourque") was, at all relevant times until February 6, 2020 (when she resigned), a HEXO director.  Bourque signed the Registration Statement and Prospectus.

60.     Defendant Vincent Chiara ("Chiara") was, at all relevant times, a HEXO director.

Chiara signed the Registration Statement and Prospectus.

61.     Defendant Jason Ewart ("Ewart") was, at all relevant times, a HEXO director. Ewart signed the Registration Statement and Prospectus.

62.     Defendant Adam Miron ("Miron") was, at all relevant times until July 18, 2019 (when he resigned), a HEXO director.  Miron co-founded the Company with Defendant St. Louis.  Miron signed the Registration Statement and Prospectus.

63.     Defendant Michael Munzar ("Munzar") was, at all relevant times, a HEXO director and chairman.  Munzar signed the Registration Statement and Prospectus.

64.     Defendants Chaplin, St. Louis, Chiara, Ewart, Miron, and Munzar are collectively referred to as the "Securities Act Individual Defendants".  Defendants Chaplin and St. Louis are both Securities Act Individual Defendants and Exchange Act Individual Defendants.

65.     Defendant CIBC World Markets Inc. ("CIBC") is a Canadian corporation organized under the laws of the Province of Ontario with principal executive offices located at 161 Bay Street, Brookfield Place, Toronto, Ontario, Canada. Defendant CIBC served as an underwriter to HEXO in connection with the Offering.  Defendant CIBC has offices in this District.

66.     Defendant BMO Nesbitt Burns Inc. ("BMO") is a Canadian corporation organized under the laws of the Province of Ontario with principal executive offices located at 1 First Canadian Place, 5th Floor, Toronto, Ontario, Canada. Defendant BMO served as an underwriter to HEXO in connection with the Offering.

67.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is a New York corporation with principal executive offices located at 85 Broad Street, New York, New York. Defendant Oppenheimer served as an underwriter to HEXO in connection with the Offering.  Defendant

Oppenheimer has offices in this District.

68.     Defendant AltaCorp Capital Inc. ("AltaCorp") is a Canadian corporation organized under the laws of the Province of Alberta with principal executive offices located at 585 8th Avenue SW, Suite 410, Calgary, Alberta, Canada. Defendant AltaCorp served as an underwriter to HEXO in connection with the Offering.

69.     Defendant Beacon Securities Limited ("Beacon") is a Canadian limited company with principal executive offices located at 66 Wellington Street W, Suite 4050, Toronto, Ontario, Canada. Defendant Beacon served as an underwriter to HEXO in connection with the Offering.

70.     Defendant Bryan, Garnier & Co Ltd ("Garnier & Co.") is a United Kingdom limited company organized under the laws of England and Wales with principal executive offices located at Beaufort House, 15 St. Botolph Street, London, United Kingdom.  Defendant Garnier & Co. served as an underwriter to HEXO in connection with the Offering.

71.     Defendant Cormark Securities Inc. ("Cormark") is a Canadian corporation organized under the laws of the Province of Ontario with principal executive offices located at 200 Bay Street, Royal Bank Plaza, South Tower, Suite 2800, Toronto, Ontario, Canada. Defendant Cormark served as an underwriter to HEXO in connection with the Offering.

72.     Defendant Eight Capital ("Eight Capital") is a Canadian entity organized under the laws of the Province of Ontario with principal executive offices located at 100 Adelaide Street West, Suite 2900, Toronto, Ontario, Canada. Defendant Eight Capital served as an underwriter to HEXO in connection with the Offering.

73.     Defendant GMP Securities L.P. ("GMP") is a Canadian limited partnership organized under the laws of the Province of Manitoba with principal executive offices located at 145 King Street West, Suite 300, Toronto, Ontario, Canada. Defendant GMP served as an

underwriter to HEXO in connection with the Offering.

74.     Defendant Laurentian Bank Securities Inc. ("Laurentian") is a Canadian corporation with principal executive offices located at 1360 René-Lévesque Boulevard West, Suite 620, Montreal, Quebec, Canada.  Defendant Laurentian served as an underwriter to HEXO in connection with the Offering.

75.     Defendant PI Financial Corp. ("PI Financial") is a Canadian corporation organized under the laws of the Province of British Columbia with principal executive offices located at 666 Burrard Street, Suite 1900, Vancouver, British Columbia, Canada. Defendant PI Financial served as an underwriter to HEXO in connection with the Offering.

76.     Defendant Roth Capital Partners, LLC ("Roth") is a California limited liability company with principal executive offices located at 888 San Clemente, Suite 400, Newport Beach, California. Defendant Roth served as an underwriter to HEXO in connection with the Offering.

77.     Defendants CIBC, BMO, Oppenheimer, AltaCorp, Beacon, Garnier & Co., Cormark, Eight Capital, GMP,  Laurentian,  PI Financial, and Roth are collectively referred to herein as the "Underwriter Defendants".

78.     HEXO, the Securities Act Individual Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants".

79.     HEXO, the Exchange Act Individual Defendants, the Securities Act Individual Defendants, and the Underwriter Defendants are collectively referred to as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### A.  Background

80.     Based in Gatineau, Quebec, HEXO is a consumer-packaged goods cannabis company that, together with its subsidiaries, produces, markets, and sells cannabis for both

recreational and medical use in Canada and abroad.

81.     HEXO was incorporated in 2013 under the name The Hydropothecary Corporation.  In 2018, with the growing market for legalized cannabis, the Company rebranded itself as HEXO Corp.  In its filings and public statements, the Company describes itself as "one of the largest licensed cannabis companies in Canada."

### B.  The Historic and Transformative SQDC Agreement

82.     On April 11, 2018, before the start of the Class Period, HEXO announced that it had signed the historic and transformative SQDC Agreement.[5]  Under the SQDC Agreement, HEXO and the SQDC agreed that HEXO would provide Quebec with approximately 200,000 kilograms of cannabis product for the first five-years following cannabis legalization, with a valuable option to renew for an additional year.  The SQDC was responsible for adult-use sales in Quebec, including the opening of retail stores and online sales.

83.     Defendant St. Louis represented that "[b]ecoming the preferred supplier to the Quebec market out of the gate post legalization is a source of great pride and a vote of confidence in our ability to scale operations to meet our supply commitment."  HEXO touted its special relationship with the SQDC as its preferred cannabis supplier, and emphasized that, as a result, it had a clear head start in Canada's multi-billion-dollar cannabis industry.  Defendant St. Louis also stated that "[t]his agreement marks an important step in the execution of our growth strategy, which is focused initially on the Quebec market by expanding our Gatineau facilities and hiring new employees, and then establishing our presence in other Canadian markets."

84.     Notably, HEXO emphasized to the market that the SQDC Agreement required the SQDC to purchase 20,000 kg of cannabis from the Company during the first year following

---

[5] The SQDC Agreement does not appear to be publicly available.

legalization; that volumes were expected to increase to 35,000 kg and 45,000 kg in years two and three, respectively; that volumes in the final two years of the contract would be based on the volumes in the preceding three years; and that the five-year contract included an option for an additional bonus year.  HEXO's net revenue was expected to grow substantially over the years as the volume of sales to the SQDC grew.

85.     Importantly, the SQDC Agreement included a "take or pay" feature that HEXO touted continuously to the market.  Under that provision, even if the rollout of recreational cannabis legalization in Quebec went slower than forecast, the SQDC was still obligated to either "take" the entire 20,000 kg amount or "pay" anyway – providing HEXO with insurance for substantial revenues in either scenario.

86.     In Canada, the Cannabis Act came into force on October 17, 2018, legalizing the sale of cannabis for adult recreational use.  Accordingly, the SQDC Agreement required the SQDC to purchase 20,000 kg of cannabis from HEXO by October 17, 2019 (*i.e.*, the first year of the contract) – **which, based on the pricing for cannabis at the time, was worth over an estimated $100 million in net revenues**.  As noted *supra*, the point of the "take or pay" feature was to guarantee HEXO a substantial revenue "floor" regardless of market demand.

87.     Market commentators realized the importance of the SQDC Agreement to HEXO.  For example, on October 29, 2018, a Seeking Alpha article by Jonathan Cooper entitled *Hexo: The Strongest Buy and the King of Quebec Cannabis* stated that "HEXO has an [a]mazing relationship with the province of Quebec – the biggest supply deal and…even manages distribution for Quebec's online cannabis store."  A later Marketwatch article on October 26, 2019 by Ciara Linnane noted that the SQDC Agreement "*was presented as one that would guarantee volumes for years*" (emphasis added).

88.     Some of HEXO's competitors also had contracts with the SQDC – but for far lower amounts and for shorter periods:  Aphria had a 12,000 kg contract over three years; Aurora Cannabis had a 5,000 kg contract for the first year of a three year agreement; Canopy Growth had a 12,000 kg contract per year for three years; MedReleaf had an 8,000 kg per year contract for three years; and Tilray had a 5,000 kg per year contract for three years.  These contracts stand in stark contrast to HEXO's five-year 200,000 kg contract, which was almost seven times larger than the next two SQDC cannabis contracts.

## C.  The Class Period Begins: HEXO Conducts the Offering and the Company's Shares Debut on the NYSE American Exchange

89.     HEXO has historically financed its working capital requirements primarily through equity and debt financings.  Indeed, HEXO stated that its ability to continue as a going concern was "dependent upon its ability to generate funds from profitable operations and raise additional financing in order to meet current and future obligations."  March 17, 2020 Form 6-K.

90.     On December 20, 2018, HEXO filed a Registration Statement on Form F-10 with the SEC (the "Registration Statement").  That Registration Statement registered C$800 million (US$600 million) worth of HEXO shares for trading on the Toronto Stock Exchange (TSX) and NYSE American exchange.  The Securities Act Individual Defendants signed the Registration Statement.

91.     After exclusively trading on the TSX, HEXO listed its shares on the NYSE American exchange on January 23, 2019.  HEXO shares subsequently became transferable from one exchange to the other.  On July 16, 2019, HEXO switched from the NYSE American exchange and became listed and began trading on the New York Stock Exchange.

92.     On January 25, 2019, HEXO conducted the Offering through the Prospectus (which was dated January 24, 2019).  HEXO offered for sale 7,700,000 HEXO shares at C$6.69

per share on the TSX and $5.15 on the NYSE American exchange.[6]   The Prospectus incorporated the Registration Statement and, as such, the signatories of the Registration Statement were deemed to have signed the Prospectus.

93.   In the Prospectus, HEXO highlighted the historic SQDC Agreement, including by stressing its guaranteed nature, "take or pay" feature, annual growing volumes, and tremendous value for years to come.   Indeed, HEXO touted the SQDC Agreement as transformative and stated that it "believes this agreement is the largest forward supply agreement in the history of the cannabis industry in Canada, based on year one volume."

**D. At the Time of the Offering, the SQDC Was Purchasing Minimal Product from HEXO, But the Guarantee of the "Take or Pay" Feature Comforted the Market**

94.   By the time of the January 25, 2019 Prospectus, HEXO had been delivering product (measured in dried gram and dried gram equivalents)[7] to the SQDC for over three months – or 25% of the first year of the SQDC Agreement.   Specifically, the Prospectus reported that in the last two weeks of 1Q2019 (October 17, 2018 through October 31, 2018), HEXO sold a total of 952 kg of adult-use product, 90% of which (857 kg) was to the SQDC.   Over the next three months (November 1, 2018 to January 31, 2019), HEXO sold a total of 2,537 kg of product, 84% of which (2,131 kg) was to the SQDC.

95.   Thus, in total, HEXO's sales to the SQDC at the time of the Offering were approximately 2,988 kg – or 840 kg per month.[8]   Based on these sales volumes, the SQDC was nowhere near on track to satisfy its 20,000 kg first-year purchase commitment under the SQDC

---

[6] With the Underwriters Defendants' over-allotment, the Offering was ultimately for 8.8 million HEXO shares.

[7] References to "product" are to gram and dried gram equivalents.

[8] 2,988 kg is reached by adding the product sold to the SQDC in the last two weeks of 1Q2019 (857 kg) and the product sold to the SQDC in 2Q2019 (2,131 kg).

Agreement.  Indeed, to satisfy this commitment, the SQDC would have had to more than double its purchasing rate – increasing it by ***approximately 140%*** – and purchase an additional 17,012 kg (20,000 minus 2,988) from HEXO in the next eight and a half months (at a rate of approximately 2,000 kg a month).

96.     The market, however, was not concerned by the low sales volumes to the SQDC at the time of the Offering.  This is because HEXO had repeatedly stressed to investors that the "take or pay" feature of the SQDC Agreement provided insurance to the Company that even if the SQDC did not "take" 20,000 kg of product in the end, HEXO was nevertheless still guaranteed payment – in other words, the contract provided HEXO with a win / win scenario.

97.     The singular importance of the SQDC Agreement and its key "take or pay" feature was repeatedly highlighted by securities analysts as being the primary value driver for HEXO securities during the Class Period.  For example, CIBC initiated coverage of HEXO on February 21, 2019 and highlighted the "guaranteed" volume and pricing that the SQDC Agreement provided to the Company, in relevant part, as follows:

> Hexo is the flagship supplier for the Quebec market, which creates an opportunity for $1 billion in sales over a five-year period. ***Volumes are guaranteed for three years, and pricing guaranteed for [] one***. (Emphasis added)

98.     Likewise, on April 4, 2019, analyst David M. Kideckel of Altacorp Capital initiated coverage of HEXO with a $10.50 price target.  In its report, Altacorp underscored the importance of the SQDC Agreement and the "take or pay" feature, in relevant part, as follows:

> ***HEXO is the preferred supplier to the province of Quebec and to date, is the only licensed producer with a 5-year agreement to supply the SQDC, with an option to extend for an additional year. This represents the largest supply agreement between a licenced producer and any provincial authority for the adult-use market.***
>
> ***Under the agreement, HEXO will supply 20,000kg of products in the first year and is expected to supply 35,000kg in the second year and 45,000kg in the third***. Volumes for the final two years of the agreement will be established at a later date based on the sales generated in the first three years. The Company estimates total volume supplied to be

more than 200,000kg over the five years. Aside from the province of Quebec, HEXO has also secured supply agreements with Ontario, British Columbia and Alberta. With the acquisition of Newstrike, HEXO now has access to distribution with the provinces of Manitoba, Nova Scotia, Prince Edward Island, Saskatchewan and New Brunswick. (Emphasis added).

### E.  HEXO Represents That the Newstrike Acquisition Will Help Drive FY2020 Net Revenues of C$400 Million and 4Q2020 Net Revenues of C$26 Million

99.     On March 13, 2019, HEXO announced that it was acquiring Newstrike for approximately C$263 million.  HEXO stated in a press release on that date that the Newstrike deal would significantly expand the Company's production capacity, which it needed to support the SQDC Agreement, and allow HEXO to reach C$400 million in net revenue for FY2020 (which ran from August 1, 2019 to July 31, 2020).

100.     The Newstrike acquisition appeared to dovetail nicely with HEXO's growth story, particularly given the increased volumes touted in the SQDC Agreement.  However, in reality, it was a complete disaster for the Company because, unbeknownst to investors, the SQDC Agreement was not as advertised, *inter alia*, because HEXO had no intention to enforce its key "take or pay" feature.  Accordingly, the market did not appreciate that if the SQDC failed to meet its volume commitments – which was a virtual certainty based on current purchase volumes and the slow roll out of cannabis retail stores – HEXO would be left holding the bag for this costly acquisition without any safety net.

101.     The SQDC had only opened 12 stores as of as of 2Q2019.  *See* Hexo 6-K filed with SEC on January 22, 2019, Exhibit 99.2 at 10 (graphic showing that province of Quebec (covered by SQDC) closed 2018 with 12 store locations in addition to website sales).  *See also* June 13, 2019 conference call at 7 (stating 13 stores opened as of 2Q2019 (November 1, 2018 through January 31, 2019).

102.     By December 2019, the SQDC had still only opened 24 stores – radically less

than the number needed to support the SQDC Agreement.  A December 16, 2019 article by Gary Bourgeault entitled "HEXO's Latest Earnings and Its Quebec Problem" described how profoundly behind schedule the SQDC store openings were in Quebec:

> In a recent note to clients, analyst Greg Mcleish of Mackie Research estimates the Quebec cannabis market to needs about **800 cannabis stores to meet demand. According to the SQDC website, it only has 24 retail outlets at this time**. **Another 20 are projected to be operational by March 2020, but that is far below the number needed to move HEXO's sales needle in Quebec**.

103.   Because the SQDC was not opening anywhere near the number of stores necessary to support the SQDC Agreement, the additional capacity represented by the Newstrike acquisition was unnecessary – a concern that would have weighed heavily on investors had they known that the SQDC Agreement was not actually guaranteeing HEXO revenue to support the deal regardless of product demand.

104.   Before acquiring Newstrike, HEXO performed due diligence on the company. Indeed, HEXO stated in an information form for FY2019 that it performed "substantial due diligence" on Newstrike.  Such due diligence included detailed analysis of Newstrike's licenses and contracts.

105.   One of the key features of the Newstrike deal was the acquisition of the company's Niagara Facility, which represented 90% of Newstrike's production capacity, and would represent 40% of HEXO's production capacity after the deal closed:

Our Newstrike campuses located in Brantford and Niagara Ontario contribute 14,000 sq. ft. and 455,000 sq. ft. (once fully retrofitted) respectively, across 17.6 acres of land.

### HEXO GROUP OF FACILITIES

| Facility | Type | Current Footprint (sq. ft.) | Estimated Capacity (kg) |
|---|---|---|---|
| Gatineau, QC | Greenhouse | 1,310,000 | 108,000 |
| Montreal, QC | Distribution | 58,000 | n/a |
| Belleville, ON | Procesing [sic] and R&D Facility | 579,000 | n/a |
| Brantford, ON | Indoor grow facility | 14,000 | 2,000 |
| Niagara, ON | Greehouse [sic] | 455,000[1] | 40,000 |
| **Total** | | **2,416,000** | **150,000** |

106.   On a March 14, 2019 conference call, Defendant St. Louis represented that HEXO was aware of certain licensing issues at a new section of the Niagara Facility. Specifically, Defendant St. Louis stated that the facility had "250,000 feet that are licensed operational" but that there was an "expected licensing delay" on a new part of the facility. Unbeknownst to investors, the purportedly "licensed operational" part of the Niagara Facility included Block B – which was not, in fact, licensed.

107.   On the same conference call, a BMO Capital analyst, Tamy Chen, asked about HEXO's sales pace and the health of the Company's inventory.[9]   Responding, Defendant St.

---

[9] At all relevant times, HEXO valued its cannabis inventory at "the lower of cost and net realizable value." March 13, 2019 MDN&A. The Company stated that it determined cost using the weighted average method. The weighted average cost method divides the cost of goods available for sale by the number of units available for sale. HEXO also stated that "[n]et realizable value is determined as the estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale." When cannabis demand fell, prices fell and, in turn, "net realizable value" fell. Because HEXO sold biological assets which have a certain shelf-life, the Company's accurate reporting of its inventory was particularly important.

Louis soothed her concerns and reiterated that the Newstrike acquisition would allow HEXO to meet its C$400 million FY2020 net revenue guidance.  Defendant St. Louis even went so far as to claim that the $400 million FY2020 net revenue guidance was "conservative" and necessary to "correct[]…overly conservative analyst estimates" during this conference call.

108.    On March 14, 2019, HEXO announced that it expected to double its 4Q2019 net revenues of C$13.4 million to C$26.8 million.

109.    After the positive March 13, 2019 and March 14, 2019 news about the Newstrike deal and FY2020 and 4Q2019 financial guidance, HEXO shares rose 13% from a March 13, 2019 closing price of $5.95 per share to close on March 14, 2019 at $6.10 per share.

**F.   HEXO's Chief Financial Officer Resigns**

110.    On April 30, 2019, Defendant Chaplin abruptly resigned as CFO.  This was to be the first of two abrupt and largely unexplained HEXO CFO resignations in less than six months.

111.    On May 01, 2019, HEXO announced the nomination of Defendant Burwash as interim Chief Financial Officer.

112.    On May 28, 2019, HEXO announced that Defendant Monahan – who had a substantial financial background – had become HEXO's CFO.

**G.   Analysts Continue To Echo the Critical Importance of the SQDC Agreement and Note Management's Confidence in HEXO's FY2020 $C400 Million Net Revenue Guidance**

113.    Analysts immediately took notice of HEXO management's "confident" announcement of its C$400 million FY2020 net revenue guidance, which supported the growth-story of the SQDC Agreement.

114.    On March 15, 2019, securities analysts Robert Fagan, Andrew Partheniou, and B. Eng, at GMP raised its HEXO price target to $10.50.  On the same date, an Oppenheimer securities analyst noted HEXO's FY2020 net revenue guidance of C$400 million, and Roth

Capital securities analyst Scott Fortune stated that "management is confident in its execution…to ramp up FY20 revenues guiding to a targeted $400 million."  An April 4, 2019 Altacorp report by analyst David M. Kideckel also further highlighted management's "confiden[ce]" in HEXO's C$400 million FY2020 net revenue figure – and connected such confidence with the certainty of future business provided by the SQDC Agreement:

> Solid distribution in Canada with substantial ramp-up in revenue for F2020:
>
> With the recent acquisition of Newstrike, HEXO will have established distribution agreements across 9 provinces. HEXO has also secured the single largest forward supply contract among the Canadian LPs with Quebec's Société québécoise du cannabis (SQDC). Management is confident and have committed to achieving over $400.0mm in net revenue by F2020. With some of the industry's leading margins to date, we expect HEXO to continue delivering superior financial results compared to their peers.

115.    More than four months after HEXO trumpeted the SQDC Agreement in the Offering (and three months after HEXO touted the agreement in March 2019), analysts continued to highlight its importance to the market.  A June 7, 2019 article entitled *Hexo Corp.: Potential Revenues Make it a Buy Opportunity*, which was by AlphaBeta Asset Management and published on Seeking Alpha, noted the significance of the "guarantee[d]" take-or-pay feature of the SQDC Agreement – which provided a substantial "floor" for HEXO revenues:

> HEXO Corp. is a cannabis company with a very interesting exclusive agreement with the SQDC….
>
> ***The most relevant agreement is the one with Quebec, an exclusive five-year supply contract with the Socièté quèbècoise du cannabis (SQDC) that is worth more than $1 billion in revenues. The SQDC guarantees to buy from HEXO up to 20,000 kg (+30% market share in the first year) of products in the first post-legalization year, then 35,000 Kg in the second year, and 45,000 Kg in the third year. The amounts for the fourth and fifth years are yet TBD, but could be around 50,000 kg depending on the market growth. This agreement is quite beneficial for HEXO since it places an interesting floor to its revenues***, but investors should focus on the fact that HEXO will store and distribute all orders generated by the SQDC online store, including products from other LPs with established supply agreements with the SQDC.

116.    Analyst John Chu at Desjardins also noted the take-or-pay provision and

tremendous future value of the SQDC Agreement on June 7, 2019:

> **Québec cannabis stores to open seven days a week now.** Previously, Québec stores (13 in total) were closed on Monday, Tuesday and Wednesday, and had shortened hours when open due to limited supply. It appears stores are now comfortable with the supply they have to open seven days a week with more regular operating hours. Québec also plans to open an additional six stores by early next year. HEXO should be a beneficiary of this given its favourable supply agreement with ***Québec (recall that the company leveraged its Québec roots into a five-year supply contract with the province that called for 20,000kg of product in year 1, 35,000kg in year 2 and 45,000kg in year 3; this is the single largest supply agreement any LP has signed with a province***).

### H. Despite Weak Demand, HEXO Reveals It Will Not Enforce the "Take or Pay" Feature in 3Q19, But Mitigates Market Concern Nonetheless

117.   HEXO held its 3Q19 earnings conference call with analysts on June 13, 2019. During that conference call, analyst Oliver Rowe from Scotiabank asked Defendant St. Louis whether, in light of the fact that the SQDC had only ordered 5,500 kg of its contractual 20,000 kg in the first six months of the SQDC Agreement's first year, there was a risk that the SQDC would not order the full 20,000 kg.

118.   Defendant St. Louis' response downplayed any such concerns.  Defendant St. Louis first casually disclosed that, despite weak demand, HEXO would not enforce the "take or pay" feature in the SQDC Agreement that quarter because the Company did not want to threaten its special relationship with the SQDC over a few million dollars.  This response was disingenuous at best as the only point of having a "take or pay" feature was to ensure revenues even if demand was weak.  Moreover, HEXO's special relationship with the SQDC was no different than it was when the Company first signed the critical agreement in April 2018 that included the "take or pay" feature.

119.   In the same breath, however, Defendant St. Louis soothed investor concern about HEXO's decision not to enforce the "take or pay" feature that quarter by proclaiming that the SQDC would still fulfill its 20,000 kg commitment by December 31, 2019 (rather than October

17, 2019) – only two months later – and that sales in other provinces would further help HEXO

hit its numbers.  Unbeknownst to investors, HEXO never had any intention to enforce the "take

or pay" feature in the SQDC Agreement, and Defendant St. Louis had no basis to claim that the

SQDC would still meet its 20,000 kg commitment by the end of the calendar year.

120.    After this June 13, 2019 disclosure, HEXO stock fell from a June 12, 2019

closing price of $6.45 per share to a June 13, 2019 closing price of $5.90, a drop of over 8%.

121.    But Defendant St. Louis' deceptive statements largely worked to mitigate investor

concern.  The stock would have dropped significantly further had Defendant St. Louis revealed

the full truth – that the SQDC Agreement was, in fact, not a "guaranteed" revenue-driver as

advertised because HEXO had no intention of ever enforcing its "take or pay" feature; that he

had no basis to claim the SQDC would still fulfill its year-one volume commitment (two months

late); and that he likewise had no basis to claim that HEXO was still on track to meet its C$400

million FY2020 and C$26.8 million 4Q2019 net revenue guidance.

122.    Some securities analysts were surprised by the news that HEXO would not

enforce the key "take or pay" feature of the SQDC Agreement in 3Q19.  For example, CIBC

analysts John Zamparo and Krishna Ruthnum later noted in October 24, 2019 that, in light of this

revelation, HEXO had misrepresented the nature of the SQDC Agreement to the market:

> *[The] most important reason "investors have in the past been bullish on HEXO stock" was "the company's Quebec purchase contract, which was touted as a take-or-pay offering in which volumes were guaranteed for three years*…. ***The Quebec contract was advertised as a take-or-pay arrangement with the province***, *with…guaranteed volumes for the first three years, with 20,000 kg in Year 1* and a total of 100,000 kg over three years…**the Quebec contract does not appear as attractive as initially advertised**.*

123.    Most analysts, however, took the bait.  For example, a June 13, 2019 report by

analysts Devin Schilling, Jason Zandberg, and Fayassir Haqna from PI Financial noted that

notwithstanding the revelation, HEXO "[m]gmt. guided that they remain on-track ramping up to

C$400M of net revenue in fiscal 2020 and that they expect Q4/19 revenue will double this current quarter." Similarly, on June 14, 2019, Altacorp analyst David Kideckel highlighted that "[m]anagement continues to remain confident in their ability to double revenue in the next quarter and achieve their F2020 revenue target of $400mm." Moreover, on June 25, 2019, analysts Rupesh Parikh and Erica Eilerat of Oppenheimer likewise underscored that despite the news, "[m]anagement reiterated Q4 and Maintains FY20 Revenue Guidance".

124.    On June 18, 2019, Seeking Alpha also published an article entitled *The Recent Drop in Share Price of HEXO is Not Fundamentally Justified* by AlphaBeta Asset Management. That article highlighted Defendant St. Louis' representation on the June 13, 2019 call that the SQDC would purchase the contractually-agreed upon amount of cannabis from HEXO (only with a slight delay of two months):

> [St. Louis]…defended the SQDC agreement, saying that they have a wonderful relationship with the Quebec distributor and that *the full 20 tons of products could be delayed about a maximum of two months (from October to December), but he is confident that the SQDC will purchase the original estimated $1 billion worth of products in the estimated five-year period*. (Emphasis added).

125.    The market, thus, accepted Defendant St. Louis' claim that, despite weak demand, HEXO would still earn revenues on the full 20,000 kg commitment. As such, news that HEXO would not enforce the "take or pay" feature for that quarter was not received in a worse light.

## I.    HEXO's Co-Founder Resigns

126.    On July 18, 2019, Defendant Miron suddenly resigned. Defendant Miron co-founded HEXO with Defendant St. Louis in 2013. HEXO provided no reason for Defendant Miron's abrupt departure.

## J.    HEXO's Second Post-Offering CFO Resigns

127.    On October 4, 2019 – just three weeks before HEXO filed its FY2019 financial statements – HEXO announced that Defendant Monahan had abruptly resigned, effective

immediately.   Again, HEXO was opaque about the reasons for Defendant Monahan's sudden departure.

128.    Analysts were disturbed by the sudden departure of an experienced CFO.   On October 4, 2019 and October 7, 2019, Bank of America analyst Christopher Carey double downgraded his "buy" recommendation to "underperform" and commented that "[p]ut simply: a departure that is so abrupt, from a person with CFO experience at other public companies, is concerning, and in our view will leave investors guessing 'what don't we know?' for some time."

129.    After disclosure of Monahan's resignation, HEXO's stock price fell $0.26 per share, or 6.4%, to close at $3.80 per share on October 7, 2019.

130.    This was HEXO's second CFO resignation in less than six months.

## K.  Three Days After Its Second CFO Resignation, HEXO Shocks the Market By Pulling Its FY2020 Net Revenue Guidance And Slashing 4Q2019 Net Revenue Guidance

131.    On October 10, 2019, despite months of bullishness and confidence, HEXO shocked the market by completely withdrawing its C$400 million net revenue figure for fiscal 2020.   The Company also preliminarily reported 4Q2019 net revenues of only C$15 million – 40% below the C$26 million the Company had repeatedly announced as guidance.

132.    It is very rare for companies to withdraw guidance; executives typically will revise guidance when warranted, but pulling guidance completely is highly unusual and suspect. *See, e.g.*, Joshua Lee, Andrew Van Buskirk, *Management Retraction of Previously-Issued Earnings Guidance* (Dec. 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3077262 at 22 (withdrawing financial guidance is "rare").

133.    Significantly, Defendant St. Louis claimed that HEXO was pulling its net revenue guidance "due to lower than expected product sell through,….[s]lower than expected store rollouts, a delay in government approval for cannabis derivative products and early signs of

pricing pressure." The market had been led to believe that none of this should have impacted the Company so severely because of the "take or pay" feature in the SQDC Agreement, and because HEXO confidently claimed that the SQDC was going to meet its year-one volume commitment anyway. The reality was that HEXO had to pull its lofty guidance because the SQDC Agreement was not "guaranteed" as advertised since HEXO had no intention of ever enforcing the "take or pay" feature, and because HEXO issued radically unrealistic FY2020 guidance in the face of weak demand and falling prices.

134. After HEXO withdrew its guidance, HEXO's stock plummeted 35% on October 10, 2019, from $3.66 per share to $2.85 per share.

135. Analysts and commentators were taken aback by HEXO's retraction of its much-touted FY2020 C$400 million net revenue guidance. On October 11, 2019, analyst Bill Kirk of MKM stated that "HEXO's preliminary results are…very disappointing and in contrast to the confidence expressed halfway through the period (last earnings call June 13)."

136. On October 17, 2019, Seeking Alpha published an article entitled *Hexo: Damage Goes Deeper Than the Numbers by Wealth Insights*. That article noted management's damaged credibility and the "horribl[e] miss" that HEXO had reported on October 10, 2019:

> ***The company revealed recently that it will horribly miss its revenue guidance from just the prior quarter, and the 2020 forecast of $400 million is now retracted. Management has become difficult to take at its word, which significantly increases risk in the stock***. We would like to see satisfactory earnings numbers before considering the name again. (emphasis added).

137. This October 17, 2019 article also took HEXO management, and particularly Defendant St. Louis, to task at length for his misleading statements about the FY2020 and Q42019 guidance:

> ***Management's Word Is Tarnished***

While the above news is tremendously disappointing at face value, ***our biggest issue with everything that has happened is how management has handled it***. Leadership for any business starts at the top, and management's recent actions have really changed our perspective towards HEXO's future prospects because there are numerous underlying problems now present.

***For example, HEXO CEO Sebastien St-Louis was touting as recently as just the previous earnings call [which was on June 13, 2019] that the company was performing well enough to maintain its forecast. St-Louis alluded to (numerous times) about how the company was on track to double third quarter revenues for Q4.***

The following quote was pulled from that earnings call in response to an analyst question:

"***We're going to reach the target***. I mean, I'd ask you and I continuously, I welcome a challenge as I think that the analyst community is doing a phenomenal job in our space. I welcome more transparency in our space. I welcome a broader discussion for investors. ***If you ever hear me say something and not deliver, you have to call me out. And in reverse, I would tell you today, nobody has ever called me out on anything because HEXO has always delivered what we said we would. We're delivering a double this quarter***."

In hindsight that response from CEO St-Louis is certainly foolish and raises a few questions that investors need to consider:

Was St-Louis being disingenuous when making such a bold statement?

Was the business on track at that point and simply deteriorated that much in such a short time frame?

***How did management not see this coming to the point that HEXO's results missed guidance so horribly***?

***It's a situation where the management team appears incompetent at best and dishonest at worst. Either way, it will be difficult to trust anything management guides to from this point until the company actually proves itself with sustained numbers….***

Given the horrible revenue miss and recent developments, it begins to look like management is potentially unqualified to take HEXO to the next level of its maturation…. Who is going to provide accountability at HEXO?...

[T]he degree of the miss and the manner in which information has been relayed to investors is a red flag to us. (emphasis added).

138.    On October 22, 2019, an article by Market Mind entitled *HEXO's Lowered Sales*

*Forecast Ahead of Earnings Release is Just One Reason for Concern* was published on Seeking

Alpha.  That article also excoriated HEXO for manipulating the Company's investors:

> It is well known that a higher market cap is beneficial to public companies, for several reasons, such as demonstrating higher market share, securing credit facilities, maintaining covenants on existing credit facilities (such as their C$65 Mm syndicated credit facility with Canadian Imperial Bank of Commerce and other Canadian banks). Other advantages of a higher market cap are ability to pursue deals with larger business partners and management bonuses. Low market valuation is good for nothing.  ***I believe there is a certain bias here on the part of the management, to keep the investor optimistic as long as is feasible, instead of being transparent, which is a more serious concern, in my opinion, than missing the ambitious sales goals***.

The October 22, 2019 article also noted that an "abrupt management change like this (Mr.

Monahan resigned in a hasty fashion, effective the day of announcement) is concerning."

## L.  Desperate For Cash, HEXO Begins A Spate of Offerings

139.    In what was to become a common occurrence in the next six months after

confidence in HEXO's business started to decline, on October 23, 2019, the cash-strapped

Company announced it had entered into a $70 million private placement debt offering with a

group of investors.  HEXO became more and more desperate for cash and repeatedly raised

funds with debt and equity offerings between October 2019 and April 2020.

## M. HEXO Fires 20% of its Workforce, Including Its Chief Manufacturing Officer and Chief Marketing Officer

140.    On October 24, 2019, HEXO announced that, as a result of slow cannabis retail

store rollouts, it was laying off 200 employees, including Arno Groll, who was HEXO's Chief

Manufacturing Officer, and Chief Marketing Officer Nick Davies.  As with the departure of

Defendant Miron, HEXO was strangely opaque about these departures, giving no reason for the

exit of these executives.

141.    The same day, CIBC published a scathing analyst report regarding HEXO.  The

report pointed out that "[c]ompressed margins, lower Quebec market share [and] management

credibility issues…serve as reasons to believe that both operations and sentiment could worsen from here." CIBC further noted that "[t]oday's announcement of job cuts indicates to us that the company has not been able to capture meaningful share outside its home province." As a result, CIBC downgraded HEXO to Underperformer from Neutral, with a new price target of $3 (previously $4).

142. On this news, HEXO's stock dropped approximately 6.3% on October 24, 2019, to close at $2.52 per share, from a $2.69 per share closing price on October 23, 2019.

**N. HEXO Reports Dismal Fiscal 2019 Results**

143. On October 29, 2019, HEXO filed its Annual Report revealing its financial results for the fourth quarter and 2019 fiscal year on Form 40-F. Among other things, HEXO reported abysmal Q42019 net revenues of only $15.9 million – 40% below HEXO's original guidance of C$24 to C$26 million. HEXO also announced that the Company was taking an impairment on C$16.9 million of inventory purchased in the prior period due to "price compression in the market". This inventory impairment demonstrated that HEXO's earlier reported inventory values were inflated because product demand was weak, HEXO did not enforce its vaunted "take or pay" feature with the SQDC, and cannabis has a limited shelf-life.

144. HEXO also announced that in the first year of the SQDC Agreement, the Company only sold the SQDC approximately *half* of the SQDC's contractually obligated 20,000 kg. The figures of sales to the SQDC were as follows:

\* 1Q2019 (August 1, 2018 to October 31, 2018) – sales of 857 kg (90% of total sales of 952 kg)

\* 2Q2019 (November 1, 2018 to January 31, 2019) – sales of 2,131 kg (84% of total sales of 2,537 kg)

\* 3Q2019 (February 1, 2019 to April 30, 2019) – sales of 2,510 kg (91% of total sales of 2,759 kg)

\*        4Q2019 (May 1, 2019 to July 31, 2019) – sales of 2,311 kg (58% of total sales of 4,009 kg)

\*        1Q2020 (August 1, 2019 through October 31, 2019) – sales of 3,080 kg (73% of total sales of 4,196 kg)[10]

145.    HEXO's Annual Report further revealed that the Company's procurement system

was fundamentally flawed and that serious problems plagued HEXO's inventory system:

Identified Material Weaknesses and Remediation Plan…

***Inventory Count***

The Company did not have effective controls around its year-end inventory count procedures, specifically with respect to its reconciliation of the ERP system due to the details outlined in the previous change to control environment section.

To further strengthen controls surrounding inventory, management has initiated or enhanced the following procedures:

Segregation of duties to initiate work, production orders and inventory adjustments will be strengthened;

Work, production orders and inventory adjustments will be reviewed and approved by the relevant supervisor;

Further enhancements to the ERP inventory processing, tracking and reporting functionality and supporting work procedures in order to ensure their sustainability;

Additional training, guidance and communications to internal teams and third-party inventory count providers regarding inventory management and count procedures.

Procurement

The Company did not maintain effective controls over the purchasing of capital goods and services, including the authorization of purchases, processing and payment of vendor invoices, the classification of various expenses and capitalization of assets….

Financial Reporting

The Company did not maintain effective process level and management review controls over manual financial reporting processes and the application of IFRS and accounting

---

[10] This data, which is for adult-use sales, is taken from HEXO's January 2, 2020 Annual Report and the Company's Form 6-K's for earlier FY2019 quarters.

measurements related to certain significant accounts and non-routine transactions.

146.    In addition, HEXO also misleadingly stated in the Annual Report that "[c]ultivation has been suspended at the Niagara Facility" – the premium facility the Company had acquired through the Newstrike deal – but did not disclose that the facility was (and had been) unnecessary due to HEXO's refusal to enforce the SQDC Agreement and subsequently skyrocketing inventories.  HEXO likewise failed to disclose that the Niagara Facility was also producing unlicensed product in its Block B.

147.    After the October 29, 2019 revelations, HEXO's stock dropped an additional 5% on October 29, 2019, to close at $2.25 per share, from a previous-day close of $2.32 per share.

148.    On October 30, 2019, analyst Matt Bottomely at Canaccord Genuity highlighted the significant inventory impairment HEXO had just announced:

> [A]fter performing an impairment testing on cannabis previously purchased by the company, an impairment charge of C$16.9M was also booked in the quarter due to market price compression.

149.    The Cannacord Genuity report also noted the SQDC's dismal volume purchases to date, in relevant part, as follows:

> The muted growth in the quarter was primarily a result of the SDQC requiring less than half of what it originally contracted with LPs in the first year of legalization due to the slow roll out of provincially run retail stores in Quebec….

150.    On October 30, 2019, analyst Jesse Pytlak of Cormark Securities Inc. joined numerous other analysts in noting "[m]anagement credibility concerns".

151.    Similarly, on November 6, 2019, an article published on Seeking Alpha entitled *HEXO: Emerging Signs by Price Compression in Canada* by Cornerstone Investments further questioned "management credibility":

> Management credibility took a hit after scrapping 2020 guidance and giving disappointing Q1 guidance that indicates no growth….

***HEXO's recent retraction of 2020 guidance hurt management credibility and it is imperative for the company to show stabilization in the coming quarters***. (Emphasis added).

152.    On October 31, 2019 – just two days later – HEXO filed an amended 2019 Annual Report to include a reclassification between operating activities and financing activities.

### O.  At Least *Four Months* After Learning That The Niagara Facility Was Producing Cannabis Without A License, HEXO Discloses This To Investors

153.    In a November 15, 2019 press release, HEXO disclosed that it had learned, at a minimum, ***on July 30, 2019*** that the Niagara Facility, which it had previously stated had suspended operations, was in fact "not adequately licensed":

> On July 30, 2019, shortly after the Newstrike Brand Ltd. acquisition closed, HEXO discovered that cannabis was being grown in Block B, which was not adequately licensed.

HEXO stated that "[w]hile we are disappointed with what we uncovered, we assume responsibility for any issues with UP products prior to the acquisition." HEXO also announced that "[t]oday, the facility is no longer operational" and that the Company was "winding down operations in Niagara", further demonstrating that the SQDC Agreement was not as advertised and that demand for HEXO's product was weak.

154.    After the November 15, 2019 negative news, HEXO's stock dropped 5% on November 15, 2019 to close at $1.79 per share, down from a previous-day close of $1.89 per share.

155.    On November 15, 2019, HEXO also restated its 2018 financial figures because the Company had misclassified cash and cash equivalents and short-term investments for the year ended July 31, 2018.

### P.  HEXO Announces Poor 1Q19 Financial Results – And Again Takes A Large Inventory Impairment

156.    On December 16, 2019, HEXO issued dismal 1Q2020 financial results, including

a net loss of C$62.4 million, adult-use sales of C$18.3 million, and another inventory impairment of C$25.5 million, demonstrating that the first impairment it took was completely insufficient. HEXO's 1Q2020 results also contained a reservation of opinion from the Company's auditor, MNP LLP, over errors relating to the Company's tax liability, which resulted from the Company not netting a tax loss generated in one subsidiary against a deferred tax liability generated by a different subsidiary.

157.    That same day, analyst Matt Bottomely at Canaccord noted HEXO's poor results and that, for the second straight quarter, HEXO was taking a large inventory impairment:

> HEXO released generally disappointing FQ1/20 financial results (ended Oct/2019) with revenues that came in at the bottom end of its guided range while continuing to book further inventory write-offs and restructuring charges in the period…..for the second consecutive quarter, the company recorded sizable inventory write-offs, totaling C$25.5M in the period (largely related to the accumulation of dried trim and milled product in excess of HEXO's existing demand for extraction purposes).

158.    Analysts Rupesh Parikh and Erica Eiler at Oppenheimer also noted the continued inventory issues in a report on December 16, 2019 entitled "Challenges Persist at HEXO with Significant Inventory Impairments".  That report provided:

> HEXO reported softer FQ1:20 results and highlighted inventory impairments of $25.5M. An adjusted EBITDA loss (excluding inventory impairments) of $24.8M fell short of a Street figure for a $21.3M loss. The inventory impairments included the following: $16.4M related to a surplus of cannabis trim, $4.4M of bulk purchased product, $3.4M of oil-based finished goods, and $1.2M of finished goods samples.

## Q. HEXO's Financial Disarray Continues As it Restates Its FY2019 Financial Statements and Announces That It Understated Its FY2019 Inventory Impairment

159.    On January 2, 2020, HEXO restated its financial statements for the fiscal year ended July 31, 2019, its corresponding amended management's discussion and analysis, and its interim condensed consolidated financial statements for the three-month period ended October 31, 2019 (1Q2020).  Specifically, HEXO restated to correct errors in the Company's reported deferred tax liability, net loss, and inventory impairment.  The inventory impairment resulted in a

$2.4 million reduction of the impairment loss on inventory for 1Q2020 because HEXO had to move this impairment back to FY2019, which ended on July 31, 2019.  HEXO admitted with this restatement that it should have taken this impairment during the earlier period because the inventory fell in value during that earlier period.  Thus, HEXO's refusal to enforce – and the Company never had any intention of enforcing – the SQDC Agreement continued to unfold as the market began to learn of the Company's substantially impaired inventories caused, in large part, by that decision.

160.    After this news, HEXO stock fell from a January 2, 2020 closing price of $1.67 per share to close on January 3, 2020 at $1.57 per share.

### R.  The Market Further Realizes that the Newstrike Acquisition Was A Bust, And Takes HEXO To Task for it

161.    On January 30, 2020, Seeking Alpha published a lengthy article entitled *Hexo: the Newstrike Mistake* by Jonathan Cooper.  That article noted the failure of HEXO's due diligence prior to the Newstrike acquisition and the fact that demand for HEXO's products did not actually support the acquisition (due largely to the illusory SQDC Agreement):

**Closing shop**: When Hexo acquired Newstrike, the latter had two cultivation facilities in Brantford and Niagara, ON. ***These "state-of-the-art" facilities included "premium indoor" cultivation space that would boost Hexo's cultivation capacity and provide them with diversified growing techniques for global sales, we were told***.

Five months after acquiring Newstrike Brands, Hexo shut down Newstrike's Niagara cultivation facility. ***This facility had made up nearly 90% of Newstrike's cultivation capacity***.  Hexo described this closure as "rightsizing" its operations by "winding down" operations. Hexo also slashed 200 jobs in the move, blaming market conditions. The same month, Hexo's Chief Financial Officer left the beleaguered cannabis grower and Hexo slashed its guidance.

***Apparently Hexo didn't need that added cultivation capacity after all.***

**Poor due diligence**: When Hexo acquired Newstrike, the latter was growing and selling cannabis from its two cultivation facilities. ***As with any acquisition, Hexo's lawyers and investment bankers did due diligence on the deal to ensure than Hexo was getting what it bargained for and that Newstrike's facilities were fully licensed***, operating, and

as successful as promised.

*Their due diligence failed*.

*In November, Hexo admitted that Newstrike Brands had been growing cannabis without proper licensing. Hexo did not discover this until after they purchased Newstrike*. It turned out that Newstrike had been growing cannabis in a region of their Niagara facility called Block B. But Block B had never been certified by Health Canada - the facility was not properly covered under Newstrike's licenses.

*This is a failure of Hexo's due diligence processes - in a heavily-regulated industry like cannabis, it's vital that companies be able to adequately comply with those regulations….*

162.    In addition to HEXO's fundamentally flawed due diligence, the Newstrike acquisition was never supported because the SQDC Agreement was not "guaranteed" as advertised and because HEXO had no intention of enforcing its "take or pay" feature.

### S.  HEXO Scrambles For Cash With Four Offerings In Five Months

163.    On December 5, 2019, HEXO completed a private placement of unsecured convertible debentures for aggregate gross proceeds of $70.0 million.  The Company stated that it needed the money for working capital and general corporate purposes.

164.    On December 31, 2019, the Company completed a registered direct offering of 14.9 million common shares at $1.67 per share and 7.45 million warrants exercisable for five years at $2.45 per share.  HEXO again stated that it needed the money for working capital and general corporate purposes.

165.    On January 22, 2020, the Company completed another offering with certain U.S. institutional investors of 11.9 million shares at $1.67 per share and 5.98 million warrants exercisable at $2.45 per share for five years for aggregate gross proceeds of US$ 20.0 million.

166.    HEXO stated in a January 22, 2020 prospectus supplement that it intended to use "at least US$3 million of the net proceeds from the [January 2020 offering] to fund CBD derived from hemp initiatives aimed at potential business expansion into the United States" – showing

that HEXO's trumpeted Canadian business was failing.

167.    On April 13, 2020, HEXO closed on another offering for total gross proceeds to the Company of approximately C$46 million. The Company sold 59,800,000 units of the Company at a price of C$0.77 per unit under the offering. Each unit was comprised of one common share of the Company and one common share purchase warrant of the Company. HEXO again stated it needed this money for working capital and general corporate purposes.

168.    On May 21, 2020, HEXO closed yet another offering.  This offering was of 55.6 million units of the Company at a price of C$0.90 per unit.  HEXO again stated that it needed this money for working capital and general corporate purposes.

**T.  HEXO's Auditor Abruptly Resigns**

169.    On January 20, 2020, HEXO held its annual shareholders meeting.  At that meeting, the Company's shareholders voted to retain MNP LLP as the company's external audit services provider.  MNP LLP had been doing business with HEXO for more than two years.

170.    On January 31, 2020 – just eleven days later – in the middle of a restatement and continued financial chaos at HEXO, MNP suddenly resigned.

171.    HEXO    subsequently    changed    auditors    from    MNP    LLP    to PricewaterhouseCoopers LLP.

172.    A February 10, 2020 Motley Fool article noted that MNP's resignation was suspicious:

> [A]udit firms don't just resign and give up on lucrative business accounts, especially given the fact that MNP had just been given another year as service provider in a recent shareholder vote last month.

**U.  Defendant Director Bourque Suddenly Resigns From The HEXO Board**

173.    On February 6, 2020, Nathalie Bourque suddenly resigned as a director of the Company.  Defendant Bourque had been a HEXO director for almost two and a half years.  On

the next day, February 7, 2020, market analyst Motley Fool noted that Bourque's resignation was "effective immediately" and that HEXO once again "did not give a reason or reasons for Bourque's move."

### V.  The Market Learns More As HEXO Delays Filing Its 2Q2020 Interim Financial Statements, Announces Another Huge Inventory Impairment, And Admits That the Second and Third Year SQDC Agreement Expectations Were Unlikely

174.    On March 17, 2020, HEXO announced that (i) the Company was delaying filing its 2Q2020 interim financial statements; (ii) the Ontario Securities Commission was reviewing the Company's filings; (iii) the Company was taking a third gargantuan inventory impairment of up to $280 million; (iv) the Company was selling the Niagara Facility – a material part of the vaunted Newstrike deal of ten months prior; and (v) even with all the new cash from the Company's frantic equity and debt offerings, there were questions as to whether HEXO could continue as a going concern.

175.    Thus, the market learned even more about the fallout of the failed SQDC Agreement and the resulting low demand for HEXO's product and its skyrocketing inventories.

176.    After this news, HEXO's stock plummeted an additional 30% from a March 16, 2020 closing price of $.77 per share to close on March 17, 2020 at $.45 per share.

177.    On March 23, 2020, the Company filed a Form 6-K that stated that HEXO now did not believe the expected second and year SQDC figures would pan out.  The Company also noted that the figures for those years were – unlike the 20,000 kg figure for the first year – not legally binding:

> [W]e no longer expect to achieve the previously anticipated 35 tonnes in the second year of legalization under our contract with the SQDC, and if these conditions continue, we expect we will not likely achieve the previously anticipated 45 tonnes in the third year of legalization under our contract with the SQDC either. As previously disclosed by the Company, both of these amounts are non-binding targets and there are no requirements for the SQDC to purchase these amounts.

**W. The Full Truth Is Finally Revealed**

178.    On March 30, 2020, HEXO announced a net loss of C$298.2 million in its fiscal second quarter as of January 31, 2020 – exponentially wider than the loss of C$4.3 million posted in the year-earlier period.  HEXO's C$298.2 million net loss included a C$138.3 million impairment loss relating to its Niagara Facility (which was now up for sale) and on intangible assets acquired from Newstrike, and C$111.9 million relating to a goodwill impairment charge.

179.    In its second quarter report, HEXO also finally came clean to the market about the SQDC Agreement – specifically, that the agreement was far from the guaranteed revenue driver that the Company had long trumpeted.

180.    According to HEXO's Form 6-K, "[b]y amendment effective on January 17, 2020, the Company contractually relieved the SQDC of the 1st year obligation to purchase the full 20 tons of the outstanding commitment."

181.    In other words, HEXO finally admitted that the "take or pay" feature in the SQDC Agreement – which it touted repeatedly – was (and always was) meaningless, and that the SQDC would not meet its purportedly "guaranteed" first-year purchase commitment to HEXO.

182.    With this disclosure, the market learned the full extent of the truth about HEXO.

183.    After these adverse disclosures, HEXO stock fell over 35% on March 30, 2020 to close at $.79 per share, after closing on March 27, 2020 at $1.09 per share.

**MATERIAL MISSTATEMENTS AND OMISSIONS UNDER THE SECURITIES ACT**

**Misstatements and Omissions in the January 25, 2019 Prospectus**

184.    On January 25, 2019, HEXO issued the Prospectus.  The Prospectus was a supplement to HEXO's amended and restated short form base shelf prospectus dated December 14, 2018.  The Prospectus stated that "[t]he Company has applied to the TSX and NYSE American to list the Offered Shares on the TSX and the NYSE American."  The Prospectus also

stated that "[o]n January 24, 2019, the closing price of the Common Shares on the TSX was $6.69 and the closing price of the Common Shares on the NYSE American was U.S. $5.15." The Prospectus incorporated the Registration Statement, which was signed by the Securities Act Individual Defendants.  The Offering was underwritten by the Underwriter Defendants.

185.    The Prospectus emphasized the singular importance of the SQDC Agreement to HEXO's future, as well as the key "take or pay" feature of the SQDC Agreement:

> In Québec, where HEXO was the first licensed producer and is currently the only publicly listed cannabis licensed producer headquartered in the province, *the Company has entered into a supply agreement with the SQDC to be the preferred supplier of cannabis products for the Québec market for the first five years post-legalization, with an option to extend the term for an additional year*. The supply arrangement covers the full range of the Company's products and brands. *Under the agreement, the Company will supply 20,000 kg of products in the first year of the agreement, which is subject to a take-or-pay feature for that year. The Company estimates that this represents an approximate 35% market share of the province's adult-use sales in the first year of legalization based on the volumes disclosed by other publicly traded cannabis companies who have also entered into SQDC supply agreements. The Company expects to supply 35,000 kg in the second year of the agreement and 45,000 kg in the third yea*r. *The Company estimates that the total amount expected to be supplied in the first three years of the agreement represents an approximate 30% market share of the province's adult-use sales based on the volumes disclosed by other publicly traded cannabis companies who have also entered into SQDC supply agreements*. The volumes for the final two years of the Company's agreement with the SQDC will be established at a later date based on the sales generated in the first three years. The Company estimates that the total volume of cannabis to be supplied over the five-year term of the agreement could exceed 200,000 kg which, based on the average sale prices assumed by the Company for its products, would represent *approximately $1 billion in estimated potential revenue to the Company. The Company believes this agreement is the largest forward supply agreement in the history of the cannabis industry in Canada, based on year one volume*.

186.    The above statement is actionable under Section 11 because it misstated or omitted material facts, including that:

> (i) The "take-or-pay" feature in the SQDC Agreement had no effect because of the special relationship HEXO had with the SQDC since before the Offering, and thus provided HEXO with no guaranteed revenue to weather weak demand. *See* ¶¶ 82-88.

> (ii) HEXO's purportedly guaranteed year-one sales volume of 20,000 kg to the

SQDC was, in fact, not guaranteed.

(iii) HEXO was not even close to being on track to sell the SQDC 20,000 kg of product.  At the time of the Offering, three and a half months of the first year of the SQDC Agreement (30%) had elapsed and the SQDC had only bought approximately 2,988 kg (less than 15%) of its 20,000 kg commitment.  Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 140%** to meet its 20,000 kg commitment.  *See* ¶ 95.

(iv) The SQDC could not increase its orders to meet its first-year purchase commitment.  In fact, the SQDC had opened substantially fewer stores than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand.  *See* ¶¶ 101-102.

(v) It failed to warn investors of the highly material risk that HEXO would not enforce the first-year 20,000 kg SQDC purchase commitment or exercise the "take or pay" feature in the SQDC Agreement.

187.    HEXO's risk language in the Prospectus concerning the SQDC Agreement was also materially misleading when made.  In the Prospectus, the Company made a point of contrasting the "take or pay" feature of the SQDC Agreement with HEXO's other agreements – the latter of which were not guaranteed by such a provision:

> ***Other than the agreement with the SQDC, pursuant to which the SQDC has agreed to purchase 20,000 kg of HEXO's products for the first year of the agreement, the agreements with the SQDC, the OCRC and the BCLDB do not contain purchase commitments or otherwise obligate the purchaser to buy a minimum or fixed volume of products from HEXO***. The amount of cannabis that the SQDC, the OCRC and the BCLDB may purchase under HEXO's agreements with them may therefore vary from what HEXO expects or has planned for. As a result, HEXO's revenues could fluctuate materially in the future and could be materially and disproportionately impacted by the purchasing decisions of the SQDC, the OCRC and the BCLDB…. (Emphasis added).

188.    This statement was materially false and misleading because:

(i)    The "take-or-pay" feature in the SQDC Agreement had no effect because of the special relationship HEXO had with the SQDC since before the Offering, and thus provided HEXO with no guaranteed revenue to weather weak demand. *See* ¶¶ 82-88.

(ii)    HEXO's purportedly guaranteed year-one sales volume of 20,000 kg to the SQDC was, in fact, not guaranteed.

(iii)    It failed to warn investors of the highly material risk that HEXO would not enforce the first-year 20,000 kg SQDC purchase commitment or exercise the "take or pay" feature in the SQDC Agreement.

**Regulation S-K**

189.    This paragraph pertains only to the alleged Securities Act violations and, thus, does not sound in fraud.  Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, required, in the "Risk Factors" section of the Registration Statement and Prospectus, a discussion of the most significant factors that made the Offering risky or speculative and that each risk factor adequately describe the risk.  Despite Item 105's requirements, the Prospectus failed to disclose that the SQDC was not ordering anywhere near enough product to meet its 20,000 kg commitment; and that HEXO would not execute the take-or-pay provision in the event of a shortfall of demand from the SQDC because the Company would not jeopardize its relationship with the SQDC.  Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, HEXO violated Item 105.

**DEFENDANTS' MATERIALLY FALSE AND
MISLEADING STATEMENTS UNDER THE EXCHANGE ACT**

**A. March 2019 Misstatements and Omissions of Material Fact**

190.    On March 13, 2019, HEXO issued a press release announcing the Newstrike Acquisition, which was intended to increase the Company's production capacity to support product demand based largely on the SQDC Agreement.  Relatedly, HEXO also announced that the Newstrike Acquisition would help the Company achieve *over* C$400 million in net revenue in FY2020:

>*Over $400 million of pro forma net annual revenue ending July 2020 expected by HEXO following [Newstrike] acquisition*
>
>GATINEAU, Quebec and TORONTO, March 13, 2019 (GLOBE NEWSWIRE) --

HEXO Corp ("HEXO") (TSX: HEXO; NYSE-A: HEXO) and Newstrike Brands Ltd. ("Newstrike") (TSX-V: HIP) are pleased to announce that they have entered into a definitive arrangement agreement (the "Arrangement Agreement") under which HEXO will acquire, by way of a plan of arrangement under the Business Corporations Act (Ontario), all of Newstrike's issued and outstanding common shares in an all-share transaction valued at approximately $263 million (the "Transaction")….

Transaction Highlights

Capacity boost with state-of-the-art cultivation infrastructure: The Transaction gives HEXO the capacity to produce approximately 150,000 kg of high-quality cannabis annually. The Transaction also provides HEXO access to four cutting-edge production campuses totalling close to 1.8 million sq. ft. of near-term cultivation space and diversified growing and production techniques….

***Premium indoor facility: Newstrike's licensed indoor facility provide HEXO with access to diversified growing techniques and positions HEXO for flexibility for international exports as global cannabis markets continue to open***.

Accretive synergies: The combined entity is estimated to realize annual synergies of $10 million, allowing HEXO to operate more efficiently with a commitment to continued excellence.

"We're thrilled to welcome the Newstrike team into the HEXO family.  Jay Wilgar (CEO of Newstrike) and his team have built incredible relationships, including teaming up with The Tragically Hip, and they share HEXO's vision of bringing exceptional branded cannabis experiences to adults everywhere," said Sebastien St-Louis, CEO and co-founder of HEXO Corp "With Newstrike, we're adding talented employees and infrastructure to take HEXO to the next level on our journey to become one of the largest cannabis companies in the world. ***We're extremely proud of our record of execution, and today are committing to achieving over $400 million in net revenue in 2020***."

"This is the most compelling combination we see in the Canadian cannabis sector.  Our strength in Ontario and English Canada clearly complements HEXO's strong position in Quebec and creates an industry leader.  The combination will deliver meaningful synergies, a stronger financial position with increased flexibility, ***and will position the combined company to meet growing consumer demand on a national basis***. I believe this transaction is beneficial to our shareholders, customers, and employees. We look forward to working closely with the leadership team to complete this transaction," added Jay Wilgar, CEO of Newstrike. (Emphasis added).

191.    This press release was issued on Form 6-K and signed by Defendant Chaplin.

192.    The statements above concerning the Newstrike Acquisition, HEXO's C$400 million FY2020 net revenue guidance, and consumer demand were materially false and

misleading when made because:

(i)    The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii)    The "take-or-pay" feature in the SQDC Agreement had no effect because of the special relationship that HEXO had with the SQDC since before the Offering, and thus provided HEXO with no guaranteed revenue for weak product demand. In fact, HEXO never intended to enforce the feature. As Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before the Offering. *See* ¶¶ 82-88, 231.

(iii)    HEXO's purportedly guaranteed year-one sales volume of 20,000 kg to the SQDC was, in fact, not guaranteed. Moreover, HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis. The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019. At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month. Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which HEXO knew would not happen. *See* ¶¶ 94-95, 144.[11]

(iv)    The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020). HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support even year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand. *See* ¶¶ 101-102.

(v)    Defendant St. Louis admitted on March 13, 2019 that HEXO was unable

---

[11] The 4,200 kg figure is reached by adding 1,255 (the mid-point of the 2,510 kg HEXO sold in the 3Q19 (between February 1, 2019 and April 30, 2019) since these statements were made on March 13, 2019) to the amounts HEXO sold earlier in the first year of the SQDC contract (857 kg for the last two weeks of 1Q19 and 2,131 kg for 2Q19).

to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

(vi)    HEXO had no basis to claim there was "growing consumer demand" when there were not enough SQDC stores to fill such demand.  *See* ¶¶ 101-102.

193.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance.  Nor did it have a need to increase production capacity via the Newstrike Acquisition.

194.    The statement about HEXO's "licensed indoor [Niagara] facility" was also materially false and misleading when made because part of the Niagara Facility was not properly licensed by Health Canada – despite the fact that HEXO had touted the "substantial due diligence" it performed prior to the acquisition.  *See* ¶ 258.

195.    HEXO's Management's Discussion and Analysis ("MDN&A") attached to the March 13, 2019 Form 6-K continued to trumpet the SQDC Agreement and its "take or pay" feature, in relevant part, as follows:

Global Cannabis Company with Top Two Market Share in Canada

After establishing a dominant presence within our home market of Quebec, we look to expand nationally on a larger scale. Our objective is to execute on our supply agreements with the Ontario Cannabis Store ("OCS") and the British Columbia Liquor Distribution Branch ("BCLDB"), *as well as on our long-term supply agreement with the Société québécoise du cannabis ("SQDC"),* and to successfully manage our distribution centre responsible for all SQDC online sale–based cannabis distribution…

*In Quebec alone, we will supply 20,000 kg in the first year of legalized adult-use cannabis* and up to approximately 200,000 kg over the first five years of legalized adult-use cannabis….

SQDC SUPPLY AGREEMENT

*The strategic value of our SQDC relationship cannot be understated [sic]*. We hold the single largest forward contract in the history of the emerging cannabis industry with the SQDC and are the preferred supplier for cannabis products for the Quebec market for the first five years following legalization. *We will supply the SQDC with 20,000 kg of products in the first year, and we expect to supply 35,000 kg and 45,000 kg in years two and three, respectively*. The volumes for the final two years of the agreement will

be established at a later date based on the sales generated in the first three years. However, based on an expected market growth rate of 10%, we anticipate supplying 49,500 kg and 54,450 kg in years four and five, respectively. The Company estimates the total volume to be supplied over the five-year term of the agreement to be in excess of 200,000 kg. ***Based on the current publicly disclosed agreements signed between the SQDC and seven other licensed producers, we have obtained the highest year one volume, representing approximately 30+% market share within Quebec, and we are aiming to remain the largest supplier in subsequent years***….

We expect to derive a significant portion of our future revenues from the recently legalized adult-use cannabis industry and market in Canada, including through our agreements with the SQDC in Québec, the OCRC in Ontario and the BCLDB in British Columbia. ***Other than the agreement with the SQDC, pursuant to which the SQDC has agreed to purchase 20,000 kg of HEXO's products for the first year of the agreement, the agreements with the SQDC, the OCRC and the BCLDB do not contain purchase commitments or otherwise obligate the purchaser to buy a minimum or fixed volume of products from HEXO.***[12]

196.    The statements concerning the SQDC Agreement, including that HEXO "will supply" the SQDC with guaranteed volume of 20,000 kg in its first year, were materially false and misleading when made because:

(i)      The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii)     The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(iii)    HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019. At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month.  Thus, the SQDC would have had to increase its orders for the

---

[12] This Form 6-K used the word "understated" but it seems HEXO intended to use the word "overstated".  HEXO repeatedly made the same error in other SEC filings.  *See*, *e.g.*, ¶ 221.

remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which HEXO knew would not happen.  *See* ¶¶ 94-95, 144.

(iv)   The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020).   HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand.  *See* ¶¶ 101-102.

(v)   Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

(vi)   It failed to warn investors of the highly material risk that HEXO would not enforce the first-year 20,000 kg SQDC purchase commitment or exercise the "take or pay" feature in the SQDC Agreement.

197.   The March 13, 2019 Form 6-K also included financial results for 2Q2019 (the period from November 1, 2018 through January 31, 2019).  That filing reported total inventory as of January 31, 2019 of $21,112,000.  This inventory was purportedly needed to support the guaranteed volumes of the SQDC Agreement.

198.   The inventory figure of $21,112,000 was materially false and misleading when made because (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's "take or pay" feature (¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or to write off stale product that no longer had value (¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

### B.  Misleading Statements During March 14, 2019 Earnings Call

199.    Defendant St. Louis made many misrepresentations and omissions of material fact during HEXO's March 14, 2019 2Q19 earnings call.

200.    First, securities analysts expressed some concern that HEXO would have to ramp-up significantly in Q419 to meet the 20,000 kg first year commitment in the SQDC Agreement. But in the March 14, 2019 call, Defendant St. Louis doubled down and claimed that he was "absolutely confident" in HEXO's ability to ramp-up in Q419:

> Robert Fagan - GMP Securities L.P., Research Division - Equity Research Analyst of Healthcare
>
> Sebastien, I was – just want to focus on your guidance for the next quarter being somewhat flat in terms of revenues. If we kind of look at that outlook and assume you double sales in the Q4, it'd still require a pretty significant ramp-up in volumes in kind of like Q1 2020, to hit your 20 tons supply commitment to Québec. How confident are you feeling about that? And is there any risk for that?
>
> Sebastien G. St-Louis - HEXO Corp. - Co-Founder, President, CEO & Director
>
> ***I'm absolutely confident about that***, Rob, but look at historically what we've done in terms of ramp-up. So if you look at the multiples we put forth on previous sales, I think there's always been a doubt for HEXO's ability to ramp up, and we've executed every single time. ***So I'm telling everybody now we will execute again.*** Are there risks? Yes. So there is some licensing risk around our Belleville facility. So that Belleville facility and the infrastructure and the packing is critical towards getting this done, but we've given ourselves adequate buffer, the license application is already in. We're already in conversation with Health Canada, and we have, of course, phenomenal relationship. So we think that's adequately mitigated.

201.    Defendant St. Louis' statement during the March 14, 2019 call that he was "absolutely confident" that HEXO would "hit [HEXO's] 20 tons supply commitment" under the SQDC Agreement was materially false and misleading because:

(i)    The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶

82-88, 231.

(ii)   HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis. The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019. At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month. Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which HEXO knew would not happen. *See* ¶¶ 94-95, 144.

(iii)   HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 201) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand. *See* ¶¶ 201-201.

(iv)   Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement

(v)   It failed to warn investors of the highly material risk that HEXO would not enforce the first-year 20,000 kg SQDC purchase commitment or exercise the "take or pay" feature in the SQDC Agreement.

202.   Analysts were also concerned over the size of HEXO's growing inventory. On the March 14, 2019 call, Defendant St. Louis assuaged analyst Tamy Chen's concerns over HEXO's inventory – and again reiterated HEXO's $C400 million net revenue guidance:

**Tamy Chen** - BMO Capital Markets Equity Research – Analyst

And my next question is just looking at yesterday, there was some Health Canada data that came out about industry production, inventory and sales data. And there seems to be this continued disconnect in terms of – *inventory seems to be piling up, but it's not flowing through enough down to the sales channel*. And just wondering, if you have any insights and what HEXO's experience has been? I mean, what's causing this? Is it production issues? Is it supply chain issues? And as a result, can you just comment on how we should think about HEXO's pace of sales over the rest of this year in this context?

**Sebastien G. St-Louis** - HEXO Corp. - Co-Founder, President, CEO & Director

Yes. And when I think about pace of sales, I've mentioned that Q3 would be relatively flat and that's much due to not only the growing out of B9, but also all the processing equipment required. I think as a general rule all the LPs, including HEXO, generally underestimated the amount of packaging, infrastructure and logistics and employees and space that it would take to actually do fulfillment. It's one thing to grow this product, it's one thing to bag it in giant bags. But by the time you think about putting in an individual multiline products, now that's quite complex. And this is why HEXO is very bullish and why we think our Belleville facility is transformational. *A 2 million square-foot facility will give us enough space to fulfill that $400 million net sales next year and beyond. And so that's all baked in to that forecast that we're giving you*….

203.    Defendant St. Louis' statements about HEXO's inventory and $400 million net revenue forecast were materially false and misleading when made because:

  (i)   The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

  (ii)  The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature. Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019. *See* ¶¶ 82-88, 231.

  (iii) HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis. The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019. At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month. Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which HEXO knew would not happen. *See* ¶¶ 94-95, 144.

  (iv)  The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020). HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 201) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand. *See* ¶¶ 201-202.

(v) Defendant St. Louis' statement that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019, did not disclose the real issue, which was the lack of demand and HEXO's refusal to enforce the take-or-pay feature.

204.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance. Nor did it have a need to increase production capacity via the Newstrike Acquisition.

205.    During the March 14, 2019 call, an analyst also asked HEXO senior management for an update on the Newstrike acquisition, including production in Newstrike's Niagara Facility. Defendant St. Louis discussed licensing at the Niagara Facility – and emphasized that HEXO's "regulatory team" had licensing for the facility under control:

> **Question - Tamy Chen:** Just first question on Newstrike, are you able to give us an update in terms of where the company is with respect to the ramp of their greenhouse in Niagara, where are they currently at? Any color there would be helpful.
>
> **Answer - Sebastien G. St-Louis:** Yes. So of the total 450,000 square feet that we're adding, *there is 250,000 feet that are licensed operational,* and we're looking forward to bringing in the HEXO team in there to ramp up the yields. We believe that coupled with the great infrastructure Newstrike has put in place, putting in HEXO's management and production processes will greatly increase yields there.
>
> **Question - Tamy Chen:** And the other 200,000 square feet, that's still under construction?
>
> **Answer - Sebastien G. St-Louis:** That's correct. So well underway, the walls are all up, the glass is on, but there will be a licensing – there is an expected licensing delay on that. But of course, we're putting our regulatory team, which as we've proven time and time again, one of the best in the business, so we don't anticipate any major issues.

206.    These statements were materially false and misleading when made because Defendant St. Louis knew or recklessly disregarded that, particularly in light of HEXO's purportedly "substantial" due diligence before the Newstrike Acquisition (i) part of the Niagara Facility was not "licensed operational" – it was, as Defendant St. Louis later admitted (*see* ¶¶153, 258) – operating without a license; (ii) Defendant St. Louis made it sound like licensing issues only pertained to a new segment in the Niagara Facility; and/or that (iii) HEXO's

regulatory team and due diligence performance was woefully inadequate.

207.    Analysts also asked about HEXO's inventory and sales on the March 14, 2019 call.  In response to an analyst's question about the Company's production of "twice as much cannabis as was [sold] in the quarter" – after conceding that sales for Q319 would be "flat" and that HEXO was having packaging issues – Defendant St. Louis again allayed concerns over increased inventory and definitively represented that HEXO had strong current demand that would enable the Company to reach its C$400 million net revenue guidance:

**Steven Jason Schneiderman - Cowen and Company, LLC, Research Division - Research Associate**

Just 1 question on Q3 being relatively flattish. ***Is that more of a factor of what you're seeing in terms of market demand or is that more of a factor of current production limitations?*** And just also in the face of that, you produced twice as much cannabis as was [sold] in the quarter, which seemed that there should be enough inventory for a little bit more of a meaningful ramp-up in the quarter? So just want to get your thoughts there.

**Sebastien St. Louis**:

***Yes, it's entirely related to supply and packaging infrastructure***. So I've alluded to this earlier in one of the questions. But effectively, growing cannabis is one thing and producing it and putting it on the inventory as bulk packaged inventory, but then actually packaging it for the consumer is an entirely different beast. And we're ramping all – we're ramping up all that production infrastructure to rapidly accelerate. So that's really what's happening, although the product coming off the line from our B9 facility is – I mean, the harvests are starting soon. Once it's come off the line, you have all the testing protocols, you have all the cleaning protocols that need to go in such as the radiation or other, and then you need to actually have the packaging, shipping, et cetera, loading into the stores. So there's a delay there. And really it's that delay, coupled with the kicking in of B9, which is causing a bit of a flat Q3. But of course, we're unlocking that in Q4. So we think it's momentary, and then there is really a complete decoupling ***when we hit that $400 million net next year, and of course, that's supported by very strong demand. That's why we're confident putting out numbers.*** We have that demand pent-up through multiple provinces beyond Quebec.

208.    These statements about HEXO's C$400 million net revenue guidance were materially false and misleading because:

(i)    The five-year SQDC Agreement was to be HEXO's main source of revenues for

FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii) The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature. Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019. *See* ¶¶ 82-88, 231.

(iii) HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis. The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019. At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month. Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which HEXO knew would not happen. *See* ¶¶ 94-95, 144.

(iv) The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020)). HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand. *See* ¶¶ 101-102.

(v) Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement. Yet, packaging and shipment issues were not the real problem – low demand and HEXO's refusal to enforce the take-or-pay provision was.

209.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance. Nor did it have a need to increase production capacity via the Newstrike Acquisition.

210.    Defendant St. Louis also doubled down on HEXO's revenue guidance during the March 14, 2019 conference call. Defendant St. Louis went so far as to claim the C$400 million FY2020 net revenue guidance was "conservative" and necessary to "correct[]…overly

conservative analyst estimates":

**Luke Michael Perda - Seaport Global Securities LLC, Research Division – Analyst**

Great. And last one here on the Newstrike Brands deals, you talked about that $400 million expected in revenue from the combined entity. It seems fairly conservative based on Newstrike capacity and legacy growth brands with HEXO. Can you talk a little bit about the forward asset mix expectations for Newstrike and any other factors that might go in your forward revenue projections.

**Sebastien G. St-Louis - HEXO Corp. - Co-Founder, President, CEO & Director**

Yes. So I'm not breaking up the HEXO or Newstrike. So the forecast is really a function of us correcting the overly conservative analyst estimates.

I'm glad to hear your comment. I mean, if you think that's conservative, that was certainly. *The intention is to hit that number. So we'll do that or better. And so anything above that is really upside. We're quite happy just providing that to the market. It's obviously much bigger number than where the market had us, so we'll make sure we do that. I think if we can do better, obviously, that's great. But achieving that $400 million in net revenue next year will firmly put us in the top 2 position*, we believe.

211.    Defendant St. Louis' bullish statements about HEXO's C$400 million net revenue guidance were materially false and misleading when made because:

(i)    The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii)    The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(iii)    HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019.  At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month.  Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which

HEXO knew would not happen.  *See* ¶¶ 94-95, 144.

(iv) The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020)).  HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand.  *See* ¶¶ 101-102.

(v) Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

212.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance. Nor did it have a need to increase production capacity via the Newstrike Acquisition.

213.    Defendant St. Louis also reassured the market during the March 14, 2019 earnings call that the SQDC's contractual obligation to purchase 20,000 kg of cannabis from HEXO in year-one was "fully on track":

> Sales volume increased 166%, so that was about 2.5 tons from Q1 as we continue to scale up B9 and execute on our SQDC and other supply agreements. ***I want to take a note to mention that the SQDC 20-ton commitment is fully on track. Our relationship remains in amazing standing, and we're really excited about all the stores they're opening, the education programs they're setting up and the additional products we'll be introducing in October***.

214.    This statement about the SQDC Agreement, including that the "SQDC 20-ton commitment is fully on track", was materially false and misleading when made because:

(i) The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(ii) HEXO was not even close to being on track to sell the SQDC 20,000 kg of

product in year one and thus its FY2020 guidance had no basis. The SQDC was responsible for the vast majority (between 84% and 91%) of HEXO's adult-use revenues between October 18, 2018 and April 30, 2019. At the time of these statements, five months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 4,200 kg of its 20,000 kg commitment, or approximately 840 kg per month. Thus, the SQDC would have had to increase its orders for the remainder of the first year **by approximately 160%** to 2,257 kg per month for the next seven months to meet its 20,000 kg commitment, which HEXO knew would not happen. *See* ¶¶ 94-95, 144.

(iii)   The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020)). HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand. *See* ¶¶ 101-102.

(iv)   Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

215.   On March 14, 2019, HEXO released its Condensed Interim Consolidated Statements of Financial Position, reporting net revenue of over C$13 million and inventory of over C$10 million.

216.   The reported C$10 million inventory figure was materially false and misleading when made since it was not at "net realizable value" because (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision (¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or write off stale product that no longer had value (¶¶ 94-95, 144); and (iv) did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike deal (¶ 263).

### C. June 2019 and August 2019 Misstatements and Omissions of Material Fact

217.    HEXO continued to reiterate its $C400 million net revenue guidance, which it touted as being based on existing demand largely from the SQDC Agreement.  On June 13, 2019, HEXO issued a press release stating that the Company "remains on-track ramping up to C$400 million net revenue in fiscal 2020 and to double net revenue in Q4 fiscal 2019."  HEXO's 3Q2019 net revenue was C$12.9 million.  Thus, HEXO represented that its Q42019 net revenue would be approximately $C26 million.

218.    This press release was also issued on Form 6-K and signed by Defendant Chaplin.[13]

219.    The statements in paragraph 217 about HEXO being "on-track ramping up to C$400 million net revenue in fiscal 2020 and to double net revenue in Q4 fiscal 2019" were materially false and misleading when made because:

(i)    The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii)    The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(iii)    HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority of HEXO's adult-use revenues between October 18, 2018 and July 31, 2019.  At the time of these statements, eight months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 6,653 kg of its 20,000 kg commitment, or approximately 830 kg per month.  Thus, the SQDC would have had to increase its orders for the remainder of the first year by **over 300%** for the next four

---

[13] HEXO filed an amended Form 6-K later on June 13, 2019 signed by Defendant St. Louis, stating that "the wrong signature page was included" with the original Form 6-K.

months to meet its 20,000 kg commitment, which HEXO knew would not happen.  *See* ¶¶ 94-95, 144.[14]

(iv)  The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020)).   HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand.  *See* ¶¶ 101-102.

(v)  Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

220.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance. Nor did it have a need to increase production capacity via the Newstrike Acquisition.

221.    The June 13, 2019 Form 6-K contained Management Discussion and Analysis, which provided as follows:

The strategic value of our SQDC relationship cannot be understated. We hold the single largest forward contract in the history of the emerging cannabis industry with the SQDC and are the preferred supplier for cannabis products for the Quebec market for the first five years following legalization. ***We will supply the SQDC with 20,000 kg of products in the first year, and we expect to supply 35,000 kg and 45,000 kg in years two and three, respectively***. The volumes for the final two years of the agreement will be established at a later date based on the sales generated in the first three years. The Company estimates the total volume to be supplied over the five-year term of the agreement could exceed 200,000 kg. The total supply agreement is estimated to be worth $1 billion in potential revenue based on the estimated total volume as described above to be supplied over the term and the average sale prices assumed by the Company for its products. Based on the current publicly disclosed agreements signed between the SQDC and seven other licensed producers, we have obtained the highest year one volume, representing approximately 30+% market share within Quebec, and we are aiming to remain the largest supplier in subsequent years.

---

[14] The 6,653 kg is reached by adding 1,155 kg (the mid-point of the 2,311 kg HEXO sold in the 4Q19 (between May 1, 2019 and July 31, 2019) since these statements were made on June 13, 2019) to the amounts HEXO sold earlier in the first year of the SQDC contract (857 kg for the last two weeks of 1Q19, 2,131 kg for 2Q19, and 2,510 kg for 3Q19).

222.    The statement about the SQDC Agreement, including that HEXO "will supply" the SQDC with the guaranteed 20,000 kg of product during the first year of the contract was materially false and misleading when made because:

(i)    The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(ii)   HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority of HEXO's adult-use revenues between October 18, 2018 and July 31, 2019.  At the time of these statements, eight months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 6,653 kg of its 20,000 kg commitment, or approximately 830 kg per month.  Thus, the SQDC would have had to increase its orders for the remainder of the first year by **over 300%** for the next four months to meet its 20,000 kg commitment, which HEXO knew would not happen.  *See* ¶¶ 94-95, 144.

(iii)  The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020)).  HEXO knew that the SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores during the 2Q19 (13 rather than 25, *see* ¶ 101) than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand.  *See* ¶¶ 101-102.

(iv)   Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

223.    HEXO's June 13, 2019 Form 6-K also reported that "[t]he inventory expensed to cost of goods sold in the three and nine months ended April 30, 2019, were $6,165 and $14,881

respectively (April 30, 2018 – $717 and $2,977)."[15]

224.    These reported inventory figures were materially false and misleading when made because (i) the SQDC was not buying the necessary amounts to satisfy its first year commitment under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision (¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or to write off stale product that no longer had value (*see* ¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

225.    On June 13, 2019, HEXO held a conference call to discuss its financial results. Defendant St. Louis reiterated on the call that HEXO's Q42019 net revenue would double from Q32019:

> Our total gross revenue was $15.9 million for the third quarter, an increase of 11.8x over the same quarter in the prior year. As I guided last quarter, gross adult use revenue remained flat at $14.6 million. In comparison to the same period in 2018, it increased by almost 1,000%, which included only medical sales last year.
>
> **We expect revenues to double this quarter** with realized sales from the first harvest from B9 and our 1 million square foot facility and also as we start to ship flower outside of Quebec, which we're very excited to do.

226.    This statement was materially false and misleading when made because:

 (i)    The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii)    The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before

---

[15] These figures are in thousands.  Thus, the reported figures were $6.1 million and $14.8 million.

Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(iii)   HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority of HEXO's adult-use revenues between October 18, 2018 and July 31, 2019.  At the time of these statements, eight months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 6,653 kg of its 20,000 kg commitment, or approximately 830 kg per month.  Thus, the SQDC would have had to increase its orders for the remainder of the first year by **over 300%** for the next four months to meet its 20,000 kg commitment, which HEXO knew would not happen.  *See* ¶¶ 94-95, 144.

(iv)   The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020).  *See* ¶¶ 101-102.

(v)   Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

227.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance. Nor did it have a need to increase production capacity via the Newstrike Acquisition.

228.    During the earnings call, Analyst Krishna Ruthnum of CIBC questioned Defendant St. Louis' representation that Q42019 net revenue would double.  In response, Defendant St. Louis brazenly stood by his representation, trumpeting his "transparency" and flatly stating that "we are going to reach the [4Q19] target" and that "[w]e're delivering a double this quarter":

**Krishna Ruthnum** - CIBC Capital Markets, Research Division - Associate

Okay. And one last question just on your guidance for Q4. Just given where we are in the quarter, just wondering if you can give us some comments on the trend to date as well as your – the pace and sort of your confidence of reaching that target?

**Sebastien G. St-Louis** - HEXO Corp. - Co-Founder, President, CEO & Director

***We're going to reach the target***. I mean I'd ask you and I continuously welcome

challenges. I think that the analyst community is doing a phenomenal job in our space. I welcome more transparency in our space. I welcome a broader discussion for investors. *If you ever hear me say something and not deliver, you have to call me out. And in reverse, I would tell you today, nobody has ever called me out on anything because HEXO has always delivered what we said we would. We're delivering a double this quarter*.

229.    These statements were materially false and misleading when made because:

(i)    The five-year SQDC Agreement was to be HEXO's main source of revenues for FY2020 (August 1, 2019 through July 31, 2020) (*see* ¶¶ 82-88).

(ii)    The "take-or-pay" feature in the SQDC Agreement was meaningless, and thus provided HEXO with no guaranteed revenue for weak product demand, because HEXO never intended to enforce the feature.  Indeed, as Defendant St. Louis admitted on June 13, 2019, HEXO had no intention of jeopardizing its special relationship with the SQDC – and that relationship was established long before Offering and not change between the Offering date and June 13, 2019.  *See* ¶¶ 82-88, 231.

(iii)    HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority of HEXO's adult-use revenues between October 18, 2018 and July 31, 2019.  At the time of these statements, eight months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 6,653 kg of its 20,000 kg commitment, or approximately 830 kg per month.  Thus, the SQDC would have had to increase its orders for the remainder of the first year by **over 300%** for the next four months to meet its 20,000 kg commitment, which HEXO knew would not happen.  *See* ¶¶ 94-95, 144.

(iv)    The SQDC's slow orders (caused by, among other things, the slow SQDC store openings) would impact the expected 35,000 kg second-year figure in the SQDC Agreement – which second year included eight and a half months of FY2020 (October 17, 2019 through July 31, 2020).  *See* ¶¶ 101-102.

(v)    Defendant St. Louis admitted on March 13, 2019 that HEXO was unable to timely package and ship goods to its customers, including the SQDC, during the 2Q2019 (*see* ¶ 202), further undermining HEXO's ability to supply the SQDC 20,000 kg in the first year of the SQDC Agreement.

230.    In light of the foregoing, HEXO had no basis for its revenue estimates and guidance. Nor did it have a need to increase production capacity via the Newstrike Acquisition.

231.    On HEXO's June 13, 2019 call, Defendant St. Louis also casually snuck in a

surprising revelation about the SQDC Agreement.  Specifically, after being asked by securities analysts how HEXO would triple its sales to the SQDC within the next five months – which it would have to do for the SQDC to fulfill its 20,000 kg first-year obligation – Defendant St. Louis offhandedly disclosed that, despite weak demand, HEXO would not enforce the "take or pay" feature of the SQDC Agreement that quarter:

**Oliver S. Rowe** - Scotiabank Global Banking and Markets, Research Division – Associate

When I think about Québec, which is obviously an important market for you, you're expecting 20,000 kilograms of sales to Québec in the first year of [rec]. I think we're over halfway through that year now and sales have been about 5,500 kilograms to that province. So it seems to me like it could be a bit challenging for the SQDC sales to triple over the remaining 5 months. Do you see a risk that the SQDC doesn't need that much product but takes it anyway and that leads to significant inventory builds and maybe even impacts demand on your year 2 contract?

**Sebastien G. St-Louis** - HEXO Corp. - Co-Founder, President, CEO & Director

Yes. So definitely, a risk. I think the demand is there in Québec. I think the SQDC has been doing a fantastic job. But since there were inventory supply shortages on the early days from most LPs, so HEXO was delivering on its purchase orders, but the SQDC wasn't getting fully supplied. They slowed their store ramps. *So the original plan called for about 25 stores in Québec by this day. And last quarter, we were at about 13. Now the good news is SQDC has now gone back to 7 days of full-time selling. So that adds significant demand. They've added more stores now, so we have a brand-new store in Gatineau right next to an Ottawa population center. I do think there could be some timing risk around a few of those tons -- of those 20 tons. Now of course, as you pointed out, it is a take-or-pay contract, but we value our relationship with SQDC more than the few million dollars in revenue we could get this quarter. So we're working very closely with them. We've asked our SKU mix to create more interesting products.*

232.    Defendant St. Louis, nevertheless, lessened the blow from this surprising revelation by misleadingly representing that HEXO was nevertheless "confident" that the SQDC would still meet its first-year 20,000 kg obligation (and more) – only that it would be by the end of calendar 2019 rather than October 2019.  Accordingly, Defendant St. Louis suggested that there was no cause for alarm and that enforcing the "take or pay" feature that quarter would be

short-sighted in light of the SQDC's re-confirmed year-one commitment:

> We plan on launching a whole bunch of new products over the following couple of quarters, which we think will help that, ***but expect some timing risk whether it's in October, November, December time line to hit the full 20, I think, would be a reasonable assumption.  We're confident we can completely offset that and more, of course, in other provinces***.

233.    These statements were materially false and misleading when made because Defendant St. Sebastian lacked any basis to claim confidence that the SQDC would still order 20,000 kg by December 31, 2019 because:

(i)    HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one and thus its FY2020 guidance had no basis.  The SQDC was responsible for the vast majority of HEXO's adult-use revenues between October 18, 2018 and July 31, 2019.  At the time of these statements, eight months of the first year of the SQDC Agreement had elapsed and the SQDC had only bought approximately 6,653 kg of its 20,000 kg commitment, or approximately 830 kg per month.  Thus, the SQDC would have had to increase its orders for the remainder of the first year by over 300% for the next four months to meet its 20,000 kg commitment, which HEXO knew would not happen.  *See* ¶¶ 94-95, 144.

(ii)    The SQDC's demand for volume would not pick up in year one because, among other things, the SQDC had opened substantially fewer stores than were needed to yield the necessary demand to support year-one volume and would not be able to open up additional stores in sufficient time to meet year-one demand.  *See* ¶¶ 101-102.

(iii)    Although Defendant St. Louis represented that HEXO would not enforce the take-or-pay feature for the 3Q2019, he did not represent that HEXO would not enforce the take-or-pay feature at all.

234.    Although Defendants' misstatements and omissions of material fact, including on the June 13, 2019 conference call, continued to artificially inflate HEXO stock, the Company's stock fell from a June 12, 2019 closing price of $6.45 per share to a June 13, 2019 closing price of $5.90, a drop of over 8%, due to the disclosure that HEXO would not enforce the "take-or-pay" feature of the SQDC Agreement.  The drop would have been far more severe had investors learned the full truth about the SQDC Agreement, including that HEXO never intended to

enforce the "take or pay" feature and that Defendant St. Louis had no basis to claim that the SQDC would still meet its year-one commitment.

235.    On August 8, 2019, HEXO filed a Form 6-K, which was signed by Defendant Monahan, attaching the Company's financial results for the first nine months of FY2019.  That Form 6-K reported total inventory as of April 30, 2019 as C$39.9 million.

236.    This inventory figure was materially false and misleading when made because (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision; (¶¶ 82-88, 231) (iii) HEXO failed to write down product that had fallen in value or write off stale product that no longer had value (¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

### D.  October 2019 Misstatements and Omissions of Material Fact

237.    On October 1, 2019, HEXO filed a Form 6-K signed by Defendant Monahan. That Form 6-K reported inventory as of April 30, 2019 as $52.7 million.

238.    That figure was materially false and misleading when made because (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision (¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or write off stale product that no longer had value (¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

239.    In addition, on October 10, 2019, HEXO announced preliminary revenue for its

fiscal fourth quarter that was radically below prior estimates.  The Company also announced its financial results for the year ended July 31, 2019 and – of particular importance – it shockingly withdrew the previously issued financial outlook for fiscal 2020 that it was so confident about.

HEXO's October 10, 2019 press release stated:

> Based on preliminary financial information and subject to year-end closing adjustments, HEXO expects net revenue for the fourth quarter to be approximately $14.5 million to $16.5 million and net revenue for the year to be approximately $46.5 million to $48.5 million.

> "Fourth quarter revenue is below our expectation and guidance, primarily due to lower than expected product sell through," commented Sebastien St-Louis, CEO and co-founder of HEXO Corp. "While we are disappointed with these results, we are making significant changes to our sales and operations strategy to drive future results. Over the past quarter, we began re-configuring our operations to focus on high-selling strains and initiated a new sales strategy that we believe will meaningfully improve performance.  We plan to discuss these in more detail on our upcoming earnings call."

> ***Slower than expected store rollouts, a delay in government approval for cannabis derivative products and early signs of pricing pressure are being felt nationally. The delay in retail store openings in our major markets has meant that the access to a majority of the target customers has been limited***.  Additionally, regulatory uncertainty across the pan-Canadian system and jurisdictional decisions to limit the availability and types of cannabis derivative products have contributed to an increased level of unpredictability. ***As a result, HEXO is withdrawing its previously issued financial outlook for fiscal year 2020***.

> "Withdrawing our outlook for fiscal year 2020 has been a difficult decision," added St-Louis. "However, given the uncertainties in the marketplace, we have determined that it is the appropriate course of action. We are also placing a greater focus on profitability. We are evaluating our plans and operations to see where we can be even more efficient. We are at our best when we are highly focused on our strategic priorities, always with a view to drive long-term value for shareholders. Growing low-cost, quality cannabis and developing innovative products is our priority and we are renewing our commitment to do so."

240.    These statements were materially false and misleading because HEXO pulled its guidance not because of slower store rollouts and price compression, but because the Exchange Act Defendants knew that the SQDC Agreement was illusory; thus, the guidance never had any basis.  These statements were also materially false and misleading for the reasons given above.

*See*, *e.g.*, ¶ 229.

241.    Also on October 10, 2019, HEXO reported an inventory figure of $86.2 million as of July 31, 2019.  This inventory figure was materially false and misleading when made because (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (*see* ¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision (*see* ¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or write off stale product that no longer had value (*see* ¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

242.    The market was obviously disappointed with HEXO's disclosures.  One CIBC analyst stated on October 24, 2019 that HEXO had misleadingly "advertised" the take-or-pay feature of the SQDC Agreement:

> [The] most important reason "investors have in the past been bullish on HEXO stock" was "the company's Quebec purchase contract, *which was touted as a take-or-pay offering in which volumes were guaranteed for three years*…. *The Quebec contract was advertised as a take-or-pay arrangement with the province*, with…guaranteed volumes for the first three years, *with 20,000 kg in Year 1 and a total of 100,000 kg over three years*…*the Quebec contract does not appear as attractive as initially advertised*.

243.    On October 28, 2019, HEXO announced that the Company was granted new licenses at its Belleville facility acquired during the Newstrike Acquisition – but HEXO failed to disclose licensing problems that HEXO discovered on July 30, 2019 (or earlier) about the Niagara Facility, *i.e.*, that one of the Niagara Facility's lots was growing unlicensed cannabis:

> GATINEAU, Quebec, Oct. 28, 2019 (GLOBE NEWSWIRE) -- HEXO Corp ("HEXO" or the "Company") (TSX:HEXO; NYSE:HEXO) is pleased to announce *it has received licences from Health Canada for its cannabis Centre of Excellence in Belleville, Ontario, for research, and for the sale of cannabis topicals, extracts, edibles and beverages from its flagship Gatineau campus*.

> "The research licence will allow us to take our innovation work to the next level, with

testing on derivative products, including taste testing. Consumers have high expectations for their packaged goods experiences, and cannabis will be no different," said Sebastien St-Louis, CEO and co-founder of HEXO Corp. "We are committed to not only ensuring a quality consistent experience but to also guaranteeing that experiences powered by HEXO meet these expectations."

While a Processing Licence provides for testing on live plants, fresh and dried plant material, seeds, and oil, a Research and Development Licence significantly expands the scope of work that can be conducted on cannabis and its derivatives. The Company plans to conduct research and development at its Vaughan and Montreal Innovation, Development and Engineering hubs, as well as at its Centre of Excellence in Belleville and in other facilities.

Health Canada also granted HEXO Corp's cannabis Centre of Excellence in Belleville licensing for its first phase. The space – a former distribution centre, retrofitted to house not only HEXO but also Fortune 500 partners entering the cannabis space – has ample capacity for the manufacturing of advanced cannabis products, including cosmetics, vapes, non-alcoholic beverages and other edibles. The Centre's centralized location, conveniently located along primary shipping routes in Ontario, presents the opportunity to process and distribute products and to fulfil commitments across Canada. The issuance of a first licence for the site signals federal support for the Company's production and distribution hub, a required step to delivering cannabis derivative products to Canadian consumers. On October 17, 2019 HEXO submitted 60-day notification to Health Canada for new products in the recently legalized product categories.

Finally, an amended licence has been issued to HEXO Corp allowing the sale of cannabis topicals, cannabis extracts and edible cannabis from its Gatineau cultivation, harvesting and production facility.

"We trust that by continuing to demonstrate Good Production Practices, by operating in complete alignment with regulations, and by working closely with our partners, licences and amendments will be issued in a timely manner that supports a vibrant and healthy legal cannabis sector," added St-Louis.

244.    These statements were materially false and misleading because while discussing other Health Canada licenses at length, HEXO did not disclose that it had been producing cannabis at the Niagara Facility without a Health Canada license – which the Company was aware of at least by July 31, 2019.  *See* ¶¶ 153, 258.

245.    On October 29, 2019, HEXO filed its annual report on Form 40-F.  That annual report announced a substantial impairment loss of C\$16.9 for 4Q19.  HEXO represented that this

impairment loss stemmed from price compression in the market. CIBC noted in an October 29, 2019 report that the "$16MM inventory impairment charge [] result[ed] from costly purchases on the wholesale market in spite of a lack of ability to sell those products".

246. HEXO's statement in paragraph 245 was materially false and misleading when made because it severely understated the extent of the inventory impairment for 4Q2019 since (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion of HEXO's inventory to be stale and impaired (*see* ¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision (*see* ¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or write off stale product that no longer had value (*see* ¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

247. Also on October 29, 2019, HEXO filed a Form 6-K with the SEC signed by Defendant St. Louis that misleadingly stated that HEXO had stopped production at the Niagara Facility – but again the Company omitted to disclose that the Company had learned three months prior that the facility was producing cannabis without a license. *See* ¶¶ 153, 258.

248. This statement was also materially false and misleading when made because HEXO knew months prior that it would have to close the Niagara Facility because there was insufficient demand to support it (*see* ¶¶ 101-102).

249. HEXO also filed a Form 40-F filed with the SEC on October 29, 2019. That Form 40-F, which was signed by Defendant St. Louis and certified by Defendants St. Louis and Burwarsh, provided in pertinent part:

> The Niagara facility is a 240,000 sq. ft fully automated, modern "Dutch-Tray" facility, consisting of 186,400 sq. ft **licensed for production and cultivation, with the remaining space allocated to administration, packaging and shipping/ receiving areas. The facility is currently capable of producing up to 20,000 kg of dried cannabis**

*annually. This facility is situated on approximately 16.6 acre of land and received its cultivation licence under the Cannabis Act on March 29, 2018*.The Niagara facility is currently undergoing a retrofit which is expected to be completed during the end of Q1 to early Q2, fiscal 2020. Once completed, the retrofit will add approximately 215,000 sq. ft. of additional space and will bring the total Niagara campus to approximately 455,000 sq. ft. of cultivation, production, packaging, shipping and administrative space.

On October 24, 2019, the Company announced that it has taken steps to reduce its workforce. The Company is rightsizing its operations to adjust to a changing market and regulatory environment with a view towards profitability and long-term stability. The actions taken are intended to rightsize the organization to the revenue the Company expects to achieve in fiscal 2020. *As part of the changes to its operations, cultivation has been suspended at the Niagara facility acquired from Newstrike, and in 200,000 sq. ft. at the Company's main facility in Gatineau. The Company determined that this cultivation space is not required at this time given the current market conditions in Canada.* HEXO continues to drive improvements in yields and processing facilities. Operations in the suspended areas can be recommenced when required.

250.     These statements were materially false and misleading when made because (i) as Defendant St. Louis claims, HEXO learned on July 30, 2019 (*see* ¶¶ 153, 258) that the Niagara Facility was operating one of its lots without a license; and (ii) the Niagara Facility was not needed because there was insufficient demand to support it (*see* ¶¶ 101-102); and (iii) HEXO's decision to not enforce the "take or pay" feature of the SQDC Agreement rendered the guaranteed nature of that agreement meaningless (*see* ¶ 231).

251.     On October 29, 2019, HEXO held a conference call with analysts.  On that call, an analyst asked why, in light of the inventory impairment, HEXO was buying so much product:

John Zamparo - CIBC Capital Markets, Research Division - Associate

I wanted to ask about the inventory impairment. So it seems related to product you purchase on the wholesale market, and you mentioned the price compression you've seen there. I guess, what I'm wondering is that given the lack of stores and sell-through isn't where you want it to be, what's the thinking behind buying so much product on the wholesale market at this time?

252.     While answering, Defendant St. Louis unconvincingly called the past purchases a simple "mistake":

Sebastien G. St-Louis - HEXO Corp. - Co-Founder, President, CEO & Director

Well, John, I think purchasing that product was before we had full visibility on the store count. And so quite frankly, in hindsight, that's a – purchasing that product was a mistake.

253.    Defendant St. Louis had admitted that HEXO had produced twice as much product as it shipped seven months earlier during the March 14, 2019 conference call (*see* ¶ 207) – and this was when HEXO knew the SQDC had not opened a sufficient number of stores; thus, HEXO continuing to purchase too much product was no mere "mistake". Thus, Defendant St. Louis' statement was materially false and misleading.

254.    On the same call, Defendant St. Louis made another omission of material fact about the Niagara Facility:

We've scaled back our cultivation facilities to 1.1 million square feet with a ***temporary*** suspension of activity at our Niagara Facility and a reduction of 200,000 square feet in Gatineau.

255.    This statement was materially false and misleading because (i) it omitted to disclose that the Niagara Facility was operating one of its lots without a license (*see* ¶¶ 153, 258); (ii) Defendant St. Louis knew this was no "temporary suspension" as HEXO did not need the Niagara Facility in light of poor demand (*see* ¶¶ 101-102); and (iii) of HEXO's decision not to enforce the "take or pay" feature of the SQDC Agreement (*see* ¶ 231).

256.    On the same call, after an analyst specifically asked about when the Niagara Facility would reopen, Defendant St. Louis was purposefully evasive:

**Brett Michael Hundley** - Seaport Global Securities LLC, Research Division - Research Analyst.

Just a couple of quick questions on the EBITDA bridge, and then more of a philosophical question for you, Sebastien. So just first, on the EBITDA bridge, does your target of positive EBITDA within calendar '20 assume production restarts at Niagara and Gatineau?

**Sebastien G. St-Louis** - HEXO Corp. - Co-Founder, President, CEO & Director

No, it does not.

Analyst Hundley was surprised and repeated Defendant St. Louis' phrase:

**Brett Michael Hundley** - Seaport Global Securities LLC, Research Division - Research Analyst

It does not.

257.    Defendant St. Louis' terse response "No, it does not" was materially false and misleading when made because (i) it suggested that HEXO did not need the Niagara Facility to meet the positive EBITDA target – and omitted to disclose that the Niagara Facility had been producing unlicensed cannabis (*see* ¶¶ 153, 258); and (ii) Defendant St. Louis knew HEXO did not need the Niagara Facility in light of poor demand (*see* ¶¶ 101-102); and (iii) HEXO's decision not to enforce the SQDC Agreement (*see* ¶ 231).

### E.   HEXO Admits on November 15, 2019 That the Company Knew As Of July 30, 2019 That the Niagara Facility Was Producing Unlicensed Cannabis

258.    On November 15, 2019, HEXO shockingly announced that it had learned – almost four months prior on July 30, 2019 (at the latest) – that the Company's Niagara Facility was "not adequately licensed" and that "[w]hile we are disappointed with what we uncovered, we assume responsibility for any issues with UP products prior to the acquisition." HEXO also announced that "[t]oday, the facility is no longer operational" and that the Company was "winding down operations in Niagara."

259.    On this news, HEXO's stock dropped an additional 5% on November 15, 2019, from a previous-day close of $1.89 per share to $1.79.

### F.   December 2019 Misstatements and Omissions of Material Fact

260.    On December 16, 2019, HEXO issued 1Q19 financial results, including inventory figures of C$6.6 million as of October 31, 2019.

261.    This figure was materially false and misleading when made since (i) the SQDC was not buying the necessary amounts under the SQDC Agreement, causing a significant portion

of HEXO's inventory to be stale and impaired (*see* ¶¶ 94-95, 144); (ii) HEXO had no intention of enforcing the SQDC Agreement's take-or-pay provision (*see* ¶¶ 82-88, 231); (iii) HEXO failed to write down product that had fallen in value or write off stale product that no longer had value (*see* ¶¶ 94-95, 144); and (iv) HEXO did not perform an inventory impairment on the Niagara Facility until five months after the Newstrike Acquisition (¶ 263).

262.    HEXO also announced another inventory impairment of $25.5 million during 1Q2020:

> The Company incurred an impairment loss on inventory of $25.5M during Q1'20 compared with $16.9M in Q4'19. The impairment loss was realized on the Company's inventory in comprised of the following;
>
> Impairment of a surplus of cannabis trim (trim is the accumulation of the cannabis' sugar leaves during the dry trimming process and is primarily used for extraction purposes) and milled products the amount of $16.4M due to an excess of stock relative to the Company's short-term demand for cannabis distillate production;
>
> Impairment of bulk purchased product of $4.4M due, in part, to an oversupply in the market of bulk products with lower potencies as well as a relatively low value when compared to competing bulk goods with a higher potency in the current adult-use market;
>
> Impairment of oil based finished goods of $3.4M due a surplus of finished goods as oil-based products haven't captured the market share as originally estimated. Also contributing to the impairment is the decision made by certain provinces to return oil products with packaged dates greater than 3 to 4 months old; and
>
> Impairment of finished goods of $1.2M which are required to be archived as at October 31, 2019 due to Health Canada requirements with a net realizable value of $nil.

263.    This statement was materially false and misleading because it did not disclose the full extent of the 1Q2020 inventory impairment.

264.    On December 16, 2019, HEXO also held its 1Q2019 conference call.  On that call, Defendant Burwarsh admitted that HEXO did not perform an inventory impairment on the Niagara Facility until 1Q2019 (August 1, 2019 through October 31, 2019) – which was five

months after the Newstrike Acquisition:

> **Brett Michael Hundley** - Seaport Global Securities LLC, Research Division - Research Analyst
>
> Okay. And then separately, did you guys run an impairment test for Niagara during the quarter? Or will that be pushed to the end of the fiscal year?
>
> **Stephen Harry-Donald Burwash** - HEXO Corp. - CFO
>
> We ran an impairment test in Q1.

265.    This admission further demonstrates that HEXO's inventory was impaired throughout the Class Period.

266.    This statement also further demonstrates that even when HEXO began taking inventory charges, the Company did not so fully and completely.

### G.   HEXO Restates Its FY2019 Financial Statements

267.    On January 2, 2020, HEXO restated its financial statements for the fiscal year ended July 31, 2019 due to, as alleged above (*see* ¶ 35), a misstated inventory impairment and misstated tax liability.    HEXO also restated the corresponding amended management's discussion and analysis and its restated interim condensed consolidated financial statements for the three-month period ended October 31, 2019 and corresponding amended management's discussion and analysis:

> As contemplated in the Notice to Reader included in the Company's previously filed interim financial statements for the three-month period ended October 31, 2019, the Restated Annual Financial Statements were filed to correct identified errors in the Company's previously filed financial statements for the fiscal year ended July 31, 2019, in which the deferred tax liability was overstated as at July 31, 2019, as it was not offset by a deferred tax asset relating to a tax loss generated in one subsidiary against a deferred tax liability generated by a separate subsidiary. Due to the two tax positions existing in two separate entities, the Company's original position was that they could not offset or reduce one another. The applicable subsidiaries were amalgamated on August 1, 2019. The correction of this error resulted in a reduction of the deferred tax liability and deficit by $14.3 million as at July 31, 2019. Additionally, net loss for the year ended July 31, 2019 was overstated by $14.3

million.

> *In assessing the financial impact of subsequent events for the restatement, the Company has also adjusted its audited annual consolidated financial statements for the fiscal year ended July 31, 2019 for the estimated fair market value of its cannabis trim based inventory due to new and available third-party information, resulting in an increased impairment on inventory of $2.4 million. The inventory impairment resulted in a $2.4 million reduction of the impairment loss on inventory for the interim financial statements for the three months ended October 31, 2019.*

268.   Although it disclosed part of the truth, this statement was also materially false and misleading because it did not disclose the full extent of HEXO's inventory impairment.

### H.  HEXO Announces A Delay in Filing FY2019 Financial Statements, As Well As A Tremendous Inventory Impairment

269.   On March 17, 2020, HEXO announced that (i) HEXO was delaying filing its financial statements; (ii) the Ontario Securities Commission was reviewing the Company's filings; (iii) HEXO was taking a third gargantuan inventory impairment of up to $280 million; (iv) HEXO was selling the Niagara Facility; and (v) there were questions as to whether HEXO could continue as a going concern:

OTTAWA, March 17, 2020 (GLOBE NEWSWIRE) -- HEXO Corp. ("HEXO" or the "Company") (TSX: HEXO; NYSE: HEXO) today announced that it has not filed its interim financial statements and related management's discussion and analysis ("MD&A") and certifications for the three and six month periods ended January 31, 2020 (the "Q2 2020 Filings") by the filing deadline of March 16, 2020.

The delay in the filing of the Q2 2020 Filings has arisen due to certain exceptional circumstances, including that for the quarter ended January 31, 2020 ("Q2 2020"), *the Company will be recording a significant impairment loss in the Q2 2020 Filings.* The calculation of this impairment is complex and, while a value range for the impairment is known, the final amount remains to be determined. This impairment and certain other financial results for Q2 2020 are discussed below.

In addition, over the course of the past few weeks, the Company has been working on amending its MD&A for the fiscal year ended July 31, 2019 and the three months ended October 31, 2019 (the "Amended MD&A") in connection with a continuous disclosure review by the Ontario Securities Commission ("OSC"). The amendments are being made to address comments received from OSC Staff and to strengthen the Company's continuous disclosure record….

- On March 2, 2020, the Company completed a strategic review of its cultivation assets. Due to an excess of cultivation capacity in the market and estimated forecast demand for cannabis products, as result of slower than expected market development, ***the Company no longer expects to re-commence operations at the Niagara Facility and has decided to market the facility for sale***. The Niagara Facility consists of land and greenhouse facilities, as well as cultivation and production licenses and related equipment,

- At the end of Q2 2020, the carrying amount of the Company's total net assets significantly exceeded the Company's market capitalization as at January 31, 2020. ***In addition, the industry has experienced slower than expected retail store roll-outs in Canada and delays in government approval for cannabis derivative products which has constrained distribution channels and adversely affected overall market sales and profitability***. These factors are indicators of impairment in relation to the Company's inventory, property, plant and equipment, intangible assets and goodwill. The Company is in the process of completing its impairment assessment and has not reach its final conclusions. ***However, it is expected that the impairment loss will be in the range of $265 million to $280 million***.

- The Company's financial statements for Q2 2020 have been prepared on a going concern basis, which assumes that the Company will be able to continue its operations and will be able to realize its assets and settle its liabilities in the normal course of business as they become due in the foreseeable future. The Company has historically financed its working capital requirements primarily through equity and debt financings. The Company's ability to continue as a going concern is dependent upon its ability to generate funds from profitable operations and raise additional financing in order to meet current and future obligations. While the Company has been successful in raising financing in the past, there is no assurance that it will be able to obtain additional financing or that such financing will be available on reasonable terms. These conditions combined with the accumulated losses to date indicate the existence of a material uncertainty that may cast doubt on the Company's ability to continue as a going concern. The financial statements will not include any adjustments to the amounts and classification of assets and liabilities that might be necessary should the Company be unable to continue as a going concern.

270.   After this news, HEXO's stock dropped an additional 30% from a March 16, 2020 closing price of $.77 per share to close on March 17, 2020 at $.45 per share.

271.   This statement was materially false and misleading and still left HEXO shares artificially inflated because it did not reveal the final impairment loss and did not reveal the full truth about the SQDC Agreement's take-or-pay feature.

I. **The Last Chapter: HEXO Reveals the Full Truth About The SQDC Agreement And Announces a Net Loss of Almost C$300 Million in 1Q2020**

272.    On March 30, 2020, in a Form 6-K, HEXO announced a net loss of C$298.2 million in its fiscal second quarter as of January 31 – exponentially wider than the loss of C$4.3 million posted in the year-earlier period.  HEXO also booked an impairment loss of C$138.3 million relating to its Niagara Facility (which is now up for sale) and on intangible assets acquired from Newstrike Brands and a goodwill impairment charge of C$111.9 million.

273.    The MDN&A attached to the March 30, 2020 Form 6-K also announced:

By amendment effective on January 17, 2020, the Company contractually relieved the SQDC of the 1st year obligation to purchase the full 20 tons of the outstanding commitment.

*Id*. at 14 n.5.

274.    With this announcement, HEXO finally acknowledged that the Company had no guaranteed revenue – not even for year one – under the SQDC Agreement.  Thus, the market learned the full truth about the SQDC Agreement, including that HEXO never intended to enforce the agreement.  *See* ¶¶ 82-88, 231.  This announcement also fully revealed the fallout from the Company's refusal to enforce the SQDC Agreement, including the spiraling inventories and the lack of a need for the Niagara Facility's production capacity that resulted.

275.    On March 30, 2020, HEXO stock fell over 35% to close at $.79 per share, after closing on March 27, 2020 at $1.09 per share.

276.    News commentators immediately realized the significance of the announcement. For example, Market Watch published an article on March 30, 2020 comparing HEXO's dismal announcement with its rosy representations about net revenues and synergies when the Company acquired Newstrike in March 2019:

Quebec-based Hexo HEXO, -0.208% HEXO, -0.971% reported a net loss of

C$298.2 million ($210.8 million) in its fiscal second quarter Monday, far wider than the company's loss of C$4.3 million in the year-ago period. Sales net of excise taxes rose to C$17 million from $13.4 million a year ago; adult-use revenue rose to C$16.3 million from C$12.2 million in the year-ago quarter. Analysts polled by FactSet had estimated second-quarter sales of C$17.6 million.

Hexo booked an impairment loss of C$138.3 million related to its Niagara pot-growing facility, which it is currently trying to sell, and another C$111.9 million for intangible assets relating to its acquisition of Newstrike Brands. Hexo acquired Newstrike in an all-stock deal for about C$263 million in March 2019. At the time the company said it expected the acquisition to generate "annual synergies of $10 million" and expected to achieve net revenue from Canadian cannabis sales of C$400 million.

**Additional Scienter/Falsity Allegations for Exchange Act Claims**

277.    Paragraphs 277 through 288 pertain only to Plaintiffs' Exchange Act claims.

278.    As alleged herein, the Exchange Act Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding HEXO, the importance of the SQDC Agreement to HEXO, their control over and/or receipt and/or modification of HEXO's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning HEXO, participated in the fraudulent scheme alleged herein.

       **A.  The Singular Importance of the SQDC Agreement to HEXO's Growth Strategy**

279.    The SQDC Agreement was of pivotal importance to HEXO.  The agreement

spanned five years (with a bonus additional year) and order amounts that dwarfed those of HEXO's competitors and of any other agreement HEXO had with its customers. *See* ¶¶ 82-88. The SQDC Agreement, unlike any other agreement the Company had, also contained the critical take-or-pay feature (*see*, *e.g.*, ¶ 85) – which HEXO continually emphasized.

280.    During the Class Period, the Exchange Act Defendants knew that the SQDC was not ordering enough cannabis to satisfy its 20,000 kg first-year commitment. *See* ¶¶ 94-95, 144.

281.    During the Class Period, the Exchange Act Defendants also knew that they had no intention to enforce the "take or pay" feature in the SQDC Agreement because of HEXO's special relationship with the SQDC (predating the Offering), and, as such, the guaranteed revenues touted concerning the agreement, as well as HEXO's FY 2020 guidance based on those revenues, were a farce. *See* ¶¶ 82-88, 231.

282.    Defendant St. Louis was, in particular, intimately involved with the SQDC Agreement and repeatedly discussed the SQDC Agreement, as well as the Company's C$400 net revenue guidance, at great length with analysts and investors. *See* ¶¶ 199-216; 225-232.

### B. Motive To Inflate HEXO Stock Price

283.    Several defendants were also personally motivated to artificially inflate the price of HEXO stock by their materially false and misleading statements because they had substantial stock options, most of whose strike prices were above HEXO's Class Period trading prices.

284.    In addition, the Exchange Act Defendants were motivated to commit fraud because HEXO continually raised sorely needed cash in stock offerings.

285.    HEXO officers had the following options during the Class Period:

| Name | Number of Securities Underlying Unexercised Options (#) | Option Exercise Price | Option Expiration Date |
|---|---|---|---|
| Sebastien St-Louis *Chief Executive Officer* | 93,750<br>333,333<br>1,600,000<br>3,333,333 | $0.75<br>$2.69<br>$4.89<br>$7.46 | Nov 24, 2026<br>Dec 4, 2027<br>Jul 11, 2028<br>Feb 21, 2029 |
| Ed Chaplin Former *Chief Financial Officer* | 350,000 | $4.89 | Jul 11, 2028 |
| Michael Monahan, *Former Chief Financial Officer* | 325,000 | $6.54 | Jul 18, 2029 |
| Stephen Burwash *Chief Financial Officer* | 325,000 | $8.50 | Mar 20, 2019 |

286.     These defendants were motivated to commit fraud to artificially inflate HEXO's stock price to a level above the exercise price of their options.

287.     The Exchange Act Individual Defendants were also motivated to commit fraud to artificially inflate HEXO's stock price to use in its numerous Class Period offerings.  *See* ¶¶ 164-168.

### C.  Suspicious Pattern of Resignations and Firings

288.     During the Class Period, HEXO went through three Chief Financial Officers; its co-founder resigned; it fired its Chief Manufacturing Officer and Chief Marketing Officer; its auditor resigned; and Director Bourque resigned.  *See* ¶¶ 110-112, 126-129, 140, 169-173.

289.     This spate of resignations and firings further supports a strong inference of scienter.

**Presumption of Reliance: Fraud on the Market**

290.     At all relevant times, the market for HEXO securities was efficient for the following reasons, among others:  (1) the securities were listed and actively traded on the NYSE American and NYSE, highly efficient and automated markets; (2) as an issuer, HEXO filed

periodic public reports on Forms 6-K and 40-F with the SEC; (3) HEXO regularly issued press releases that were carried by the national news wires, were publicly available, and entered the public marketplace; and (4) HEXO was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

291.    As a result, the market for HEXO securities promptly digested current information regarding HEXO from all publicly available sources and reflected such information in HEXO share price.

292.    Under these circumstances, all purchasers of HEXO securities during the Class Period suffered similar injury through their purchase of HEXO securities at artificially inflated prices and a presumption of reliance applies.

**Loss Causation / Economic Loss**

293.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HEXO securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about HEXO's business, operations, and prospects as alleged herein.

294.    During the Class Period, as detailed herein, HEXO securities were artificially inflated due to Defendants' misleading statements and omissions.  When Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of HEXO securities fell as the prior artificial inflation came out.

295.    As a result of their purchases of HEXO securities during the Class Period,

Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the securities laws.

296.    The decline in the price of HEXO securities after the corrective disclosures on June 13, 2019, October 4, 2019, October 10, 2019, October 24, 2019, October 30, 2019, November 15, 2019, January 2, 2020, March 17, 2020, and March 30, 2020 were a direct result of Defendants' misrepresentations being revealed to investors and the market.

297.    The decline in the price of HEXO securities was also the result of the materialization of the concealed investment risks concerning HEXO.

298.    Defendants' materially false and misleading statements relate to the SQDC Agreement, HEXO's inventory, HEXO's C$400 million net revenue guidance, and the Niagara Facility, all of which are related as set forth *supra*.

299.    The corrective disclosure on June 13, 2019 revealed that the SQDC was not ordering enough cannabis to meet its 20,000 kg cannabis contractual commitment and that HEXO would not enforce the much touted "take or pay" feature of the SQDC Agreement that quarter, which purportedly provided HEXO with substantial guaranteed revenue in the face of weak market demand for cannabis.  After this disclosure, HEXO stock fell from a June 12, 2019 closing price of $6.45 per share to a June 13, 2019 closing price of $5.90, a drop of over 8%.

300.    The corrective disclosure on October 4, 2019 revealed that Defendant Monahan, the Company's CFO, was resigning immediately and abruptly – this was the second CFO resignation for HEXO during the Class Period and one that was concerning in light of Defendant Monahan's experience.  This news began to disclose, but did not fully reveal, the financial chaos at HEXO.  After this news, HEXO stock price fell $0.26 per share, or 6.4%, to close at $3.80 per share on October 7, 2019.

301.    The corrective disclosure on October 10, 2019 revealed that HEXO was pulling its FY2020 C$400 million net revenue guidance and drastically reducing its Q42019 net revenue guidance.  Defendants had repeatedly stated with high confidence, due largely to the guaranteed nature of the SQDC Agreement, that it would meet or exceed the FY2020 net revenue target and meet the Q42019 net revenue target.  After this news, HEXO's stock plummeted 35% from an October 10, 2019 closing price of $3.66 per share to an October 11, 2019 closing of $2.85 per share.  This disclosure revealed that HEXO's FY2020 and 4Q2019 net revenue guidance were materially false and misleading and never had any reasonable basis.

302.    On October 24, 2019, HEXO announced that it was laying off 200 employees, including Arno Groll, who was HEXO's Chief Manufacturing Officer, as well as Chief Marketing Officer Nick Davies.  This disclosure further revealed some of HEXO's collapse in demand.  On this news, HEXO's stock dropped approximately 6.3% on October 24, 2019, to close at $2.52 per share, from a $2.69 per share closing price on October 23, 2019.

303.    The corrective disclosure on October 24, 2019 also further revealed that HEXO's business was imploding.

304.    On October 29, 2019, the Company announced (i) wider than expected losses in Q42019, including recording a substantial impairment loss on inventory of nearly C$17 million; and (ii) that HEXO was suspending operations at its touted Niagara Facility.  On this news, HEXO's stock dropped an additional 5% on October 29, 2019, from a previous-day close of $2.32 per share to $2.25.

305.    This disclosure began to reveal that HEXO's inventory was overvalued, but did not reveal the true magnitude of the impairment.

306.    This disclosure also began to reveal problems with the Niagara Facility but also

continued to artificially inflate HEXO's stock price because it did not disclose that the Niagara Facility had been growing unlicensed cannabis and that the facility actually needed to be shut down completely because there was no demand to support it.

307.   On November 15, 2019, HEXO finally admitted to growing cannabis in an unlicensed area of its Niagara Facility – a fact Defendant St. Louis admits the Company knew as of July 30, 2019.  After this news, HEXO's stock dropped an additional 5% on November 15, 2019, from a previous-day close of $1.89 per share to $1.79.

308.   This disclosure revealed that the Niagara Facility had been operating without a license.

309.   After market close on January 2, 2020, HEXO restated its 2019 financial statements and its interim results for Q12020, including disclosing that it understated its FY2019 inventory impairment for FY2019 by $2.4 million, which it had to move from 1Q2020.  HEXO conceded in its restatement that its inventory fell in value earlier and that the Company should have written off this extra $2.4 million in inventory during the 4Q2019, not the 1Q2020.

310.   After this news, HEXO stock fell from a January 2, 2020 closing price of $1.67 per share to close on January 3, 2020 at $1.57 per share.

311.   This disclosure revealed more of the truth about HEXO's impaired inventory.

312.   On March 17, 2020, HEXO announced that (i) HEXO was delaying filing its FY2019 financial statements; (ii) the Ontario Securities Commission was reviewing the Company's filings; (iii) HEXO was taking another huge inventory impairment – up to a staggering $280 million; (iv) HEXO was selling the Niagara Facility; and (v) there were questions as to whether HEXO could continue as a going concern.

313.   After this news, HEXO's stock dropped an additional 30% from a March 16,

2020 closing price of $.77 per share to close on March 17, 2020 at $.45 per share.

314.   This disclosure revealed more about the extent of HEXO's inventory overvaluations.

315.   On March 30, 2020, the Company announced a net loss of C$298.2 million in its fiscal second quarter as of January 31, 2020 – exponentially wider than the loss of C$4.3 million posted in the year-earlier period.  HEXO's C$298.2 million net loss included a C$138.3 million was an impairment loss relating to its Niagara Facility (which was now up for sale) and on intangible assets acquired from Newstrike Brands, and C$111.9 million was a goodwill impairment charge.

316.   HEXO also announced that it had relieved the SQDC of its contractual obligation to purchase 20,000 kg in the first year of the SQDC Agreement.  This further disclosed to the market that HEXO never had any intention of enforcing the take-or-pay feature of the agreement.

317.   After these adverse disclosures, on March 30, 2020, HEXO stock fell over 35% to close at $.79 per share, after closing on March 27, 2020 at $1.09 per share.

318.   The March 30, 2020 disclosure fully and finally revealed the staggering extent of HEXO's losses.

319.   Analysts' statements after the corrective disclosures show the market's surprise by the adverse revelations.  *See* ¶¶ 122, 128, 135-138, 141, 148-152, 161.

320.   The timing and magnitude of the price declines in HEXO securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the

subsequent significant decline in the value of HEXO securities when Defendants' misrepresentations were revealed.

## CLASS ACTION ALLEGATIONS

321.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired HEXO securities between January 23, 2019 and March 30, 2020, inclusive, on the NYSE or NYSE American exchanges, and who were damaged thereby (the Class), including those who purchased or acquired HEXO stock in the Offering.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

322.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, HEXO securities actively traded on the NYSE American and NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of HEXO securities were traded publicly during the Class Period on the NYSE American and NYSE. Record owners and other members of the Class may be identified from records maintained by HEXO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

323.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

324.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class and securities litigation.

325.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of HEXO; and

(c)    to what extent the members of the Class have sustained damages, and the proper measure of damages.

326.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## CAUSES OF ACTION

### COUNT I
### Violations of Section 11 of the Securities Act Against All Defendants

327.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiffs or members of the Class.

328.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent

conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 11 claim.

329.    This Count is asserted against all Defendants for violations of § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who purchased or otherwise acquired HEXO's common stock pursuant or traceable to the Prospectus.

330.    Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the Offering pursuant to the Prospectus, which contained misrepresentations of material fact about the SQDC Agreement.

331.    The Prospectus contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above.  The Individual Securities Act Defendants were executive officers and directors of the Company who were responsible for the contents and dissemination of the Prospectus. Further, these defendants signed the Prospectus in their official capacity with the Company.

332.    The Underwriter Defendants were underwriters for the Offering.  As such, these defendants issued, caused to be issued and participated in the issuance of the Prospectus and are subject to liability for violations of § 11 of the Securities Act.

333.    Plaintiffs and the other Class members who purchased or acquired HEXO common stock pursuant or traceable to the Prospectus did not know of the false statements and omissions alleged herein and could not have reasonably discovered such facts or conduct.

334.    Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the Prospectus.  Less than three

years elapsed from the time that the securities upon which this Count is brought were offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Prospectus.

335.    Plaintiffs and the other Class members have sustained damages.  The value of HEXO common stock has declined substantially subsequent to and due to Defendants' violations of § 11 of the Securities Act.  By reason of the foregoing, Defendants are liable for violations of § 11 of the Securities Act to Plaintiffs and the other Class members who purchased or otherwise acquired HEXO's common stock pursuant or traceable to Prospectus.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against HEXO, the Underwriter Defendants, and the Securities Act Individual Defendants

336.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiffs or members of the Class.

337.    The defendants named in this Count violated § 12(a)(2) of the Securities Act, 15 U.S.C. § 77-1(a)(2).  This Count is alleged on behalf of all Class members who purchased or otherwise acquired the HEXO common stock pursuant or traceable to the Offering.

338.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 12(a)(2) claim.

339.    The defendants named in this count were sellers, offerors and/or solicitors of sales of HEXO common stock offered pursuant to the Prospectus.  These offering documents contained untrue statements of material fact and omitted other facts necessary to make the

statements not misleading, and failed to disclose material facts, as set forth above.

340.     Plaintiffs and the other Class members who purchased or otherwise acquired HEXO common stock pursuant or traceable to the materially untrue and misleading offering documents did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

341.     The Defendants named in this count owed to Plaintiffs and the other Class members who purchased or otherwise acquired HEXO common stock pursuant or traceable to the materially false and misleading offering documents the duty to make a reasonable and diligent investigation of the statements contained in the offering documents, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading.  The defendants named in this count did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the offering documents were true and without omissions of any material facts and were not misleading.  By virtue of the conduct alleged herein, the defendants named in this count violated § 12(a)(2) of the Securities Act.

## COUNT III

### Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants

342.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiffs or members of the Class.  This Count is asserted against the Individual Defendants for violations of § 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other Class members who purchased or otherwise acquired HEXO's common stock pursuant or traceable to the Prospectus.

343.     This Count does not sound in fraud.   Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.   For purposes of asserting this claim under the Securities Act, Plaintiffs does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 15 claim.

344.     At all relevant times, the Individual Defendants were controlling persons of the Company within the meaning of § 15 of the Securities Act.   Each of the Individual Defendants served as an executive officer or director of HEXO prior to and at the time of the Offering, as set forth above.

345.     Each of the Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of HEXO's business affairs.   As officers and directors of a publicly owned company listed on the NYSE and registered with the SEC, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HEXO's financial condition and results of operations.

346.     By reason of the aforementioned conduct, each of the Defendants named in this Count are liable under § 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under §§ 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other Class members who purchased HEXO common stock pursuant or traceable to the Prospectus.

## COUNT IV

**Violation of Section 10(b) of the Exchange Act And
Rule 10b-5 Promulgated Thereunder Against The Exchange Act Defendants**

347.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

348.     During the Class Period, the Exchange Act Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase HEXO securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of the, took the actions set forth herein.

349.     The Exchange Act Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HEXO securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Exchange Act Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

350.     The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about HEXO financial well-being and prospects, as specified herein.

351.     The Exchange Act Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of HEXO's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to

make the statements made about HEXO and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

352.    Each of the Exchange Act Defendants' primary liability and controlling person liability arises from the following facts: (i) the Exchange Act Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's sales, inventory, finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

353.    The Exchange Act Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Thus, the Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with HEXO's business and financial results from the investing public and supporting the

artificially inflated price of its securities.

354.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of HEXO securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Exchange Act Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by these defendants, but not disclosed in public statements during the Class Period, Plaintiffs and the other members of the Class acquired HEXO securities during the Class Period at artificially high prices and were damaged thereby.

355.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that HEXO was experiencing, which were not disclosed by the Exchange Act Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their HEXO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

356.    By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

357.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants

358.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

359.     The Exchange Act Individual Defendants acted as controlling persons of HEXO within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  The Exchange Act Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

360.     In particular, the Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

361.     As set forth above, the Exchange Act Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Exchange Act Individual Defendants are liable pursuant to Section

20(a) of the Exchange Act. As a direct and proximate result of the Exchange Act Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A)     Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(B)     Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

(C)     Awarding rescission of HEXO stock purchased pursuant to or traceable to the Prospectus under Section 12(a)(2) of the Securities Act;

(D)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: June 15, 2020                Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: /s/ Laurence J. Hasson

_____

Stanley D. Bernstein
Laurence J. Hasson
Joseph R. Seidman, Jr.
Lisa Sriken
10 East 40th Street
New York, NY  10016
Telephone: (212) 779-1414
Facsimile:  (212) 779-3218
bernstein@bernlieb.com
hasson@bernlieb.com
seidman@bernlieb.com
sriken@bernlieb.com

*Lead Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that June 15, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Laurence J. Hasson*
LAURENCE J. HASSON