**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE HEXO CORPORATION SECURITIES LITIGATION | No. 1:19-cv-10965-NRB (DCF)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO DISMISS**

NORTON ROSE FULBRIGHT US LLP

Gerard G. Pecht (admitted *pro hac vice*)
Todd D. Batson (TB-0629)
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone:  (713) 651-5151
Facsimile:   (713) 651-5246

Peter A. Stokes (admitted *pro hac vice*)
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone:  (512) 536-5287
Facsimile:   (512) 536-4598

*Attorneys for HEXO Corp., Sébastien St-Louis, Michael Monahan, Steve Burwarsh, Adam Miron, Michael Munzar, Jason Ewart, Vincent Chiara, Nathalie Bourque, and Ed Chaplin*

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

Jay B. Kasner
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, New York 10001
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

*Attorneys for CIBC World Markets Inc., BMO Nesbitt Burns Inc., Oppenheimer & Co. Inc., Altacorp Capital Inc., Beacon Securities Limited, Bryan, Garnier & Co Ltd, Cormark Securities Inc., Eight Capital, GMP Securities L.P., Laurentian Bank Securities Inc., PI Financial Corp., and Roth Capital Partners, LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

ARGUMENT .......................................................................................................................... 12

    I.     PLAINTIFFS FAIL TO STATE A CLAIMS UNDER SECTIONS 11 OR 12(A)(2) ..... 12

       A.   The Registration Statement Did Not Misstate or Omit Material Facts......................... 13

       B.   Defendants Did Not Violate Item 105 of SEC Regulation S-K.................................. 16

       C.   The Bespeaks Caution Doctrine Bars Plaintiffs' Securities Act Claims ...................... 17

       D.   Plaintiffs Lack Standing To Assert a Section 12(a)(2) Claim ..................................... 18

    II.    PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM......................................... 19

       A.   The Allegations Do Not Support a Strong, Cogent, and Compelling Inference of Fraud or Recklessness, and Do Not Show Actionable Misstatements.................................... 20

       B.   The PSLRA Safe Harbor and the Protections for Statements of Opinion Further Support Dismissal ................................................................................................... 24

    III.   PLAINTIFFS FAIL TO STATE CONTROL PERSON CLAIMS ............................... 25

CONCLUSION....................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................................25

*In re Ariad Pharms., Inc.*,
98 F. Supp. 3d 147 (D. Mass. 2015) ........................................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)......................................................................................................25

*In re Bank of Am. Corp. Secs., Deriv. & ERISA Litig.*,
No. 09 MD 2058 (PKC), 2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012)................................22

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...................................................................................22

*Bayerische Landesbank, N.Y. Branch v. Barclays Capital, Inc.*,
902 F. Supp. 2d 471 (S.D.N.Y. 2012).....................................................................................25

*Caiafa v. Sea Containers Ltd.*,
331 F. App'x 14 (2d Cir. 2009) .........................................................................................18, 19

*Cement Masons & Pasterers Joint Pension Trust v. Equinix, Inc.*,
No. 11-01016 SC, 2012 WL 685344 (N.D. Cal. Mar. 2, 2012)........................................15, 25

*In re Centerline Holdings Co. Sec. Litig.*,
613 F. Supp. 2d 394 (S.D.N.Y. 2009).....................................................................................23

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008).....................................................................................24

*City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Tech. Corp.*,
No. 18-cv-10320 (AJN), 2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020)................................13

*City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014).....................................................................................................12

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017)......................................................................................................23

*In re Cutera*,
610 F.3d 1103 (9th Cir. 2010) .................................................................................................24

*Davidoff v. Farina*,
No. 04 Civ. 7617 (NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ..............................15

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002) .....................................................................................................4

*In re Express Scripts Holdings Co. Sec. Litig.*,
773 F. App'x 9 (2d Cir. 2019) ...............................................................................15

*In re Fairway Grp. Holdings Corp. Secs. Litig.*,
No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) .......................18

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
764 F. App'x 127 (2d Cir. 2019) ...........................................................................14

*Fisher v. Ross*,
93 Civ. 0275(JGK), 1996 WL 586345 (S.D.N.Y. Oct. 11, 1996) ...........................................14

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019) ...................................................................................2

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008) ......................................................................13

*In re GeoPharma, Inc. Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006) ...............................................................3, 23

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) ...............................................................3, 20

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) .....................................................................20

*In re Global Crossing, Ltd. Sec. Litig.*,
471 F. Supp. 2d 338 (S.D.N.Y. 2006) .....................................................................25

*In re Global Crossing, Ltd. Secs. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y.2003) .....................................................................18

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ...................................................................................4

*Gray v. Wesco Aircraft Holdings, Inc.*,
No. 19-cv-8528 (LJL), 2020 WL 1904019 (S.D.N.Y. Apr. 16, 2020) ....................................25

*Gregory v. ProNAi Therapeutics Inc.*,
297 F Supp. 3d 372 (S.D.N.Y. 2018) .....................................................................23

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) ...................................................................................18

*In re HEXO Corp. Sec. Litig.*,
No. 150444/2020 (N.Y. Sup. Ct. July 13, 2020) ...................................................................1

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ....................................14

*Ho v. Flotek Indus., Inc.*,
    248 F. Supp. 3d 847 (S.D. Tex. 2017),
    *aff'd sub nom. Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
    915 F.3d 975 (5th Cir. 2019) ...............................................................................23

*Holbrook v. Trivago N.V.*,
    No. 17 Civ. 8348 (NRB),
    2019 WL 9848809 (S.D.N.Y. Feb. 26, 2019)........................................................14, 19, 21, 25

*Johnson v. Sequans Commc'ns S.A.*,
    No. 11 Civ. 6341 (PAC), 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ..................................18

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................20, 23

*In re Kandi Techs. Grp., Inc.*,
    17 Civ. 1944 (ER), 2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019) ...........................................22

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    No. 07 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...............................13

*Lopez v. Ctpartners Executive Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016).....................................................................24

*Luo v. Sogou, Inc.*,
    No. 19-cv-230 (LJL), 2020 WL 3051019 (S.D.N.Y. June 8, 2020) .......................................14

*In re Magnum Hunter Res. Corp. Secs. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014),
    *aff'd*, 616 F. App'x 442 (2d Cir. 2015)..................................................................3, 21, 22, 24

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).................................................................23

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ..........................................................................25

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)..................................................................25

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
    No. 09 Civ. 3708, 2012 WL 6168151 (S.D.N.Y. Dec. 11, 2012)..........................................25

*Miyahira v. Vitacost.com, Inc.*,
    715 F.3d 1257 (11th Cir. 2013) ...........................................................................13

*In re Molycorp, Inc. Secs. Litig.*,
    No. 12-CV-00292, 2015 WL 1540523 (D. Colo. Mar. 31, 2015) .....................................18, 24

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).................................................................................12

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................................................4

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018)...................................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)...............................................................................19, 21

*Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015)...................................................................................21

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)...................................................................................19

*In re Proshares Trust II Sec. Litig.*,
    No. 19-CV-886 (DLC), 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020).........................................16

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)...................................................................................25

*Recupito v. Prudential Secs., Inc.*,
    112 F. Supp. 2d 449 (D. Md. 2000).......................................................................................15

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...................................................................................25

*Rok v. Identiv, Inc.*,
    No. 15-cv-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .........................................24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...........................................................................................12, 18

*Rubinstein v. Credit Suisse Group AG*,
    No. 19-CV-1069 (VEC), 2020 WL 2036850 (S.D.N.Y. Apr. 28, 2020)................................17

*Sanders v. AVEO Pharm., Inc.*,
    No. 13-11157-DJC, 2015 WL 1276824 (D. Mass. Mar. 20, 2015) ....................................3, 23

*In re Satyam Comp. Serv. Ltd. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)...................................................................................25

*Schaffer v. Horizon Pharma PLC*,
    No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...................................17

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014).....................................................................................14

*Sinay v. CNOOC Ltd.*,
    No. 12 Civ. 1513(KBF), 2013 WL 1890291 (S.D.N.Y. May 6, 2013) ..................................20

*Singh v. Schikan*,
    106 F. Supp. 3d 439 (S.D.N.Y. 2015).............................................................................13, 25

*In re Skechers USA, Inc. Secs. Litig.*,
    No. 18 Civ. 8039 (NRB), 2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020)..............................20

*In re Société Générale Secs. Litig.*,
　　No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ..............................21

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
　　573 F.3d 98 (2d Cir. 2009)...................................................................................4, 20, 21, 23

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
　　No. 1:12-cv-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015) .........................................13

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
　　33 F. Supp. 3d 401 (S.D.N.Y. 2014).....................................................................................25

*Stadnick v. Vivint Solar, Inc.*,
　　No. 14-CV-9283 (KBF), 2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015),
　　*aff'd*, 861 F.3d 31 (2d Cir. 2017) .........................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007).............................................................................................................19

*In re The Hain Celestial Grp. Inc. Secs. Litig.*,
　　No. 2:16-cv-04581 (ADS), 2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019).............................22

*In re Twinlab Corp. Sec. Litig.*,
　　103 F. Supp. 2d 193 (E.D.N.Y. 2000) ..................................................................................22

*In re Uxin Sec. Litig.*,
　　66 Misc. 3d 1232(A), 2020 N.Y. Slip Op. 50336(U),
　　(N.Y. Sup. Ct. 2020) ...........................................................................................................14

*In re Velti PLC Secs. Litig.*,
　　No. 13-cv-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ..................................13

*In re WebMD Health Corp. Sec. Litig.*,
　　No. 11 Civ. 5382(JFK), 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ........................................24

*Wilson v. Merrill Lynch & Co.*,
　　671 F.3d 120 (2d Cir. 2011)..................................................................................................15

*Y-GAR Capital LLC v. Credit Suisse Grp. AG*,
　　No. 19 Civ 2827 (AT), 2020 WL 71163 (S.D.N.Y. Jan. 2, 2020)..................................13, 15

*Yung v. Lee*,
　　432 F.3d 142 (2d Cir. 2005)..................................................................................................18

**Rules and Statutes**

17 C.F.R. § 229.105 .................................................................................................................16

15 U.S.C. § 77k(a) ...................................................................................................................12

15 U.S.C. § 78u-4 (2010)......................................................................................................1, 20

Fed. R. Civ. P. 8......................................................................................................................13

Fed. R. Civ. P. 9(b) ..................................................................................................1, 12, 13, 22

Fed. R. Civ. P. 12(b)(6)........................................................................................................1

**Other Sources**

National Instrument 51-102, Section 4.11(7) ...............................................................24

Defendants[1] respectfully submit this memorandum of law in support of their joint motion to dismiss the First Amended Class Action Complaint for Violations of the Federal Securities Laws ("FAC") for failure to state a claim under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), failure to plead fraud with sufficient particularity under FRCP 9(b), and failure to meet the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 (2010).

## PRELIMINARY STATEMENT[2]

Canada legalized adult-use recreational cannabis on October 17, 2018. HEXO, a Québec-based cannabis supplier, expected that this new market would increase the demand for its products significantly. In anticipation of this increased demand, HEXO entered into supply agreements with Québec's government-run cannabis dispensary (the "SQDC," and the supply agreement, the "SQDC Agreement") and with other major Canadian dispensaries. HEXO then completed a U.S. securities offering in January 2019 and began trading on the NYSE American. In March 2019, HEXO acquired Newstrike Brands Ltd. ("Newstrike"), including two greenhouse facilities, in a C$263 million all-stock acquisition.[3] HEXO believed that the Newstrike acquisition would enable the Company to meet the anticipated growth in demand following legalization of adult-use.

---

[1] The FAC asserts claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act") against HEXO Corp. ("HEXO" or the "Company"); Sébastien St-Louis, Adam Miron, Michael Munzar, Jason Ewart, Vincent Chiara, Nathalie Bourque, and Ed Chaplin (the "Securities Act Individual Defendants"); and CIBC World Markets Inc., BMO Nesbitt Burns Inc., Oppenheimer & Co. Inc., Altacorp Capital Inc., Beacon Securities Limited, Bryan, Garnier & Co Ltd, Cormark Securities Inc., Eight Capital, GMP Securities L.P., Laurentian Bank Securities Inc., PI Financial Corp., and Roth Capital Partners, LLC (the "Underwriter Defendants," and with HEXO and the Securities Act Individual Defendants, the "Securities Act Defendants"). The FAC asserts claims under Section 15 of the Securities Act against the Securities Act Individual Defendants. The FAC also asserts claims under Section 10(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against HEXO; Mr. St-Louis, Mr. Chaplin, Michael Monahan, and Steve Burwarsh (the "Exchange Act Individual Defendants," and with HEXO, the "Exchange Act Defendants"). The FAC asserts claims under Section 20(a) of the Exchange Act against the Exchange Act Individual Defendants.

[2] Defendants also have moved to dismiss a parallel Section 11 class action filed in the New York Supreme Court for failure to state a claim, or alternatively, to stay the case in favor of this action. *See In re HEXO Corp. Sec. Litig.*, No. 150444/2020 (N.Y. Sup. Ct. July 13, 2020) (Borrok, J.), Dkt. 33-45 (Mot. Seq. No. 5).

[3] References to "C$" are to Canadian dollars, and to "$", U.S. dollars.

Unfortunately, the anticipated growth in demand failed to materialize.  Although HEXO's Québec market share generally met expectations, the SQDC did not open the projected number of retail stores during the first year of legalization, and ultimately, its overall sell-through across all licensed cannabis suppliers was less than half of what was projected.[4]  To maintain good relations with the SQDC, HEXO announced that it would not require the SQDC to purchase the full Year One commitment of 20,000 kilograms under the SQDC Agreement.  As a young company in a new industry, HEXO also faced challenges with licensing, internal controls, and financial reporting, which eventually led to a modest financial restatement.[5]

Plaintiffs have attempted to concoct Securities Act and Exchange Act claims based on these events.  The claims, however, are not supported by well-pled facts.  The Securities Act claims rest on the bald assertion that HEXO knew at the time of the January 2019 offering that it would not sell its Year One allotment to the SQDC, and that HEXO never intended to enforce the purchase commitment.  Conclusory assertions that a company knew from the beginning that it would not achieve a sales target or enforce a contractual remedy do not state a viable Securities Act claim.  Indeed, the fact that HEXO acquired Newstrike *after* the offering confirms that HEXO legitimately believed that demand would increase.  The offering documents made clear that the SQDC needed to increase its purchasing rate substantially in order to fulfill its Year One commitment.  Federal securities laws do not protect investors from the inherent risks that accompany investing in a nascent market, from risks that are plainly disclosed, or from market expectations that later prove

---

[4] *See* Exhibit 1 at 18, and Exhibit 2 at 5, to the accompanying Declaration of Todd Batson ("Batson Declaration") (both discussing HEXO's estimated 33% market share achieved in Québec during the first year of legalization ("Year One")).  References to "Ex. [●]" are to the exhibits accompanying the Batson Declaration.  The Court may consider these exhibits, as each was referenced in the FAC and/or should be judicially noticed without converting the motion into one for summary judgment.  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (courts may consider documents filed with the Securities and Exchange Commission on a motion to dismiss).

[5] Plaintiffs do not allege Securities Act claims for the financial restatement, nor do they otherwise allege Securities Act claims arising from the financial statements in the offering documents.  *See* FAC ¶¶ 184-89.

wrong.  Independently, Plaintiffs lack standing to bring Section 12(a)(2) claims because the FAC does not allege Plaintiffs purchased their HEXO securities in the initial public offering, so Plaintiffs lack standing to bring claims under Section 12(a)(2).

The Exchange Act claims fare no better.  Plaintiffs cannot plead a "strong inference" of fraudulent intent, which is required under Section 10(b), by simply identifying accounting errors, weaknesses in internal controls, disappointing earnings, or compliance failures.  There is no allegation that HEXO executives engaged in suspicious trading or reaped wrongful profits.[6]  Nor is there any allegation from a confidential witness (or other source) that HEXO officers knew of specific facts that contradicted their disclosures.  And there is no allegation that HEXO misrepresented the terms of its supply agreements.  To be sure, HEXO faced a series of setbacks during its first year as a U.S. public company.  But HEXO *disclosed* those setbacks.  That HEXO experienced additional challenges, and disclosed them in "dribs and drabs" after they occurred, does not support a cogent and compelling inference of fraudulent intent.[7]  Section 10(b) does not protect investors from mistakes, negligent financial reporting, compliance failures, improvident business practices, underperformance, or even arguable insufficient disclosures.[8]  Nor is the

---

[6] The absence of such allegations weighs heavily against an inference of fraud.  *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) ("Absent allegations of insider sales during the period of stock-price inflation, there would be no concrete benefit to defendants to justify [the] risks" that the alleged scheme "would be revealed[] in relatively short order" and would "likely have generated recriminations – or worse" for defendants).

[7] *See, e.g.*, *In re Magnum Hunter Res. Corp. Secs. Litig.*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014) (no scienter where company "clearly made numerous accounting errors and revealed internal control weaknesses in dribs and drabs"; allegations showed defendants "were in a constant game of 'Catch up' – acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more," and did not support strong inference of scienter), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

[8] *See id.*; *see also In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no strong inference of scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable").

scienter requirement merely a "heightened form of negligence."[9]  Plaintiffs must instead plead particularized facts supporting a cogent and compelling inference that Defendants' state of mind approximated actual intent to defraud.[10]  The FAC does not plead anything remotely approaching that standard.

Accordingly, this case should be dismissed in its entirety, with prejudice.

## BACKGROUND

HEXO sells cannabis products in Canada through a subsidiary licensed under Canada's Cannabis Act, which legalized adult-use cannabis effective October 17, 2018.  FAC ¶¶ 51, 86. HEXO's common shares were traded on the Toronto Stock Exchange before HEXO applied to list on the NYSE American.  FAC ¶¶ 90-91; Ex. 3 at iii.  The Company filed a Form F-10 Registration Statement for the U.S. offering on December 20, 2018, followed by prospectus supplements on January 22, 2019 and January 25, 2019 (which together with the Form F-10 formed an integrated "Registration Statement").  *See* Exs. 3-5.  The Securities Act Individual Defendants were HEXO officers and directors at the time of the offering.  FAC ¶¶ 52, 53, 59-64.  The Underwriter Defendants are banks that underwrote the offering.  *Id.* ¶¶ 65-77.

The method for selling cannabis in Canada differs by province.  In Québec, cannabis must be sold through government-run dispensaries operated by the SQDC.  FAC ¶¶ 11, 82; Ex. 3 at 10. Other provinces, such as British Columbia, Alberta and (eventually) Ontario, have allowed cannabis sales through private retailers as well as government dispensaries.  Ex. 3 at 10-11.  The

---

[9] The degree of recklessness required under Section 10(b) is "a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)); *accord Goldstein v. MCI WorldCom*, 340 F.3d 238, 253-54 (5th Cir. 2003) (even "gross mismanagement" of accounting compliance leading to large financial restatement failed to demonstrate strong inference of scienter); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002) ("[n]egligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud").

[10] *See S. Cherry St.*, 573 F.3d at 109.  As set forth below, some of Plaintiffs' claims involve forward-looking statements, which are subject to an "actual knowledge" requirement.

prospectus supplements contained the following disclosure about HEXO's agreement with the

SQDC:

> The Company has positioned itself for the sale of its products across various distribution channels throughout Canada through supply agreements with the Société québécoise du cannabis ("**SQDC**") in Québec, the Ontario Cannabis Retail Corporation ("**OCRC**") in Ontario and the British Columbia Liquor Distribution Branch ("**BCLDB**") in British Columbia, and by aligning itself with Fire & Flower Inc. ("**F&F**"), a private cannabis retailer operating in certain Canadian provinces where private retailers are permitted including British Columbia, Alberta and Saskatchewan.
>
> In Québec, where HEXO was the first licensed producer and is currently the only publicly listed cannabis licensed producer headquartered in the province, ***the Company has entered into a supply agreement with the SQDC to be the preferred supplier of cannabis products for the Québec market for the first five years post-legalization, with an option to extend the term for an additional year***. The supply arrangement covers the full range of the Company's products and brands. ***Under the agreement, the Company will supply 20,000 kg of products in the first year of the agreement, which is subject to a take-or-pay feature for that year.*** The Company estimates that this represents an approximate 35% market share of the province's adult-use sales in the first year of legalization based on the volumes disclosed by other publicly traded cannabis companies who have also entered into SQDC supply agreements. The Company expects to supply 35,000 kg in the second year of the agreement and 45,000 kg in the third year. The Company estimates that the total amount expected to be supplied in the first three years of the agreement represents an approximate 30% market share of the province's adult-use sales based on the volumes disclosed by other publicly traded cannabis companies who have also entered into SQDC supply agreements. The volumes for the final two years of the Company's agreement with the SQDC will be established at a later date based on the sales generated in the first three years.[11]

Plaintiffs do not assert that HEXO misstated the terms of the SQDC Agreement. As stated

in the challenged disclosure, the Year One purchase commitment was "subject to a take-or-pay

feature for that year," thus conveying that the SQDC might not "take" the entire allotment.[12]

Indeed, HEXO disclosed that total company-wide sales during the initial three months of the

SQDC Agreement (October 17, 2018 to January 13, 2019) totaled approximately $15.2 million

---

[11] Ex. 4 at S-9 (emphasis added); Ex. 5 at S-9 (emphasis added); *see also* Ex. 3 at 7.

[12] *See* Ex. 4 at S-9; Ex. 5 at S-9. A "take-or-pay" clause allows a supplier to collect payment if the purchaser does not fulfill its contractual obligation.

(roughly 2,787 kilograms), signaling the SQDC was not on pace to "take" the full 20,000-kilogram Year One allotment as of January 2019.  Ex. 5 at S-10.  Moreover, the Registration Statement does not affirmatively guarantee that HEXO would enforce the payment obligation if the SQDC ultimately fell short.  HEXO further cautioned that there were no purchase commitments of any kind beyond Year One,[13] that the market was nascent and uncertain, and that there was significant uncertainty in how much cannabis HEXO could sell through the SQDC (or elsewhere):

- "The commercial adult-use and medical cannabis industry is a relatively new industry in Canada."  Ex. 4 at S-16; Ex. 5 at S-16. "There is no guarantee that provincial or territorial regulatory regimes governing the distribution and sale of cannabis for adult-use purposes in each jurisdiction will remain as currently enacted *or that any such legislation and regulation will create the growth opportunities that the Company currently anticipates*."  Ex. 4 at S-17; Ex. 5 at S-17 (emphasis added).

- "HEXO *expects* to derive a significant portion of its future revenues from the recently legalized adult-use cannabis industry and market in Canada, including through its agreements with the SQDC in Québec. . . .  Other than the agreement with the SQDC, pursuant to which the SQDC has agreed to purchase 20,000 kg of HEXO's products for the first year of the agreement, *the agreements with the SQDC, the OCRC and the BCLDB do not contain purchase commitments or otherwise obligate the purchaser to buy a minimum or fixed volume of products from HEXO*.[14]  The amount of cannabis that the SQDC, the OCRC and the BCLDB may purchase under HEXO's agreements with them may therefore vary from what HEXO expects or has planned for.  As a result, HEXO's revenues could fluctuate materially in the future and could be materially and disproportionately impacted by the purchasing decisions of the SQDC, the OCRC and the BCLDB.  *If any of the SQDC, the OCRC or the BCLDB decides to purchase lower volumes of products from HEXO than HEXO expects, alters its purchasing patterns at any time with limited notice or decides not to continue to purchase HEXO's cannabis products at all, HEXO's revenues could be materially adversely affected, which could have a material adverse effect on HEXO's business, financial condition, results of operations and prospects.*"  *Id.* (emphasis added).

---

[13] As HEXO acknowledged, there was "definitely[] a risk" that if the SQDC elected to "take" inventory that the SQDC could not sell to its customers by the end of Year One, it could "lead[] to significant inventory builds" that reduce the SQDC's purchasing needs in year two, for which there was no take-or-pay right.  *See* Ex. 10 at 8-9.

[14] Plaintiffs cite multiple analyst reports that inaccurately accuse HEXO of representing the supply agreement as "guaranteeing" revenues or volumes for multiple years.  *See* FAC ¶¶ 87, 99, 122.  HEXO made no such guarantee and stated the opposite.  The word "guarantee" appears no fewer than 65 times in the FAC, but not once in any actual challenged disclosure by HEXO (aside from disclosing there was *no* guarantee).

- "In the future, cannabis producers in Canada *may produce more cannabis than is needed to satisfy the collective demand of the Canadian adult-use and medical markets*." *Id.* (emphasis added).

Other documents incorporated into the Registration Statement included similar cautionary statements. For instance, HEXO's October 25, 2018 Annual Information Form ("AIF") stated:

- "[T]here is no guarantee that the regulatory regimes in the provinces and territories of Canada will be enacted according to all the terms announced by such provinces and territories, or at all, *or that any such regulatory regimes will create the growth opportunities that the Company currently anticipates.*" Ex. 6 at 20 (emphasis added).

- "The Company must rely largely on its own market research to forecast sales as detailed forecasts are not generally obtainable from other sources at this early stage of the medical cannabis industry in Canada." *Id.* at 23.

HEXO reasonably anticipated that demand for its products would increase as the SQDC established a market. On December 12, 2018, HEXO disclosed that the SQDC had "established 12 retail locations throughout [Québec], for in-store cannabis sales. *It expects to increase this number to 50 locations within the first year of legalization* [*i.e.*, by October 17, 2019]. *It will also sell cannabis online.*" Ex. 7 at 4 (emphasis added).

On March 13, 2019, consistent with its genuine belief that demand would increase, HEXO announced that it had acquired Newstrike (and its greenhouse facilities in Brantford and Niagara, Ontario) for C$263 million in HEXO stock.[15] The FAC baldly asserts that investors were fraudulently "led to believe that this acquisition was necessary to support demand." FAC ¶ 18. Plaintiffs, however, offer no cogent and compelling reason why HEXO would acquire such a facility if it did not genuinely believe that demand would increase. Although HEXO announced on March 13 that it "estimates net and gross revenues from the sale of cannabis in Canada will be in excess of $400 million and $479 million respectively,"[16] and Sébastien St-Louis (HEXO's Chief

---

[15] FAC ¶¶ 4, 18, 190; Ex. 8.

[16] *See* FAC ¶ 19.

Executive Officer) agreed with an analyst's statement during HEXO's March 14, 2019 earnings call that these estimates seemed "conservative,"[17] there are no particularized allegations that HEXO executives knew as of March 2019 that these figures were unachievable or used the announcement as a springboard for insider sales.

After the U.S. offering and Newstrike acquisition, HEXO faced a series of setbacks in operations, internal controls, and licensing, which it disclosed to investors. On June 13, 2019, HEXO "casually disclosed" that it would not enforce the take-or-pay requirement for 3Q2019, explaining that HEXO "value[d] [its] relationship with the SQDC more than the few million dollars in revenue we could get this quarter." FAC ¶¶ 21, 118; Ex. 10 at 9. "Causally disclosing" an adverse development, however, is indicative of candor, not fraud. Moreover, Mr. St-Louis expressly disclosed in response to an analyst question that there was "definitely" a "risk" that the SQDC would not need 20,000 kilograms for Year One, and that if the SQDC were to "take [the full allotment] anyway," it could result in "significant inventory builds" that could reduce demand in the second year. *See* Ex. 10 at 8-9. Mr. St-Louis also disclosed that the SQDC had "slowed their store ramps" and that investors should "expect some timing risk" with respect to the SQDC's ability to fulfill its Year One commitment. *See id.* at 9. Although Plaintiffs fault Mr. St-Louis for "confidently" projecting that HEXO would double its 4Q2019 revenue from C$12.9 million to approximately C$27 million, Plaintiffs allege no particularized facts showing that Mr. St-Louis knew at the time that these results were unachievable. *See id.* at 21; FAC ¶ 23.

On October 10, 2019, HEXO allegedly "shocked" the market by voluntarily withdrawing its C$400 million annual guidance, which Plaintiffs described as a "rare and draconian step." *See* FAC ¶ 26. Taking "draconian" steps to disclose adverse facts, however, is the opposite of fraud.

---

[17] *See id.* ¶ 20; Ex. 9 at 10.

The FAC again alleges no particularized facts showing that HEXO knew its prior guidance was unachievable at the time it was given. Plaintiffs also assert that HEXO's inventory rose significantly between 3Q2019 and 4Q2019, but admit that this fact was disclosed "by [HEXO's] SEC filings." *See* FAC ¶ 25. Again, candid disclosure is the antithesis of fraud.

Two weeks later, on October 24, 2019, HEXO disclosed that it was laying off 200 employees, in part, because of "the SQDC's slower than anticipated cannabis store retail rollout." FAC ¶ 28. Plaintiffs again fail to allege how this candid disclosure shows fraud, or how the fact that Québec's provincial cannabis authority did not meet its own timetable for opening new stores supports a strong inference that HEXO acted fraudulently.

On October 29, 2019, HEXO announced an inventory impairment of nearly C$17 million due to sagging demand. *See* FAC ¶ 29. HEXO also disclosed that the SQDC had taken only half of its Year One allotment, and that HEXO was suspending all operations at the Niagara greenhouse facility acquired from Newstrike. *See* FAC ¶¶ 30, 247; Ex. 2 at 5. HEXO disclosed that although it had achieved its target market share with the SQDC, the SQDC's overall sell-through across all licensed cannabis suppliers was less than half of what the SQDC expected, and that HEXO had decided that "we don't think it would be responsible as a partner to demand that [the SQDC pay for the] full 20 tons" contemplated in the SQDC Agreement. Ex. 2 at 5. Plaintiffs assail HEXO for having previously purchased cannabis on the wholesale market to meet anticipated demand that never materialized, and "admit[ing] that HEXO had produced twice as much product as it shipped seven months earlier" (*see* FAC ¶¶ 252-53), but fail to explain how these allegations show fraud. Indeed, the fact that HEXO had purchased substantial inventory and production capacity simply corroborates that HEXO genuinely believed demand would increase. Absent illicit short-term profit motives from insider trades (which are not alleged), it makes no sense for a company

to buy inventory if it knew there would be no demand for it. HEXO also disclosed on October 29, 2019 that it lacked effective internal controls over year-end inventory count procedures. *See* FAC ¶ 145. Plaintiffs allege no facts attributing these shortcomings to fraud.

On November 15, 2019, HEXO further disclosed that it had discovered on July 30, 2019 that cannabis was being grown in a portion of the Niagara facility ("Block B") that was not properly licensed. *See* FAC ¶¶ 32, 258; Ex. 11. HEXO immediately notified its regulator (Health Canada) after discovering the issue in July, ceased all cultivation activities in that space, and removed the inventory from circulation. *See* Ex. 11. Plaintiffs allege no facts to controvert HEXO's disclosure that Health Canada was "satisfied with HEXO management's corrective actions." *See id.* There are no allegations showing how much cannabis or growing space was affected by this issue, whether the Block B issue prevented HEXO from meeting anticipated supply obligations to customers, whether the licensing issue with Block B was temporary or permanent, whether the statement rendered any specific prior statement false or misleading, or whether the licensing issue had any material impact on HEXO's financial statements. HEXO had previously disclosed that portions of the Niagara facility had other "licensing issues" and that there was an "expected licensing delay" with respect to those issues. *See* FAC ¶ 106. HEXO also made clear in October 2019 that demand was lower than anticipated and that it was thus ceasing all production activity at the Niagara facility. Again, there is no allegation that HEXO insiders sold stock to avoid potential losses purportedly attributable to the Block B licensing situation, which was followed by a modest 5% drop in HEXO's stock price after it disclosed the licensing issue.

On December 16, 2019, HEXO reported disappointing 1Q2020 revenues of C$14.5 million, an additional inventory impairment of C$62.4 million, and a reservation of opinion by HEXO's outside auditor over errors relating to HEXO's tax liability. *See* FAC ¶ 156.

Plaintiffs allege no particularized facts that HEXO's officers knew in advance that the Company's prior treatment of its tax liability was inaccurate.  Plaintiffs also allege that by December 2019, the SQDC had only opened 24 stores, "radically less" than the 50 locations expected at the time of the January 2019 offering, but fail to explain how *the SQDC's* slower-than-anticipated roll out means that *HEXO* committed fraud.  *See* FAC ¶ 102.

On January 2, 2019, HEXO restated its FY2019 and interim 1Q2020 financial statements to correct the tax liability issue identified above, and to move a $2.4 million impairment loss recognized in 1Q2020 to FY2019, concluding that the decrease in value giving rise to the impairment had already occurred in FY2019.  *See* FAC ¶ 159.  The restatement of the tax liability actually resulted in a $14.3 million *reduction* of HEXO's net loss for FY2019 – hardly indicative of a company intentionally manipulating its financial statements to look better.  *See* FAC ¶ 267.  The FAC offers no particularized allegations showing that HEXO officers knew in real time that the $2.4 million impairment had to be taken earlier.  Viewed in the context of HEXO's disclosures to date (which included the July 2019 disclosure that the SQDC roll out was slower than expected, the October 2019 disclosures that HEXO was impairing nearly C$17 million in inventory and sold only half the expected allotment to SQDC, and the additional C$62.4 million impairment announced in December 2019), the fact that $2.4 million of the impairment was later determined to impact FY2019 does not support a strong inference of fraud.

Finally, in March 2020, HEXO announced that it was taking significant additional inventory impairments, that it would sell the Niagara facility, and that it had amended the SQDC Agreement to relieve the SQDC of its Year One take-or-pay obligation (which HEXO had previously disclosed it was not enforcing).  *See* FAC ¶¶ 174, 180.  HEXO also disclosed that the Ontario Securities Commission ("OSC") was reviewing its filings.  *See id.* ¶ 174.  There is no

- 11 -

assertion that the OSC has determined any of HEXO's filings to be fraudulent, nor are there any particularized allegations showing how any of the March 2020 disclosures are attributable to fraud.

## ARGUMENT

## I.  PLAINTIFFS FAIL TO STATE A CLAIMS UNDER SECTIONS 11 OR 12(A)(2)

Plaintiffs' Securities Act claims are based exclusively on the Registration Statement and rest on the bare assertion that, at the time the Registration Statement became effective, HEXO must have known that it would not sell its Year One allotment to the SQDC and never intended to enforce its payment right.[18]  These unadorned allegations fail to state a Securities Act claim.

To state a claim under Section 11, Plaintiffs must allege that "the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-359 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  The same standard applies to Section 12(a)(2).  *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 182-183 (2d Cir. 2014).

Second Circuit precedent further provides that a Securities Act claim sounding in fraud is subject to FRCP 9(b)'s heightened pleading standard.  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  The gravamen of Plaintiffs' claim is that the Registration Statement misleadingly touted the SQDC Agreement as a guaranteed driver of revenues, specifically by emphasizing that the Year One supply commitment was subject to a take-or-pay right, despite HEXO "never having any intention" of claiming payment if the SQDC's purchases fell short.[19]  Allegations that a

---

[18] *See* FAC ¶¶ 184-89.

[19] *See* FAC ¶ 14 ("Unbeknownst to HEXO investors, however, **the Company never had any intention of enforcing the 'take or pay' feature**….") (emphasis added), *id.* ¶ 187 (describing HEXO's statements about the SQDC Agreement as "**materially misleading when made**.") (emphasis added), *id.* ¶ 325(b) (pleading a "[c]ommon question[]" of "whether statements made by Defendants to the investing public during the Class Period **omitted and/or misrepresented material facts** about the business, operations, and prospects of HEXO….") (emphasis added).

defendant "had to know" about some purported adverse fact, or "never intended" to exercise a payment right it had "touted," are classic fraud allegations that require insight into the speaker's intent.[20]  Because this claim sounds in fraud, FRCP 9(b) and the PSLRA apply.[21]

### A.    The Registration Statement Did Not Misstate or Omit Material Facts

Plaintiffs' claims fail, however, even under ordinary FRCP 8 pleading.[22]  The FAC does not assert that HEXO misstated the terms of the SQDC Agreement.  Plaintiffs' theory is, instead, that HEXO's truthful disclosures about the agreement were misleading because HEXO omitted that it purportedly had no reasonable hope of selling its allotment and never intended to enforce its payment right.  "When pleading an actionable omission, Plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering."  *Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) (Buchwald, J.) (quotation marks omitted).  Courts consistently have rejected Section 11 claims premised on conclusory assertions that companies must have known about future business decisions that were

---

[20] *See Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (allegation that defendant "had to know" of undisclosed fact sounded in fraud).

[21] *Y-GAR Capital LLC v. Credit Suisse Grp. AG*, No. 19 Civ. 2827 (AT), 2020 WL 71163, at *4 (S.D.N.Y. Jan. 2, 2020) (Section 11 claims sounding in fraud subject to FRCP 9(b)).  Having made broad averments throughout the FAC that statements in the Registration Statement about the SQDC Agreement's Year One purchase commitment and the take-or-pay provision were false and misleading because HEXO "never intended" to enforce the payment right, Plaintiffs cannot avoid FRCP 9(b)'s heightened pleading standard through conclusory, self-serving disclaimers of fraud.  *City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Techs. Corp.*, No. 18-cv-10320 (AJN), 2020 WL 1529371, at *11-12 (S.D.N.Y. Mar. 30, 2020) (collecting cases).

[22] Federal courts routinely dismiss Securities Act claims under ordinary Rule 8 standards.  *See, e.g.*, *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1268 & 1265 n.4 (11th Cir. 2013) (affirming dismissal of Section 11 claim concerning alleged "unrealistic" growth projections under ordinary FRCP 8 notice pleading); *In re Velti PLC Secs. Litig.*, No. 13-cv-03889-WHO, 2015 WL 5736589, at *1 (N.D. Cal. Oct. 1, 2015) (dismissing Section 11 claims under ordinary Rule 8 pleading rules for not adequately alleging "any materially misleading misstatement or omission"); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-00993, 2015 WL 3833849, at *18 (M.D. Pa. June 22, 2015) (dismissing Securities Act claims despite holding that particularity rule for fraud was inapplicable); *In re Ariad Pharms., Inc.*, 98 F. Supp. 3d 147, 157 (D. Mass. 2015) (dismissing Section 11 claims even though such claims were "subject to the ordinary pleading standard applicable to a Rule 12(b)(6) motion to dismiss" rather than the heightened requirements under FRCP 9(b)); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612-14 (S.D.N.Y. 2008) (dismissing Section 11 claims under ordinary Rule 8 pleading standards).

disclosed later – including bare allegations that a party knew from day one that it would not collect or enforce contractual remedies against a counterparty.[23]

Plaintiffs' conclusory assertions that HEXO already knew in January 2019 that it would not sell the full Year One allotment or enforce the purchase commitment are similarly insufficient. A plaintiff may not rely **solely on hindsight** to plead a misstatement. *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014); *Holbrook v. Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 9848809, at *13 (S.D.N.Y. Feb. 26, 2019) (Buchwald, J.) (relying on post-offering financial results is "paradigmatic hindsight pleading … insufficient on its own to withstand a motion to dismiss."). As in the cases cited above, Plaintiffs offer nothing but speculation that HEXO already had decided by January 25, 2019 to surrender its payment right despite having nearly nine months remaining in Year One. Although HEXO disclosed in the Registration Statement that initial purchase volumes were modest, the FAC does not allege that as of January 25, 2019, the SQDC was unable to increase its pace over the remaining nine months to fulfill its commitment, let alone that HEXO *knew* the SQDC could not possibly meet the commitment. The market for legal adult-use cannabis in Québec was barely three months old at the time of the offering. As HEXO disclosed on December 12, 2018, "[t]he SQDC has established 12 retail locations throughout the province, for in-store cannabis sales. *It expects to increase this number to 50 locations within*

---

[23] *See, e.g.*, *In re Ferrellgas Partners, L.P., Sec. Litig.*, 764 F. App'x 127, 128 (2d Cir. 2019) (per curiam) ("Plaintiffs' complaint suffers from a fatal defect: it assumes without sufficient supporting allegations that Defendants knew or should have known that a contractual counterparty would ultimately default on payments owed [under a take-or-pay agreement]."); *Luo v. Sogou, Inc.*, No. 19-cv-230 (LJL), 2020 WL 3051019, at *13 (S.D.N.Y. June 8, 2020) (dismissing Section 11 claim where facts alleged did not "show[] that such decision was made at the time the Registration Statement became effective"), *appeal filed* (July 2, 2020); *In re Uxin Sec. Litig.*, 66 Misc. 3d 1232(A), 2020 N.Y. Slip Op. 50336(U), at *7-8 (N.Y. Sup. Ct. 2020) (issuer's post-offering decision to shift its business strategy did not render prior statements touting that strategy false or misleading absent allegation issuer knew or should have known statements to be false when made); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557(CM), 2013 WL 6233561, at *1, 7-8 (S.D.N.Y. Dec. 2, 2013) (supplier did not violate Securities Act where offering documents touted contract with largest customer, including a take-or-pay clause, when relationship soured shortly after offering); *Fisher v. Ross*, 93 Civ. 0275(JGK), 1996 WL 586345, at *7 (S.D.N.Y. Oct. 11, 1996) (claims based on later developments were "classic fraud by hindsight").

***the first year of legalization*** [*i.e.*, by October 17, 2019].  ***It will also sell cannabis online***."[24]
Given that HEXO expected the SQDC to increase its number of retail stores by over 300% within the first year of legalization, it certainly was reasonable at the time of the offering to expect the SQDC to increase its purchasing substantially.  Plaintiffs allege nothing to the contrary and cite no factual basis for why HEXO would waive its payment right nine months early.

Plaintiffs also contend that statements about the take-or-pay right were misleading because the SQDC was HEXO's most important customer, which allegedly increased the risk that HEXO might waive the payment obligation as a concession to the SQDC if its Year One purchases fell short, specifically because sales over the first few months of Year One were behind the pace necessary to achieve 20,000 kilograms over the full year.  *See* FAC ¶¶ 186(i), 188(i); *see also id.* ¶¶ 82-88.  A plaintiff cannot prevail on an omission claim when the facts giving rise to the risk were disclosed.[25]  The Registration Statement made clear that the SQDC was an important business partner, that maintaining a strong relationship with the SDQC beyond Year One was important to HEXO, and that there was no take-or-pay right for future years.[26]  The general risk that a company may decide in the future to make concessions for a key customer exists in virtually any situation where a company relies on its relationships with large customers.[27]

---

[24] Ex. 7 at 4 (emphasis added) (management's discussion and analysis for the three month period ended Oct. 31, 2018).

[25] *See Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *9-10 (S.D.N.Y. Aug. 22, 2005) (Buchwald, J.) (dismissing claim where the "risk and the facts underlying it were fully disclosed"); *see also Y-GAR Capital*, 2020 WL 71163, at *4 ("There cannot be a material misstatement or omission if '[defendants'] statement[s] explicitly disclosed the very … risks about which [plaintiff] claims to have been misled.'") (alteration in original) (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 135 (2d Cir. 2011)); *Cement Masons & Pasterers Joint Pension Trust v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *5-6 (N.D. Cal. Mar. 2, 2012) (granting dismissal where cautionary language warned of pricing pressure and reliance on key customers, which risks materialized).

[26] Ex. 5 at S-10 (disclosing that the SQDC accounted for 90% of HEXO's cannabis sales during the initial reporting period); *see also id.* at S-9, S-17.

[27] *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (per curiam) (affirming dismissal of securities claims where "[Plaintiff] essentially argues that Defendants should have anticipated the outcome of the negotiations sooner or that the negotiations would deteriorate, but in the circumstances here, where the discussions were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations"); *Recupito v. Prudential Secs., Inc.*, 112 F. Supp. 2d 449, 457 (D. Md. 2000) ("The federal securities laws do not require a prospectus to state the obvious.") (citation omitted).

The Registration Statement also expressly disclosed that HEXO had achieved only modest sales during the initial reporting period of the supply agreement, which made clear that sales would need to accelerate significantly to reach the full allotment:

> For the Company's fiscal quarter ended October 31, 2018 (which reflected adult-use sales for the first two weeks following legalization in Canada on October 17, 2018), the Company reported adult-use sales of approximately $5.2 million, with gross revenue per gram for adult-use sales of $5.45 and gram and gram equivalents sold in the adult-use market of 952,223 grams for that fiscal quarter … While the Company has yet to report any financial results for any period subsequent to October 31, 2018, the Company estimates adult-use sales for the period from November 1, 2018 to January 13, 2019 to be approximately $10 million.  Such estimate is based on the information available to us at this time and should not be viewed as a substitute for our full interim or annual financial statements prepared in accordance with IFRS.

Ex. 4 at S-10; Ex. 5 at S-10.  Plaintiffs concede that this disclosure indicated the SQDC needed to accelerate its purchases significantly to meet the Year One commitment.  *See* FAC ¶¶ 94-95. Plaintiffs are thus left with the circular argument that HEXO did not adequately disclose a future risk that Plaintiffs want the Court to infer ***from the very facts disclosed in the Registration Statement:*** *i.e.*, the fact that the SQDC was an important customer and the fact that sales would need to accelerate for HEXO to sell the full 20,000 kilogram allotment.

### B.    Defendants Did Not Violate Item 105 of SEC Regulation S-K

Plaintiffs also assert that Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, required HEXO to disclose in the Registration Statement's "Risk Factors" that the SQDC was behind on its Year One purchase commitment, and that HEXO would not enforce its payment right should the SQDC's Year One purchases fall short.  FAC ¶ 189.  Formerly known as Item 503, Item 105 "creates a duty to disclose the most significant factors that make an investment in the registrant or offering speculative or risky." *In re Proshares Trust II Sec. Litig.*, No. 19-CV-886 (DLC), 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020) (internal quotation marks omitted).  "Plaintiffs[, however,] must demonstrate *actual* knowledge of an existing trend, event, or risk to allege

violations of Section 303 and 105." *Rubinstein v. Credit Suisse Group AG*, No. 19-CV-1069 (VEC), 2020 WL 2036850, at *7 (S.D.N.Y. Apr. 28, 2020). Again, as explained above, Plaintiffs fail to allege any facts showing that HEXO ***knew at the time of the offering*** that the SQDC would not fulfill its purchase obligation, let alone that HEXO already had determined to waive its payment right in the event of a shortfall. This claim also fails because the Registration Statement sufficiently disclosed the risk that the SQDC may not purchase as much cannabis as expected. Item 105 does not require exhaustive disclosures.[28] HEXO's extensive disclosures about the uncertainty of the new market, the risks posed by its supplier contracts, the absence of future take-or-pay rights, and the other disclosures cited above are more than sufficient. Indeed, HEXO specifically disclosed the SQDC's modest purchase volumes as of the offering date and warned that sales through the SQDC may fall below expectations. Ex. 4 at S-17; Ex. 5 at S-17.

## C.    The Bespeaks Caution Doctrine Bars Plaintiffs' Securities Act Claims

Plaintiffs' Securities Act claims are lastly barred under the bespeaks caution doctrine. Again, there is no allegation that HEXO misrepresented the SQDC Agreement's actual terms or falsified any historical financial information. The entire case is instead about whether HEXO expected the SQDC to purchase enough cannabis ***in the future*** to meet the 20,000-kilogram commitment and whether HEXO would decide ***in the future*** to exercise its right to payment if the SQDC ***subsequently*** fell short of its purchase obligation. "Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary

---

[28] *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235-236 (S.D.N.Y. 2018) (dismissing Item 303/503 disclosure claim where company made general disclosure that its restaurants "have been associated with customer illness" on a "small number of occasions"); *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (dismissing Item 303/503 claims where drug company disclosed it was charging higher prices than competition and may not be able to execute business plan successfully).

language set out in the same offering.'" *Rombach*, 355 F.3d at 173 (alteration in original) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).  As discussed *supra* at 6-7, statements about HEXO's supply to the SQDC were offset by ample cautionary language in the Registration Statement.  Courts consistently have dismissed Securities Act claims on account of cautionary disclosures comparable to those here.[29]  The Section 11 and 12(a)(2) claims thus fail.

### D.    Plaintiffs Lack Standing To Assert a Section 12(a)(2) Claim

Plaintiffs' Section 12(a)(2) claim independently should be dismissed because Plaintiffs lack standing.  "The Supreme Court has held that claims under Section 12(a)(2) may be brought by those who have purchased securities in initial public offerings but not by those who purchased securities in a secondary market." *Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16-17 (2d Cir. 2009) (internal quotation marks omitted).  Thus, "a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary." *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005).  Even if some members of the putative class might have standing, if the named plaintiffs lack standing, the Section 12(a)(2) claim must be dismissed. *See In re Global Crossing, Ltd. Secs. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) ("[A]t least one named plaintiff must be a member of [the] class" of persons with standing to sue).

Here, Plaintiffs do not claim to have purchased shares directly in the initial public offering and, in fact, the certifications they submitted with their motion for appointment as lead plaintiffs indicate they purchased in the aftermarket.  HEXO's offering occurred on January 25, 2019 at $5.15 per share. FAC ¶ 15.  Plaintiff Medley claims his first purchase was on January 29, 2019—

---

[29] *E.g.*, *In re Fairway Grp. Holdings Corp. Secs. Litig.*, No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357, at *13-14 (S.D.N.Y. Aug. 19, 2015) (dismissing claims under bespeaks caution doctrine where forward-looking statements were "accompanied by meaningful cautionary language"); *Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 WL 214297, at *9, 15 (S.D.N.Y. Jan. 17, 2013) (dismissing claims under the doctrine for statements made in offering documents accompanied by cautionary language); *In re Molycorp, Inc. Secs. Litig.*, No. 12-CV-00292, 2015 WL 1540523, at *25-27 (D. Colo. Mar. 31, 2015) (cautionary statement that reserve estimates are subject to various "uncertainties" sufficient to trigger safe harbor on motion to dismiss).

four days after the offering—at $5.34 per share. *See* Certification of John B. Medley, ECF No. 55-2 at 3. Plaintiff Sweeney's first purported purchase was not until July 26, 2019—six months after the offering—at $3.985 per share. *See* Certification of Timothy Sweeny, ECF No. 55-2 at 24. Accordingly, both Plaintiffs lack standing for their Section 12(a)(2) claim. *See Caiafa*, 331 F. App'x at 16-17 (affirming dismissal of Section 12(a)(2) claim where "attached to plaintiffs' complaint were certifications confirming that they acquired the securities in a secondary market").[30]

## II.     PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM

Plaintiffs' Section 10(b) claim fares no better. "The PSLRA requires that a plaintiff state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind … [*i.e.*,] an intent to deceive, manipulate, or defraud." *Holbrook*, 2019 WL 948809, at *20 (internal quotation marks omitted); *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 501 (S.D.N.Y. 2013) (Buchwald, J.) (similar). "The inference … must be 'cogent and compelling … and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Holbrook*, 2019 WL 948809, at *20 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "A strong inference of fraud may be established by alleging facts demonstrating: (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 21 (internal quotation marks omitted). The PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

---

[30] *See also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) (dismissing Section 12(a)(2) claim for lack of standing where "plaintiffs fail to allege that they purchased their shares in the public offering"); *Stadnick v. Vivint Solar, Inc.*, No. 14-CV-9283 (KBF), 2015 WL 8492757, at *16 (S.D.N.Y. Dec. 10, 2015) (dismissing Section 12(a)(2) claim for lack of standing where plaintiff "represent[ed] that he bought his shares at prices above the $16.00 offering price in the IPO, which necessarily means that he did not buy through the initial public offering itself"), *aff'd*, 861 F.3d 31 (2d Cir. 2017).

allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).

### A.   The Allegations Do Not Support a Strong, Cogent, and Compelling Inference of Fraud or Recklessness, and Do Not Show Actionable Misstatements

The FAC does not allege actionable misstatements made with fraudulent intent.  Plaintiffs make no allegation that Defendants enriched themselves through insider trading or had other concrete personal motives.  The generic allegation that HEXO's officers wanted to inflate the value of their unexercised stock options does not show scienter.[31]

The absence of allegations of a concrete motive weighs heavily against an inference of fraud.[32]  Indeed, it is not cogent to infer that HEXO would spend the time and resources to acquire the Newstrike facilities if HEXO did not expect it would need the demand.[33]  Plaintiffs thus face a "correspondingly greater" burden to plead "strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138, 141 (2d Cir. 2001).  Recklessness is "a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*."[34]

---

[31] *See* FAC ¶ 285; *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (desire to increase "value of [defendants'] stock options" was "universal" to corporate executives); *see also In re Skechers USA, Inc. Secs. Litig.*, No. 18 Civ. 8039 (NRB), 2020 WL 1233759, at *17 (S.D.N.Y. Mar. 12, 2020) (Buchwald, J.) (observing that incentive compensation is generally insufficient to show scienter).

[32] *See Gillis*, 197 F. Supp. 3d at 600 ("Absent allegations of insider sales during the period of stock-price inflation, there would be no concrete benefit to defendants to justify [the] risks" that the alleged scheme "would be revealed[] in relatively short order" and would "likely have generated recriminations – or worse" for defendants).  As in *Gillis*, HEXO's purported scheme would be quickly discovered upon the SQDC's failure to achieve the desired sell-through.

[33] *See id.* at 600, 601 n.33 (holding it was "implausible" company would "invest substantial time and resources" in clinical development that it knew was futile).

[34] *S. Cherry St.*, 573 F.3d at 109.  An alleged factual misstatement is only actionable under Rule 10b-5 if it is intentionally fraudulent or "highly unreasonable and [] represent[s] [] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Sinay v. CNOOC Ltd.*, No. 12 Civ. 1513(KBF), 2013 WL 1890291, at *7 (S.D.N.Y. May 6, 2013) (internal quotation marks omitted).

Plaintiffs appear to limit the Exchange Act claims to post-offering statements.  *See* FAC ¶¶ 190-276.  These statements fail to support anything approaching a cogent and compelling inference of fraud, and instead, show the opposite—that HEXO *disclosed* its various setbacks.[35]

That the SQDC did not open as many retail stores as HEXO expected, or achieve the industry-wide sell-through that HEXO had anticipated when formulating its earnings guidance – and HEXO's corresponding failure to achieve its guidance and its decision to waive the purchase commitment – does not show fraud.  HEXO did not conceal that the SQDC needed to increase its purchases if HEXO was to sell the full Year One allotment.  *See supra* at 15-16.  HEXO also provided accurate quarterly updates about its sales to the SQDC, as well as the number of retail stores the SQDC had opened, repeatedly warning that the SQDC was behind schedule.  *See supra* at 8, 14-15.  In violation of the PSLRA, Plaintiffs provide no particularized allegations – whether based on confidential witnesses, internal documents or otherwise – showing that any Exchange Act Individual Defendant (or for that matter, any HEXO employee) was apprised of specific facts contradicting their public disclosures of HEXO's forecasted sales or financial performance.[36]  The FAC's conclusory assertions that Defendants must have known HEXO's guidance was unachievable, and that Defendants must have known that HEXO would sell the SQDC the full

---

[35] *See supra* at 8-12; *In re Magnum Hunter*, 26 F. Supp. 3d at 297-98; *Holbrook*, 2019 WL 948809, at *21-22 (company's "cascade of disclosures" of risks were inconsistent with a fraudulent state of mind).

[36] *E.g.*, *Holbrook*, 2019 WL 948809, at *21 ("Given the nature of plaintiffs' theory of scienter, their abject failure to identify any reports or statements containing adverse facts that defendants had access [to] at the time the statements were made is itself fatal to plaintiffs' Section 10(b) claims."); *Okla. Firefighters*, 951 F. Supp. 2d at 502 ("Plaintiff's alternative allegation of conscious misbehavior or recklessness suffers from a failure to identify any contemporaneous data or information that defendants either possessed and disregarded, or failed to consider despite a duty to monitor."); *Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015) ("To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must 'specifically identify the reports or statements containing this information'") (citation omitted); *In re Société Générale Secs. Litig.*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286, at *7 (S.D.N.Y. Sept. 29, 2010) ("***Plaintiffs must allege with particularity that defendants 'actually were aware of such [contrary] facts'***") (emphasis added) (quoting *S. Cherry St.*, 573 F.3d at 114).

Year One allotment, and thereafter waive its payment right, do not amount to particularized facts supporting a strong inference of fraud.

HEXO's financial restatement and disclosure of a material weakness pertaining to its inventory controls likewise fail to support a strong inference of fraud.[37] Again, there are no particularized allegations showing that any specific HEXO executives were aware of the accounting errors or weaknesses in internal controls at the time of the alleged misstatements. Moreover, that the tax restatement *reduced* HEXO's 2019 net loss, and that the $2.4 million restated impairment was modest in comparison to other impairments and revenue shortfalls that HEXO disclosed during the relevant time period, severely undercuts any inference of fraud.[38]

HEXO's disclosure that cannabis had been cultivated in an unlicensed area of the Niagara facility fails to show an actionable omission or misstatement, much less a fraudulent one. In violation of the PSLRA and FRCP 9(b), the FAC pleads no particularized facts about the scope of the licensing issue. *Supra* at 10. Although Plaintiffs fault HEXO for not disclosing the issue sooner, Plaintiffs cannot premise their claim on a "pure" alleged omission, but instead, must plead with particularity how specific omitted facts render specific affirmative statements materially misleading.[39] "[T]he securities laws do not impose a general duty to disclose corporate

---

[37] *See, e.g.*, *In re Magnum Hunter*, 26 F. Supp. 3d at 297-298 (no strong inference of scienter despite restatement and thirteen material weaknesses); *In re The Hain Celestial Grp. Inc. Secs. Litig.*, No. 2:16-cv-04581 (ADS), 2019 WL 1429560, at *17 (E.D.N.Y. Mar. 29, 2019) (holding that "alleged GAAP violations and identification and remediation of internal controls also fail to support a strong inference of scienter"); *see also In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 207 (E.D.N.Y. 2000) (same); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) (same).

[38] *See In re Kandi Techs. Grp., Inc.*, 17 Civ. 1944 (ER), 2019 WL 4918649, at *8 (S.D.N.Y. Oct. 4, 2019) (restatement's lack of impact on company's income undercut inference of scienter); *In re Magnum Hunter*, 26 F. Supp. 3d at 295 (modest size of restatement weighed against inferring fraud).

[39] *See In re Bank of Am. Corp. Secs., Deriv. & ERISA Litig.*, No. 09 MD 2058 (PKC), 2012 WL 1353523, at *7 (S.D.N.Y. Apr. 12, 2012) ("As discussed, the Complaint's omission theory does not identify with particularity any statements that were rendered misleading by the omission of specific, then-unresolved investigations and litigation. Absent such a link to misleading statements, the Complaint does not plausibly allege an actionable omission.").

mismanagement or uncharged criminal conduct."[40]    There is no assertion that Health Canada charged HEXO with any infractions or was dissatisfied with HEXO's resolution of the issue.

Moreover, HEXO previously disclosed that other portions of the Niagara facility had other "licensing issues" and that there was an "expected licensing delay" with respect to those issues. *See* FAC ¶ 106.  HEXO also made clear before November 15, 2019 that demand was slower than anticipated and that HEXO was ceasing production at the Niagara facility.  Viewed holistically with HEXO's disclosures about "licensing issues" and "delay," and against the backdrop of HEXO's numerous grim disclosures about impairments, unmet projections, and the shuttering of the entire Niagara facility due to weak demand, the allegations fail to support a strong inference that the delay in disclosing the "Block B" unlicensed cultivation issue was fraudulent.[41]

Lastly, that various HEXO executives resigned later in 2019 fails to show scienter.[42]  Moreover, that HEXO's former auditor, MNP LLP, resigned and was replaced by a larger "Big

---

[40] *In re Marsh & McLennan Cos., Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).

[41] *See S. Cherry St.*, 573 F.3d at 109 (scienter is "not merely a heightened form of negligence"); *Kalnit*, 264 F.3d at 143 (claim fails where "the duty to disclose … was not so clear"); *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 38 (1st Cir. 2017) (company's disclosure of risks and adverse information cut against inference of scienter, "[e]ven if these [disclosures] could have been more fulsome"); *In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 404 (S.D.N.Y. 2009) (scienter not pled "when it is arguable that [the defendants] did not have a duty to disclose such information before they actually did"); *In re GeoPharma*, 411 F. Supp. 2d at 448 ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no scienter where sufficiency of disclosures is "at least debatable"); *Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Even if Flotek could have provided clearer disclosures …, Flotek's actual disclosures are not so blatantly misleading as to be severely reckless."), *aff'd sub nom. Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019).

[42] *See, e.g.*, *Gregory v. ProNAi Therapeutics Inc.*, 297 F Supp. 3d 372, 415 (S.D.N.Y. 2018) (collecting cases and rejecting similar argument because "[o]fficials resign … for many innocuous reasons" and it is "axiomatic that nascent companies with uncertain futures are especially prone to turnover").  Plaintiffs plead no particularized facts showing that anyone resigned because HEXO was acting fraudulently.

Four" audit firm likewise does not show fraud.[43]  MNP concurred with HEXO's disclosure that there were no accounting disagreements or other reportable events under Canadian law.[44]

### B.    The PSLRA Safe Harbor and the Protections for Statements of Opinion Further Support Dismissal

The Exchange Act claims arising from HEXO's FY2020 net revenue guidance, expected future performance, and future prospects under the SQDC Agreement are also barred by the PSLRA safe harbor.  The PSLRA safe harbor requires dismissal if a forward-looking statement is *either*: (i) identified as a forward-looking statement and accompanied by adequate cautionary language; or (ii) not shown through particularized factual allegations to have been made with actual knowledge of its falsity.  *See Lopez v. Ctpartners Executive Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016).  Statements dependent on future performance are forward-looking.  *See In re WebMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382(JFK), 2013 WL 64511, at *5-6 (S.D.N.Y. Jan. 2, 2013).  As set forth above, HEXO provided extensive cautionary disclosures that demand may not materialize, including periodic updates showing that the SQDC's purchasing and rate of store openings was behind schedule.  *See supra* at 8, 14-15.  These statements are more than sufficient.[45]  And, for the same reasons Plaintiffs have failed to plead intent or recklessness, the FAC fails to satisfy the actual knowledge requirement.  *See Lopez*, 173 F. Supp. 3d at 24-25.

---

[43] *See* FAC ¶¶ 169-171 (describing replacement of MNP with Pricewaterhouse Coopers LLP); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 474-475 (S.D.N.Y. 2008) (no inference of scienter where resigning auditor filed letter stating there were no accounting disagreements); *Rok v. Identiv, Inc.*, No. 15-cv-5775-CRB, 2017 WL 35496, at *14 (N.D. Cal. Jan. 4, 2017) ("Auditors' resignations by themselves are insufficient to support an inference of scienter") (citation omitted); *In re Magnum Hunter*, 26 F. Supp. 3d at 299 (dismissing case despite auditor dismissals).

[44] Exs. 12-14; *see* Section 4.11(7) of National Instrument 51-102 (requiring companies to disclose accounting disagreements and other reportable events upon auditor departure).

[45] *See, e.g.*, *In re WebMD*, 2013 WL 64511, at *8-9 (discussing sufficiency of cautionary statements and observing that "Defendants were not obligated to predict correctly the particular factor that ultimately causes [their] projection not to come true") (alteration in original) (internal quotation marks omitted); *In re Cutera*, 610 F.3d 1103, 1112 (9th Cir. 2010) (cautionary statement that performance estimates depended on capabilities and retention of sales personnel defeated securities claim); *In re Molycorp*, 2015 WL 1540523, at *25-27 (cautionary statement that reserve estimates are subject to various "uncertainties" held sufficient).

That HEXO expressed confidence regarding its ability to sell higher volumes is equally inactionable.[46] Statements that companies are "confident" about meeting future forecasts do not eviscerate the PSLRA safe harbor and are inactionable statements of opinion.[47]

## III.   PLAINTIFFS FAIL TO STATE CONTROL PERSON CLAIMS

Plaintiffs' claims under Sections 15 and 20(a) for control person liability fail for lack of a viable primary violation.[48] The claims also fail because Plaintiffs have not alleged any meaningful culpable conduct by any of the Securities Act Individual Defendants or Exchange Act Individual Defendants.[49] With respect to Section 20(a), the culpable participation requirement "is similar to the scienter requirement of Section 10(b)…."[50] For the same reasons that the scienter allegations are inadequate, Plaintiffs have not alleged culpable participation.

## CONCLUSION

Defendants respectfully request that the Court dismiss the FAC with prejudice.

---

[46] *See, e.g.*, FAC ¶¶ 20, 23, 200, 207, 228. Mr. St-Louis candidly acknowledged during the earnings calls that there were risks that could prevent HEXO from achieving guidance. *See id.* ¶ 200 (answering "Yes" in response to "[a]re there risks" question from analyst); Ex. 10 at 8-9 (disclosing multiple risks to guidance and to achieving revenues under SQDC supply agreement).

[47] *See, e.g.*, *Martin v. Quartermain*, 732 F. App'x. 37, 40-42 (2d Cir. 2018) (rejecting claim over press release indicating defendants' "continued confidence" in optimistic projections and discussing requirements for pleading fraud based on statements of opinion); *Gray v. Wesco Aircraft Holdings, Inc.*, No. 19-cv-8528 (LJL), 2020 WL 1904019, at * 16 (S.D.N.Y. Apr. 16, 2020) (rejecting argument "that a statement of confidence in a company's projections" fell outside safe harbor); *Cement Masons*, 2012 WL 685344, at *7 (statement that company "ha[d] a high degree of confidence in [their] ability" to offer guidance held inactionable).

[48] *See Singh*, 106 F. Supp. 3d at 446 (Section 15 requires a primary violation); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (same for Section 20(a)); *Holbrook*, 2019 WL 948809, at *22 (same).

[49] *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (Section 15); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (Section 20(a)).

[50] *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007) (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 351 (S.D.N.Y. 2006)); *In re Alstom SA*, 406 F. Supp. 2d 433, 493 (S.D.N.Y. 2005) (plaintiffs failed to plead culpable participation as to controlling persons where plaintiffs failed to "allege[] any facts supporting a strong inference of … extreme conduct that even approximates recklessness…."); *see also McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 138 (S.D.N.Y. 2013) (dismissing control person liability claim for failure to allege culpable participation); *In re Satyam Comp. Serv. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482-83 (S.D.N.Y. 2013) (same); *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, No. 09 Civ. 3708, 2012 WL 6168151, at *2 (S.D.N.Y. Dec. 11, 2012) (same); *Bayerische Landesbank, N.Y. Branch v. Barclays Capital, Inc.*, 902 F. Supp. 2d 471, 474 (S.D.N.Y. 2012) (same).

Dated:  July 30, 2020

NORTON ROSE FULBRIGHT US LLP

/s/ Peter A. Stokes
Gerard G. Pecht (admitted *pro hac vice*)
Todd D. Batson (TB-0629)
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

Peter A. Stokes (admitted *pro hac vice*)
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone:  (512) 536-5287
Facsimile:   (512) 536-4598

*Attorneys for HEXO Corp., Sébastien St-Louis, Michael Monahan, Steve Burwarsh, Adam Miron, Michael Munzar, Jason Ewart, Vincent Chiara, Nathalie Bourque, and Ed Chaplin*

Dated:  July 30, 2020

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

/s/ Jay B. Kasner
Jay B. Kasner
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, New York 10001
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

*Attorneys for CIBC World Markets Inc., BMO Nesbitt Burns Inc., Oppenheimer & Co. Inc., Altacorp Capital Inc., Beacon Securities Limited, Bryan, Garnier & Co Ltd, Cormark Securities Inc., Eight Capital, GMP Securities L.P., Laurentian Bank Securities Inc., PI Financial Corp., and Roth Capital Partners, LLC*