**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE HEXO CORPORATION
SECURITIES LITIGATION

No. 1:19-cv-10965-NRB

<u>JURY TRIAL DEMANDED</u>

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CORRECTED FIRST AMENDED CLASS ACTION COMPLAINT**

00594673;V1

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................4

ARGUMENT.........................................................................................................8

    I.     LEGAL STANDARDS ...............................................................................8

    II.    PLAINTIFFS ADEQUATELY PLEAD SECURITIES ACT CLAIMS .............................................................................................8

        A.     Section 11.............................................................................8

        B.     Item 105 ..............................................................................11

        C.     Section 12.............................................................................12

        D.     The Bespeaks Caution Doctrine Does Not Immunize Defendants ..........................................................................13

    III.   PLAINTIFFS ADEQUATELY PLEAD EXCHANGE ACT CLAIMS .............................................................................................14

        1.     Misrepresentations About the Agreement in March 2019.....................................................................................14

        2.     Misrepresentations About the Agreement in June 2019.....................................................................................15

        3.     HEXO's Radically Unachievable Financial Projections............................................................................16

        4.     Misleading Statements About the Niagara Facility .......................17

        5.     Misleading Inventory and Impairment Loss Figures....................18

    IV.   HEXO'S CAUTIONARY LANGUAGE WAS INSUFFICIENT .........................19

    V.    PLAINTIFFS SUFFICIENTLY ALLEGE SCIENTER........................................20

        A.     Plaintiffs Adequately Allege Conscious Misbehavior or Recklessness ......................................................................21

        B.     The 10(b) Defendants' Motive Strengthens the Inference of Scienter ..................................................................24

00594673;V1

C.    Plaintiffs' Allegations Collectively Show A Strong
Inference Of Scienter ...................................................................................25

CONCLUSION...........................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altayyar v. E*tsy, Inc.,
242 F. Supp. 3d 161 (E.D.N.Y. 2017*), aff'd*, 731 F. App'x 35 (2d Cir. 2018)....................................8, 9

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
No. 19 CIV. 10067 (PAE), 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020)..........................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................................................8

*Caiafa v. Sea Containers Ltd.*,
331 F. App'x 14 (2d Cir. 2009).................................................................................................................13

*Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*,
No. 11-01016 SC, 2012 WL 685344 (N.D. Cal. Mar. 2, 2012) ........................................................14, 20

*Century Pac., Inc. v. Hilton Hotels Corp.*,
528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd,* 354 F. App'x 496 (2d Cir. 2009)....................................21

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
No. 18-CV-10320 (AJN), 2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020)...................................9, 12, 13

*Davidoff v. Farina*,
No. 04 CIV.7617 (NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) .......................................14, 19

*Feiner v. SS&C Techs., Inc.*,
47 F. Supp. 2d 250 (D. Conn. 1999)........................................................................................................13

*Fisher v. Ross*,
No. 93 CIV. 0275 (JGK), 1996 WL 586345 (S.D.N.Y. Oct. 11, 1996) ..................................................11

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .....................................................................................................21

*Galestan v. OneMain Holdings, Inc.,*
348 F. Supp. 3d 282 (S.D.N.Y. 2018) .....................................................................................................16

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 665 (2d Cir. 2009)......................................9

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) .....................................................................................................24

*Gray v. Wesco Aircraft Holdings, Inc.*,
   No. 19-CV-8528 (LJL), 2020 WL 1904019 (S.D.N.Y. Apr. 16, 2020) .................................................. 20

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd,* 757 F. App'x 35 (2d Cir. 2018).................................................. 23

*Hall v. The Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................................................................. 23

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019) ................................................................................................. 12

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ........................................................................................................................... 8

*Holbrook v. Trivago N.V.*,
   No. 17 CIV. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom.*
   *Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) ................................................................. 10, 24

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) ................................................................................................. 26

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001). ................................................................................................ 25

*In re CPI Card Grp. Inc. Sec. Litig.*,
   No. 16-CV-4531 (LAK), 2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ......................................... 11, 12

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ............................................................................................................ 19

*In re Express Scripts Holdings Co. Sec. Litig.*,
   773 F. App'x 9 (2d Cir. 2019)............................................................................................................. 14

*In re Facebook, Inc., IPO Securities and Derivative Litigation,*
   986 F. Supp. 2d 524 (S.D.N.Y. 2014) ................................................................................................. 12

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   No. 14 CIV. 0950 LAK AJP, 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ...................................... 14

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
   764 F. App'x 127 (2d Cir. 2019)......................................................................................................... 10

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006) ................................................................................................. 23

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................................................. 13

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013).................................................. 11

*In re Intercept Pharm., Inc. Sec. Litig.*,
No. 14 CIV. 1123 NRB, 2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ..................................... 23

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) ........................................................................................ 17

*In re Magnum Hunter Res. Corp. Se*c. Litig.,
26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)........................ 23

*In re Molycorp, Inc. Sec. Litig.*,
No. 12-CV-00292-RM-KMT, 2015 WL 1540523 (D. Colo. Mar. 31, 2015) ........................................ 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ........................................................................................ 9

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019) ............................................................................ 21

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014) ............................................................................. 23

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ............................................................................ 13

*In re Proshares Tr. II Sec. Litig.*,
No. 19CV0886 (DLC), 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ......................................... 12

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ............................................................................ 23

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) ............................................................................. 25

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020) ..................................................................... 17, 25

*In re Societe Generale Sec. Litig.*,
No. 08 CIV. 2495(RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ............................... 24

*In re Symbol Techs., Inc. Sec. Litig.*,
No. 05-CV-3923 DRH AKT, 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ............................. 16

*In re Uxin Ltd. Sec. Litig.*,
66 Misc. 3d 1232(A), 2020 N.Y. Slip Op. 50336 (U) (N.Y. Sup. Ct. 2020).......................... 11

*In re WEBMD Health Corp. Sec. Litig.*,
No. 11 CIV 5382 JFK, 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013)......................................... 19

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................................................................ 26

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC,*
   91 F. Supp. 3d 456 (S.D.N.Y. 2015) ............................................................................*passim*

*Jiajia Luo v. Sogou, Inc.,*
   No. 19-CV-230 (LJL), 2020 WL 3051019 (S.D.N.Y. June 8, 2020) ...................................... 11

*Johnson v. Sequans Commc'ns S.A.,*
   No. 11 CIV. 6341 PAC, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013)...................................... 13

*Ladmen Partners, Inc. v. Globalstar, Inc.,*
   No. 07 CIV. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)................................. 9

*Levy v. Gutierrez,*
   No. 14-CV-443-JL, 2017 WL 2191592 (D.N.H. May 4, 2017) .............................................. 23

*Lewy v. SkyPeople Fruit Juice, Inc.,*
   No. 11 CIV. 2700 PKC, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ................................... 8

*Litwin v. Blackstone Grp., L.P.,*
   634 F.3d 706 (2d Cir. 2011) ................................................................................................. 18

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   437 F.3d 588 (7th Cir. 2006) ............................................................................................... 16

*Martin v. Quartermain,*
   732 F. App'x 37 (2d Cir. 2018)............................................................................................. 20

*Matrixx Initiatives, Inc. v. Siracusano,*
   563 U.S. 27 (2011) .............................................................................................................. 25

*Meyer v. Jinkosolar Holdings Co.,*
   761 F.3d 245 (2d Cir. 2014) ................................................................................................. 10

*New Orleans Employees Ret. Sys. v. Celestica, Inc.,*
   455 F. App'x 10 (2d Cir. 2011)............................................................................................. 22

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000) ................................................................................................. 19

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,*
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................................................... 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.,*
   951 F. Supp. 2d 479 (S.D.N.Y. 2013) .................................................................................. 24

*Panther Partners Inc. v. Ikanos Communications, Inc.,*
   681 F.3d 114 (2d Cir. 2012) ........................................................................................... 11, 12

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.,*
   153 F. Supp. 3d 628 (S.D.N.Y. 2015) .................................................................................. 24

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ............................................ 14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................................................................ 13, 19

*Rubinstein v. Credit Suisse Grp. AG*,
No. 19-CV-1069 (VEC), 2020 WL 2036850 (S.D.N.Y. Apr. 28, 2020) ............................................ 12

*Sanders v. AVEO Pharm., Inc.*,
No. CIV.A. 13-11157-DJC, 2015 WL 1276824 (D. Mass. Mar. 20, 2015) .......................................... 23

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................................ 21, 22, 24

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................................................ 24

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011) ............................................................................................................. 8

*Y-GAR Capital LLC v. Credit Suisse Grp. AG*,
No. 19 CIV. 2827 (AT), 2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ...................................................... 9, 14

*Zaghian v. Farrell*,
675 F. App'x 718 (9th Cir. 2017) .................................................................................................... 16

## Statutes

15 U.S.C. § 77k ................................................................................................................................. 8

15 U.S.C. § 77z ................................................................................................................................ 19

Lead Plaintiffs Timothy Sweeney and John Medley ("Plaintiffs") submit this memorandum of law in opposition to Defendants' motion to dismiss the FAC.[1]

## PRELIMINARY STATEMENT

HEXO is a Canadian cannabis company whose most important contract is with the SQDC, a government agency that controls the cannabis industry in Quebec (the "Agreement"). When HEXO went public in the U.S. in January 2019, it trumpeted this "historic" multi-year Agreement, which it valued at over $1 billion, in its Prospectus. Specifically, HEXO touted that the SQDC committed to buy 20,000 kg of cannabis, worth approximately $100 million, in the first year, and expected to buy 35,000 and 45,000 kg, respectively, in the second and third years. HEXO also highlighted that a "take or pay" clause ("ToP") guaranteed first-year revenues. Under the ToP, the SQDC was required to "pay" even if it did not "take" the agreed-upon 20,000 kg. This guarantee was further amplified by the SQDC's lack of insolvency risk.

The 11 Defendants violated the Securities Act because the Prospectus misrepresented first year revenue as guaranteed and did not warn that ToP enforcement was at risk. Moreover, at the time of the IPO, the SQDC was not opening nearly enough stores or ordering enough volume to meet its first-year commitment – in fact, orders lagged by 140%. The Prospectus was opaque about this substantial shortfall; nevertheless, investors could not have appreciated the gravity of this concern given the (supposedly) guaranteed nature of the ToP. By the end of year one, the SQDC bought only half its commitment and the ToP was never enforced.

Separately, the 10(b) Defendants violated the Exchange Act by continuing to trumpet the SQDC's first-year guarantee and expectations for years two and three – even as the SQDC's

---

[1] Definitions herein are incorporated from Defendants' motion to dismiss ("Mot." or "Motion"). Undefined terms are defined in the FAC. Paragraph cites are to the FAC. The Exchange Act Defendants are referred to as the "10(b) Defendants" and the Securities Act Defendants as the "11 Defendants".

orders continued to precipitously fall behind – 160% and 300% as of March and June 2019. But again, investors remained unconcerned as HEXO had guaranteed year-one revenues via the ToP.

In June 2019, HEXO revealed it would not enforce the ToP due to its "relationship" with the SQDC. This claim rang hollow as HEXO negotiated the ToP at arms-length and its relationship with the SQDC had not changed since signing the Agreement. But HEXO CEO St. Louis dug in, claiming – even as orders were 300% behind – that the SQDC would *still* meet its year-one commitment, just a little late. Even with his damage control, HEXO stock fell over 8%.

The 10(b) Defendants also issued misleading guidance. When announcing HEXO's Newstrike acquisition in March 2019 (purportedly to support demand), HEXO projected net revenue of $400 million for FY2020 and $26 million for Q42019 – and did so with "confidence" for seven months.[2] The guidance was groundless as the ToP was illusory and SQDC orders and store openings were dismal. In October 2019, HEXO pulled the FY2020 guidance and reported preliminary Q42019 net revenues 40% below expectations. HEXO stock plunged 35%.

After that, HEXO fired 200 employees in October 2019, including two senior officers, and revealed that its CFO had resigned (the second in six months). In November, HEXO disclosed that the Niagara Facility (part of Newstrike) had been operating without a license. HEXO admits it knew this since at least July 31, 2019 – but said nothing for four months. After several restatements, belated inventory write-downs, and more resignations, HEXO reported a $300 million net loss and revealed that it had relieved the SQDC of its first-year commitment. All told, HEXO investors lost hundreds of millions of dollars from the fraud.

---

[2] HEXO's fiscal year runs from August 1 to July 31. Thus, FY2020 ran from August 1, 2019 to July 31, 2020. FY2020 included part of the Agreement's first year (October 18, 2018 to October 18, 2019), and part of the Agreement's second year (October 19, 2019 to October 19, 2020).

Defendants make numerous unavailing arguments in their Motion. The 11 Defendants claim they never "affirmatively guarantee[d]" enforcement of the ToP in the Prospectus; HEXO made a routine business decision in not enforcing the ToP; and HEXO disclosed the SQDC was behind schedule. These arguments fail. As this Court has recognized, a ToP is a guarantee (*see infra* at 15) – and Defendants do not need to guarantee a guarantee. The Agreement's first year was also critical to HEXO, so this was no routine business decision – and if Defendants' logic is accepted, no statement could ever be relied on as companies could easily disregard commitments with impunity. Further, HEXO led investors to believe the ToP made year-one demand irrelevant. Finally, HEXO disclosed just two weeks of SQDC orders in the Prospectus when over three months of the Agreement had passed. Plaintiffs meet the Securities Act's low bar.

The 10(b) Defendants' arguments – contesting only falsity and scienter – fare no better. They claim they warned investors of risks relating to the Agreement and HEXO's guidance. Not so. HEXO's risk language was inadequate as the risks portrayed as possible had materialized. Plaintiffs plead detailed (undisputed) facts showing the SQDC would have had to increase orders by 160% at the start of the Class Period and 300% as of June 2019. Warning the SQDC *might* change purchasing patterns or that HEXO *might* not hit guidance was, thus, not meaningful. Defendants never engage the huge disparity in orders other than to claim (without basis) they thought the SQDC could magically increase orders. HEXO also never warned investors the ToP was not a guarantee and might not be enforced. Even when St. Louis revealed HEXO would not enforce the ToP in June 2019, he blunted the significance of this disclosure by confidently claiming (again without basis) HEXO would still make its numbers – albeit slightly late.

The 10(b) Defendants' scienter arguments also fail. They argue Plaintiffs do not allege insider trading, confidential witnesses, or cite to internal documents – but ignore that these are

not requirements.  Plaintiffs plead detailed facts demonstrating a strong inference of scienter. Namely, the 10(b) Defendants knew the SQDC was radically behind schedule; the Agreement's first year commitment, second year expectation, and HEXO's guidance, were unachievable; the ToP was not a guarantee; and HEXO's "relationship" with the SQDC had not changed since April 2018.  Further, these defendants were motivated to commit fraud to close five stock offerings at artificially inflated prices needed to support HEXO's cash-strapped operations, and to self-servingly inflate HEXO's stock price above their option exercise levels.  The competing inference – that HEXO believed the SQDC's drip of orders would suddenly jump, HEXO would somehow hit its lofty guidance, and that the ToP was never guaranteed – is decidedly weak.

Defendants also claim their disclosures show candor, not scienter.  Not so.  St. Louis disclosed HEXO would not enforce the ToP only when forced to do so by an analyst's questions, and then he claimed (without basis) HEXO would still hit its numbers.  That is not candor. Pulling FY2020 guidance was not candor as HEXO could no longer hide that the guidance was unachievable, especially after voiding the ToP. Likewise, restatements and announcing resignations are not candor; they are required.  And claiming to have learned the Niagara Facility was operating without a license in July 2019, but saying nothing until November 2019, is anything but candor.  The most reasonable inference – to which Plaintiffs are entitled – is that as the fraud unraveled, the 10(b) Defendants said as little and as late as possible.

For all these reasons, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

**Background and HEXO's Agreement with the SQDC**

HEXO produces and sells cannabis for recreational and medical use. ¶ 80.  On April 11, 2018, HEXO announced the Agreement, under which HEXO would provide the SQDC with approximately 200,000 kg of cannabis for the first five years following legalization, with an

option to renew for another year. ¶ 82.  HEXO estimated the contract's value at over $1 billion, and emphasized that it required the SQDC to purchase 20,000 kg in the first year and that volumes were expected to increase to 35,000 kg and 45,000 kg in years two and three.  First-year revenue alone was worth over $100 million. ¶¶ 15, 84.  Moreover, first-year revenue was guaranteed by a ToP.  Under that clause, the SQDC was obligated to either "take" the entire 20,000 kg or "pay" for it anyway. ¶ 85.[3]  The sole purpose of the ToP was to guarantee HEXO a substantial revenue "floor" regardless of market factors.  ¶ 86.

**HEXO Conducts its IPO in the United States**

On January 25, 2019, HEXO offered 7,700,000 HEXO shares at C$6.69 per share on the TSX and $5.15 on the NYSE American exchange.  ¶ 92.  In the Prospectus, HEXO stressed the Agreement's ToP, annual volumes, and huge value for years to come.  The Prospectus contrasted the ToP with HEXO's other agreements, which had no such guarantees.  ¶ 187.

**The SQDC Was Never On Pace to Meet Its First Year Commitment**

The SQDC had only opened 12 stores as of HEXO's IPO and only 24 by December 2019 – 3% of the 800 stores necessary to support demand. ¶¶ 101-02.  HEXO's sales to the SQDC at the time of the IPO were 2,988 kg, or 840 kg per month – which was not disclosed in the Prospectus.  ¶ 95.  Based on the first 3½ months of sales under the Agreement, the SQDC was not even close to meeting its first-year commitment as orders lagged by 140%. ¶ 95.

**HEXO Acquires Newstrike and Represents That It Will Help Drive Revenues**

On March 13, 2019, HEXO announced it was acquiring Newstrike for C$263 million to expand its production capacity to support the Agreement and allow HEXO to reach FY2020 net revenue of C$400 million.  ¶ 99.  On March 14, 2019, HEXO issued 4Q2019 guidance of C$26

---

[3] *See also* Mot. 5 n.12 ("A 'take-or-pay' clause allows a supplier to collect payment if the purchaser does not fulfill its contractual obligation.")

million.  HEXO repeatedly emphasized this guidance.  *See*, *e.g.*, ¶ 217 (HEXO "remains on-track ramping up to C$400 million net revenue in [FY]2020 and to double net revenue in Q4"); ¶ 228. HEXO also repeatedly discussed Newstrike's Niagara Facility, including the facility's licensing. For example, St. Louis stated that "of the total 450,000 square feet that we're adding [at the Niagara Facility], there is 250,000 feet that are licensed operational[.]"  ¶ 205.

**HEXO Issued Misleading Statements About the Agreement**

On March 13, 2019, HEXO stated "[w]e will supply the SQDC with 20,000 kg of products in the first year, and we expect to supply 35,000 kg and 45,000 kg in years two and three, respectively."  ¶ 195.  On March 14, 2019, St. Louis claimed he was "absolutely confident" in HEXO's ability to meet the year one commitment.  ¶ 200; *cf.* ¶¶ 213, 217.

**HEXO Surprisingly Voids The ToP; St. Louis Claims Year-One Orders Will Still Be Met**

On a June 13, 2019 call, an analyst asked St. Louis whether there was a risk the SQDC would not meet its year-one commitment since it had only ordered 5,500 kg in the Agreement's first six months.  ¶ 118.  St. Louis shockingly revealed HEXO would not enforce the ToP because of its "relationship" with the SQDC – but mitigated concern by claiming the SQDC would still meet its 20,000 kg commitment by December 31, 2019 (two months late).  ¶ 119.

**HEXO Pulls Its FY2020 Net Revenue Guidance And Cuts 4Q2019 Net Revenue Guidance**

On October 10, 2019 – after months of bullishness – HEXO withdrew its FY2020 guidance and reported preliminary 4Q2019 net revenues of C$15 million, 40% below guidance, causing HEXO stock to fall 35%.  ¶ 131.  Pulling guidance completely is very unusual.  ¶ 132.

**HEXO Announces The First of Many Inventory Impairments**

On October 29, 2019, HEXO reported Q42019 net revenues of $15.9 million and an inventory impairment of C$16.9 million.  ¶ 143.  This showed HEXO's earlier inventory values

were inflated because demand was weak and HEXO did not enforce the ToP.  HEXO also stated that it sold the SQDC only half of its year-one commitment. ¶ 144.  HEXO stock fell 5%.  ¶ 147.

**At Least Four Months Late, HEXO Discloses Licensing Issues At Niagara**

On November 15, 2019, HEXO disclosed that *four months earlier* it learned the Niagara Facility (which had temporarily stopped operations) was "not adequately licensed".  ¶ 153. HEXO stock fell 5%.  ¶ 154.  HEXO would later permanently shutter and sell the facility.

**HEXO Restates And Reveals the Company Understated Its FY2019 Inventory Impairment**

On January 2, 2020, HEXO restated its FY2019 and 1Q2020 financial statements. ¶ 159. HEXO restated to correct errors in its reported deferred tax liability, net loss, and inventory impairment.  HEXO reduced its 1Q2020 inventory impairment by $2.4 million, moving it back to FY2019, which ended on July 31, 2019. ¶ 160.  As a result, HEXO stock fell over 6%. ¶ 160.

**HEXO's Spate of Resignations**

HEXO saw many resignations during the Class Period.  On April 30, 2019, HEXO CFO Ed Chaplin resigned. ¶ 42.  On July 18, 2019, HEXO co-founder Adam Miron abruptly resigned without explanation.  ¶ 121.  On October 4, 2019, HEXO announced that CFO Monahan resigned. ¶ 128.  On January 31, 2020, HEXO's auditor resigned.  ¶ 170.

**HEXO Delays Its 2Q2020 Financial Statements; The Full Truth Is Finally Revealed**

On March 17, 2020, HEXO revealed that it was delaying its 2Q2020 financial statements, taking another inventory impairment of up to $280 million; selling the Niagara Facility; and that HEXO might have trouble continuing as a going concern. ¶ 174.  HEXO stock fell 30%. ¶ 176.

Then, on March 30, 2020, HEXO reported a FY2020 net loss of C$298.2 million, including a C$138.3 million impairment loss, and disclosed that HEXO "contractually relieved the SQDC" of its year one obligation. ¶¶ 179-80.  HEXO stock fell another 35%. ¶ 183.

**ARGUMENT**

## I.    LEGAL STANDARDS

A complaint can defeat a 12(b)(6) motion by alleging a facially plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). [P]lausibility…is "not akin to… probability…[but] asks for more than a sheer possibility that…defendant…acted unlawfully." *Iqbal*, 556 U.S. at 678. Courts must "accept[ ]…all factual allegations [on a 12(b)(6) motion] and draw [] all inferences in…plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011).

## II.    PLAINTIFFS ADEQUATELY PLEAD SECURITIES ACT CLAIMS

### A.    Section 11

Section 11 of the Securities Act imposes strict liability on issuers and signatories, and negligence liability on underwriters, when a prospectus contains "an untrue statement of a material fact or omitted to state a material fact…necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 claims "need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Liability under Section 11 "is…absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Securities Act claims are analyzed under Rule 8. *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012).

Defendants argue, without merit, that Rule 9(b) should apply to these claims. First, they ignore that Securities Act and Exchange Act claims can coexist in a complaint without forfeiting Rule 8. *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 170 (E.D.N.Y. 2017) (rejecting sounds in fraud argument where complaint used negligence language; *compare* ¶ 341), *aff'd*, 731 F. App'x

35 (2d Cir. 2018).  Second, there is no basis to apply Rule 9(b) here because the Securities Act claims are plead separately (*see* ¶ 2; *compare* ¶¶ 327-347 *with* ¶¶ 348-361), and their reasons for falsity differ significantly from the Exchange Act claims.  *Compare* ¶¶ 186, 188 *with* ¶¶ 192, 196.  The former do not allege falsity on the basis of "intent" – Defendants take that language from Exchange Act allegations.  Mot. 12 n.19.  But even if the Court finds that these claims do sound in fraud, and it should not, Plaintiffs readily meet Rule 9(b) standards.  *See infra* at 21-25.[4]

The 11 Defendants made material misstatements and omissions in the Prospectus, including, *inter alia*, that HEXO "will supply 20,000 kg of products in the first year, which is subject to a take-or-pay feature,…[and] expects to supply 35,000 kg in the second year of the agreement and 45,000 kg in the third year[.]"  ¶ 185.  These statements, which are (without contest) material given the size and importance of the Agreement, misstated that HEXO was guaranteed first-year revenue regardless of demand.  These statements also omitted that HEXO was way off track from selling the SQDC 20,000 kg in year one; that the SQDC could not meet its commitment as it had opened far fewer stores than needed; that this would affect other years under the Agreement; and that the ToP was not actually a guarantee because HEXO's "relationship" with the SQDC fundamentally jeopardized its enforcement.  ¶ 186.

Defendants try a weak semantics argument, claiming they never used the word "guarantee" in reference to the ToP.  *See* Mot. 6 n.14.  But a ToP *by definition* is a guarantee – that is its sole purpose.  This Court recognized a ToP as a "guaranteed-order" contract in *IOP*

---

[4] Defendants' cases on this issue are distinguishable.  *See Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (alleging fraud prior to IPO); *Y-GAR Capital LLC v. Credit Suisse Grp. AG*, No. 19 Civ. 2827 (AT), 2020 WL 71163, at *4 (S.D.N.Y. Jan. 2, 2020) (alleging conscious design and concealment); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, No. 18-CV-10320, 2020 WL 1529371, at *12 (S.D.N.Y. March 30, 2020) (11 claims sounded in fraud as "mirror image" of 10 claims).  Other cases cited by Defendants find that separately pled Section 11 claims do not sound in fraud.  *See e.g., Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612-14 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).

*Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*. *See id*., 91 F. Supp. 3d 456, 471-73 (S.D.N.Y. 2015). Thus, Defendants' claim that they never "affirmatively guarantee[d]" a guarantee fails, and their claim that they did not misrepresent the Agreement's terms (Mot. 6) is incorrect, as they gave the impression that year-one revenues were guaranteed. Indeed, the market viewed the ToP as providing a "guarantee[d]" "floor" for revenues – a guarantee amplified by the SQDC as the counterparty. *See, e.g*., ¶ 115.

*JinkoSolar* is instructive. There, JinkoSolar represented in a prospectus that it "maintain[ed]…teams…to monitor waste treatment and ensure that [it] compl[ied] with [Chinese] standards." *Meyer v. JinkoSolar Holdings Co*, 761 F.3d 245, 247 (2d Cir. 2014). The Second Circuit found these statements misleading as plaintiffs plead facts showing "existing problems" about compliance, and the issue was in "play". *Id*. at 251 & n.3. The "existing problems" here (low store openings, dismal orders, and an illusory ToP) – with the ToP issue "in play" – made HEXO's statements misleading. *See also IOP*, 91 F. Supp. 3d at 471-72 (existing adverse facts about ToP rendered statements actionable under 10(b)).[5]

Defendants' citations on Section 11 are inapposite. *See*, *e.g., In re Ferrellgas Partners, L.P., Sec. Litig.*, 764 F. App'x 127, 128 (2d Cir. 2019) (no particular allegations showing "Defendants knew or should have known that a contractual counterparty would ultimately

___

[5] Citing this Court's decision in *Holbrook v. Trivago N.V.*, No. 17 CIV. 8348 (NRB), 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019), Defendants charge Plaintiffs with hindsight pleading. Mot. 14. But Plaintiffs plead facts showing **at the time of the IPO** that the ToP had no effect because of the special relationship HEXO had with the SQDC, and SQDC orders were way off track in year-one (by 140%). ¶ 186. In *Holbrook*, plaintiffs merely claimed a statement was misleading because defendant "ultimately" paid an increased fee. *Holbrook*, 2019 WL 948809, at *13. As an aside, this Court in *Holbrook* found that two weeks of adverse data was not a trend; but here, the trend was 3½ months – which is enough in this Circuit. *See infra* at 12. Defendants also claim HEXO's market share met expectations (Mot. 2), but the issue here is not market share, it is that the SQDC was radically behind schedule and that HEXO had no guaranteed revenues.

default" on payments owed under a ToP; here, SQDC's orders as of the IPO showed it could not meet its year one commitment and HEXO never warned it might not enforce the ToP).[6]

Finally, in light of the Agreement's import, the SQDC's lack of insolvency risk, and the guaranteed revenues to HEXO in year-one, Defendants cannot claim non-enforcement of the ToP was a routine business decision. If Defendants' reasoning were accepted, investors could not rely on any statement because a company could irrationally pivot with impunity.[7]

## B.    Item 105

The 11 Defendants are also liable under Item 105 for failing to disclose the clear trend of dismal SQDC orders. ¶ 189. Item 105 requires that a prospectus "[d]escribe any known trends…that have had or that the registrant reasonably expects will have a material…unfavorable impact on…revenues or income…"[8] "Item 303's disclosure obligations [] do not turn on restrictive mechanical or quantitative inquiries." *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012). At the time of the IPO, in addition to the illusory ToP, there was a 3½ month trend – *out of a total of 12 months in the Agreement's first year* – of very low SQDC orders (*see* ¶ 95) and slow SQDC store openings (*see* ¶¶ 101-102). *See In re CPI Card Group Inc. Sec. Litig.*, No. 16-CV-4531 (LAK), 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017) (Item 303 violated when "at the…IPO, CPI's largest

---

[6] *See also Jiajia Luo v. Sogou, Inc.*, No. 19-cv-230 (LJL), 2020 WL 3051019, at *13 (S.D.N.Y. June 8, 2020) (unlike here, plaintiff failed to allege undisclosed facts *at time of offering*), *appeal filed* (July 2, 2020); *In re Uxin Sec. Litig.*, 66 Misc. 3d 1232(A), 2020 N.Y. Slip Op. 50336(U), at *7-8 (N.Y. Sup. Ct. 2020) (same); *Fisher v. Ross*, No. 93 CIV. 0275 (JGK), 1996 WL 586345, at *7 (S.D.N.Y. Oct. 11, 1996) (same); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557(CM), 2013 WL 6233561, at *1, 7-8 (S.D.N.Y. Dec. 2, 2013) (same; in addition, relationship with counterparty soured *after* offering).

[7] Defendants claim HEXO's growing inventory shows they believed the SQDC would meet its commitment, and that it would somehow increase its stores from 12 in December 2018 to 50 by October 2019. Mot. 15. Any such expectations were groundless with the SQDC's low orders and openings.

[8] Item 303 and Item 105 are both under Regulation S-K. As Defendants' Motion shows, Item 303 and Item 105 are analyzed under the same principles. *See* Mot. 16-17.

customers…were significantly over-inventoried"). Three and a half months is a significant trend – particularly in light of the fact that the Agreement's first year was only 12 months – that HEXO should have "reasonably expect[ed] [would] have a material[ly] …unfavorable impact on…income." *See* ¶ 189; *Panther Partners*, 681 F.3d at 114, 115 (trend of about three months upheld under Item 303); *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 524, 542 (S.D.N.Y. 2014); *cf. CPI*, 2017 WL 4941597 at *2 (length of a trend not ripe for adjudication on a 12(b)(6) motion). The 11 Defendants are liable under Item 105.[9]

## C.    Section 12

Under Section 12, defendants who sell stock in an offering are liable for misstatements or omissions in a prospectus. Defendants argue Plaintiffs lack standing for this claim. Not so. Plaintiffs can allege Section 12 standing by pleading that "the [seller]...passe[d] title to the plaintiff" or "solicit[ed] [the] security purchases for…financial gain." *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 856 (S.D.N.Y. 2019). As one of Defendants' own case citations shows, "privity between the buyer and seller is [not] required" when sellers solicit sales for financial gain. *Evoqua Water*, 2020 WL 1529371, at *12. *See also id.* (plaintiff need not plead which underwriter she bought

---

[9] Defendants also wrongly claim HEXO's disclosure of **Company-wide** orders of $15.2 million up to January 13, 2019 warned that the SQDC was not "on pace". Mot. 5. First, Company-wide orders are not SQDC orders – the latter of which were **not disclosed** through January 13, 2019. In fact, the Prospectus only disclosed SQDC orders during the first two weeks of the Agreement (*see* ¶ 94) – 4% of year one – when, at the time of the IPO, 25% of year one was over. Second, HEXO obscurely disclosed Company-wide orders in dollars (not kilograms), and only now states $15.2 million equaled "roughly 2,787 kg" at the time of the IPO (Mot. 6). HEXO also never warned it would not enforce the ToP. Defendants' case authorities relating to Item 105 are, thus, unavailing. *See In re Proshares Trust II Sec. Litig.*, No. 19-CV-0886 (DLC), 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020) (prospectus warned of alleged trend); *Rubinstein v. Credit Suisse Group AG*, No. 19-CV-1069 (VEC), 2020 WL 2036850, at *7 (S.D.N.Y. Apr. 28, 2020) (no "plausible facts indicating…Defendants knew of any undisclosed risk factors"; here, in addition to the illusory ToP, HEXO had months of severely low SQDC order data).

from).[10]   Here, Medley bought HEXO shares pursuant to the IPO and the 11 Defendants "were sellers… and/or solicitors of sales of" HEXO stock.   ¶¶ 50, 339.   That suffices for Section 12 standing.[11]

### D.    The Bespeaks Caution Doctrine Does Not Immunize Defendants

The 11 Defendants cannot avail themselves of the "bespeaks caution doctrine" because they did not meaningfully warn of relevant risks in the Prospectus.   The Second Circuit has warned that "[c]autionary words about future risk cannot insulate from liability the ***failure to disclose that the risk has transpired***."   *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). That is the case here.[12]   HEXO's warning of possible "lower [purchase] volumes" and possible "alter[ations] [in] purchasing patterns" was misleading when the ToP did not actually guarantee revenue for year-one, and the SQDC's *existing* purchasing volumes and pattern otherwise rendered the year one commitment unachievable and, thus, the second and third year expectations groundless.   Likewise, warning the SQDC might "not continue to purchase HEXO

---

[10] The Underwriters reaped financial gain from the IPO.  *See* Batson Decl. Ex. 4 at S-37 (HEXO "agreed to pay the Underwriters a cash commission equal to 5.0% of the gross proceeds of the Offering").

[11] Defendants misplace reliance on *Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 17 (2d Cir. 2009), a "non-precedential opinion" with scant analysis where the Second Circuit noted it "need not consider here whether a plaintiff may ever have a Section 12(a)(2) claim based on an aftermarket purchase". *Johnson v. Sequans Commc'ns S.A.*, 11 CIV. 6341, 2013 WL 214297, at *3 (S.D.N.Y. Jan. 17, 2013).  *Cf. Feiner v. SS & C Techs.*, 47 F. Supp. 2d 250, 253 (D. Conn. 1999) (cited by *Caiafa*, arguing that Section 12 may cover "aftermarket trading").  Defendants' other citations fare no better.  *See In re Global Crossing, Ltd. Secs. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (case concerned Section 11, not Section 12, which has a different standing analysis); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) (granted plaintiffs leave to cure Section 12 standing).  Here, if the Court perceives a standing deficiency, and it should not, Plaintiffs should be given the chance to cure.

[12] For example, the Prospectus stated: "If any of the SQDC, the OCRC or the BCLDB decides to purchase lower volumes of products from HEXO than HEXO expects, alters its purchasing patterns at any time with limited notice or decides not to continue to purchase HEXO's cannabis products at all, HEXO's revenues could be materially adversely affected, which could have a material adverse effect on HEXO's business, financial condition, results of operations and prospects."  Mot. 6.  *See also id.* at 7 ("[i]n the future, cannabis producers in Canada may produce more cannabis than is needed to satisfy the collective demand of the Canadian adult-use and medical markets").

[] products" was meaningless when HEXO portrayed year one revenues as guaranteed and HEXO did not warn it might not enforce the ToP at all.[13]

## III.   PLAINTIFFS ADEQUATELY PLEAD EXCHANGE ACT CLAIMS

To plead a 10(b) claim, a plaintiff must show a material misrepresentation or omission, scienter, *i.e.*, a wrongful state of mind, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020).   Here, Defendants only contest falsity and scienter.   Their arguments fail.

### 1.   Misrepresentations About the Agreement in March 2019

The 10(b) Defendants misrepresented the Agreement, including claiming that the ToP guaranteed year-one revenue; that the SQDC's first-year commitment was achievable; and by omitting that later years were adversely affected as a result.

This Court's decision in *IOP Cast Iron Holdings* is instructive.   In *IOP*, the defendant represented that no "material customer… had materially and adversely modified its relationship [with Aarrowcast]." 91 F. Supp. 3d at 463.   CNH, a material customer, had a ToP contract with Aarrowcast, and plaintiffs alleged defendant's statement was misleading because, *inter alia*, CNH was "overstocked with Aarrowcast products" and wished to "reduce its [guaranteed]

---

[13] Defendants' risk warning citations do not apply here.  *See Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *9-10 (S.D.N.Y. Aug. 22, 2005) (this Court dismissed where plaintiffs complained IPO would not raise sufficient capital and defendants disclosed shortfall); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (no duty to disclose **uncertain** negotiations; here, the ToP was illusory and SQDC orders were a negative and certain issue); *Y-GAR Capital*, 2020 WL 71163, at *4 (explicit warnings of catastrophic losses); *Cement Masons & Pasterers Joint Pension Trust v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *5-6 (N.D. Cal. Mar. 2, 2012) (risks were not existing at the time, but later "materialized", *see* Mot. 15 n.25); *In re Fairway Grp. Holdings Corp. Secs. Litig.*, No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357, at *17 (S.D.N.Y. Aug. 19, 2015) (same); *Johnson*, 2013 WL 214297, at *9, 15 (same). *In re Fairway Grp. Holdings Corp. Secs. Litig.*, No. 14 Civ. 0950 (LAK)(AJP), 2015 WL 4931357, at *13-14 (S.D.N.Y. Aug. 19, 2015) (same).

orders". *Id.* at 464.    This Court noted the ToP contract was a "guaranteed-order contract" and found defendants liable because excess inventory at CNH threatened the contract:

> IOP has pleaded that CNH had excess inventory in 2012 and was pursuing an Aarrowcast sales executive to discuss its "take or pay" contract with CNH. [Thus,] it is reasonable to infer that Aarrowcast knew that CNH was considering a significant reduction in orders, either by renegotiating the existing contract or by reducing orders after the existing contract expired…. Similarly, although other…Customers were not bound by guaranteed-order contracts [like CNH], their stated plans to reduce orders constituted material and adverse modifications of those…relationships [which] were known…before the…[a]greement was executed. 91 F. Supp. 3d at 472-73.

Here, as in *IOP*, Plaintiffs allege that the 10(b) Defendants made misrepresentations about a material contract. *E.g.*, HEXO stated "[t]he strategic value of our SQDC relationship cannot be understated [sic]. We will supply the SQDC with 20,000 kg of products in the first year, and we expect to supply 35,000 kg and 45,000 kg in years two and three, respectively." ¶ 195.[14]    *See also* ¶ 213 ("first-year commitment[,]" which involved the ToP, was "fully on track"). These statements were misleading because, similar to *IOP*, the SQDC's demand for product was weak, the ToP was illusory; HEXO was way off track to sell 20,000 kg in year one; slow orders would impact later years of the Agreement; HEXO was unable to timely package and ship goods; and HEXO failed to warn it might not exercise the ToP at all. ¶ 196.[15]

### 2.    Misrepresentations About the Agreement in June 2019

St. Louis egregiously misled the market about the Agreement on June 13, 2019. St. Louis offhandedly disclosed that despite weak demand (what the ToP was supposed to address), HEXO would not enforce the ToP. St. Louis then claimed HEXO was still "confident" the SQDC would meet its obligation (and more) by the end of 2019 rather than October 2019:

---

[14] The 10(b) Defendants made many similar misleading statements – some of which were quite emphatic. *See, e.g.*, ¶ 200 (St. Louis "absolutely confident" that the SQDC would meet its first year commitment).

[15] Defendants argue HEXO is not responsible for the SQDC's slow store openings. Mot. 11. But the 10(b) Defendants knew of the slow openings (¶¶ 280-82). Thus, they cannot pass the buck to the SQDC.

> We plan on launching…new products over the following couple of quarters, which we think will help that, ***but expect some timing risk whether it's in October, November, December time line to hit the full 20, I think, would be a reasonable assumption. We're confident we can completely offset that and more, of course, in other provinces.***

¶¶ 231-32. St. Louis had no grounds for such "confiden[ce]" since the SQDC would have had to increase orders by over 300% for the remainder of the first year – which was wildly unrealistic. Indeed, the SQDC's demand would not pick up in year one because it had opened far fewer stores than necessary. And St. Louis hid that HEXO would not enforce the ToP. ¶ 233.[16]

### 3.    HEXO's Radically Unachievable Financial Projections

Statements about unachievable financial guidance are actionable – particularly where, like here, contemporaneous facts about an important contract fatally undermine the projections. *IOP* is again instructive. In *IOP*, Aarowcast provided plaintiffs with a "good faith estimate of future financial performance." *Id*. at 91 F. Supp. 3d at 462. The plaintiffs alleged the projections were misleading under 10(b) because CNH was "overstocked" and wished to "reduce its orders." 91 F. Supp. 3d at 464. This Court found Aarrowhead's projections had no reasonable basis due to CNH's glut of Aarrowhead inventory and its desire to reduce its orders. *See id*. at 471.[17]

As in *IOP*, HEXO's guidance lacked any reasonable basis. *See, e.g.*, ¶¶ 190, 202, 210, 217, 225. And HEXO did not just issue guidance – it did so in very strong terms, emphasizing "confidence" and even calling the guidance "conservative". *See, e.g.*, ¶ 210. The guidance was materially false and misleading for numerous reasons. First, it was based largely on the

---

[16] HEXO also stated elsewhere on June 13, 2019 that it would supply the SQDC with 20,000 kg for year one. ¶ 221.

[17] *See also Galestan v. OneMain Holdings, Inc.,* 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018) (loan originator knew or recklessly disregarded increased loan delinquencies that plaintiffs alleged rendered guidance unachievable); *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 DRH AKT, 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013) ("forecasts create a duty to disclose materially misleading information, or remedy misleading omissions"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597, 599 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007) (projections unachievable due to lower demand and production far behind schedule); *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (forecasts built for "desired but unachievable…outcome" misleading).

Agreement that, despite HEXO's claims, provided no guaranteed revenue (¶¶ 82-88, 231). Second, as Defendants concede, HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in the contract's first year (*see* ¶¶ 192, 219, 222) – which included three months of FY2020 and the entire 4Q2019 (¶¶ 94-95, 144). Third, the SQDC's slow orders would impact the expected 35,000 kg second-year figure (which covered the rest of FY2020) and HEXO knew demand would not pick up in year one because the SQDC had opened few stores during 2Q19 (¶¶ 101-102). Fourth, St. Louis admitted HEXO could not timely package and ship goods during 2Q2019 (¶ 202), further harming the ability to meet the year one figure. ¶ 192.[18]

Significantly, this Court has noted that "[s]tatements regarding projections…may be actionable under Section 10(b)…if they are worded as guarantees[.]" *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 512 (S.D.N.Y. 2020) (*citing In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)). St. Louis worded projections as guarantees here.[19]

### 4. Misleading Statements About the Niagara Facility

St. Louis also made misstatements and omissions about Newstrike's Niagara Facility. On March 14, 2019, he stated the facility had "250,000 feet that are licensed operational" – omitting that part of it was not licensed. As St. Louis admitted eight months later (*see* ¶¶153, 258), the facility's Block B had been operating without a license and HEXO admits it knew this ***since at least July 20, 2019***. Indeed, St. Louis knew this even before then from the "substantial due diligence" HEXO boasted of before the March 2019 acquisition. ¶¶ 104, 195. St. Louis also made it sound like licensing issues only pertained to a new segment in the facility (¶¶ 205-06),

---

[18] HEXO also later misrepresented the reasons for pulling its guidance. *See* ¶¶ 239-240 (not only because of slower rollouts, but because the 10(b) Defendants knew HEXO would not enforce the Agreement).

[19] *See, e.g.*, ¶ 228 ("nobody has ever called me out on anything because HEXO has always delivered what we said we would. ***We are going to reach the [4Q] target…we're delivering a double this quarter***"); ¶ 207 ("***when we hit*** that $400 million net next year,…that's supported by very strong demand. ***That's why we're confident putting out numbers***"). These statements were materially misleading. *See* ¶ 192.

and later stated that HEXO had stopped production at the facility – without disclosing that HEXO had long since learned of the licensing issue.  ¶ 247; ¶¶ 249-250; 254; 256.[20]

Defendants weakly argue that "Health Canada was satisfied with HEXO management's corrective actions."  Mot.  10.  But the issue is not whether Health Canada was "satisfied"; the issue is that St. Louis publicly discussed Health Canada licenses, but did not disclose that the Niagara Facility was producing cannabis without one.  ¶ 244.[21]  Defendants also argue Plaintiffs do not specify the size of the area where HEXO was growing unlicensed cannabis (Mot. 10). Plaintiffs do not need to.  A qualitatively important issue such as illegally growing cannabis is *per se* material, especially when HEXO's most important client is the government.  *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).  Defendants also claim St. Louis did warn of "licensing issues" at the facility.  Mot. 10.  Not so.  St. Louis stated that the facility had "250,000 feet that are licensed operational" but noted an "expected licensing delay" on a new part of the facility.  ¶ 106.  Plaintiffs allege the purportedly "licensed operational" part of the Niagara Facility included Block B – which was not licensed.

### 5.    Misleading Inventory and Impairment Loss Figures

The 10(b) Defendants also misstated HEXO's inventory.  ¶¶ 197-98.  HEXO's inventory figures were misleading because the SQDC's orders were radically behind, HEXO had no intention of enforcing the ToP, HEXO failed to write down or write off stale or depreciated product, and HEXO did not perform an inventory impairment on the Niagara Facility until five months after acquiring Newstrike.  *See* ¶¶ 215; 223; 237; 241; 260, 262, 267, 269.  Courts have

---

[20] The 10(b) Defendants also claimed the Newstrike deal would "position the combined company to meet growing consumer demand on a national basis."  ¶ 190.  This had no basis given the low demand.  ¶ 192.

[21] Thus, contrary to Defendants' mischaracterization (Mot.  22), Plaintiffs do not allege a "pure" omission here.  Rather, St. Louis made a representation about Health Canada licenses that was misleading because he failed to disclose an ongoing licensing violation at an important facility.  ¶ 244.

found similar statements misleading.  *See Davidoff*, 2005 WL 2030501, at \*14 (this Court upheld claim that defendants "improperly delayed taking an impairment charge"); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (failure to take inventory writedowns actionable).[22]

## IV.    HEXO'S CAUTIONARY LANGUAGE WAS INSUFFICIENT

The PSLRA provides a safe harbor for statements that are forward-looking and "accompanied by meaningful cautionary statements[.]"  15 U.S.C. § 77z–2(c)(1)(A)(i).  The Second Circuit has held that risk language "cannot insulate from liability the failure to disclose that the risk has transpired[.]"  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[23]

Defendants' risk language here was not meaningful (*see supra* at 13 n.12).  Defendants argue HEXO's "warning" that the Agreement was "subject to a take-or-pay feature… convey[ed] that the SQDC might not 'take' the entire allotment."  Mot. 5.  But that is meaningless because it equally conveyed that *the SQDC would nevertheless still "pay" HEXO for the allotment* – plus, HEXO did not warn it might not enforce the ToP.  Defendants also point to St. Louis' "warning" on June 13, 2019 that unsold inventory could lead to inventory builds that would reduce the SQDC's purchasing needs in year two.  *See* Mot. 6 n.13.  But St. Louis did not disclose that significant inventory builds were *already a reality* at that time.  What is more, he concealed any

---

[22] Defendants claim Plaintiffs do not show "HEXO officers knew in real time that the $2.4 million inventory impairment had to be taken earlier" (Mot. 11), but that is wrong.  The SQDC's orders were woefully behind throughout the Class Period – while HEXO's reported inventory simultaneously grew.  ¶ 25.  When discussing the $2.4 million impairment, Defendants reference – without citing – an unknown "July 2019 disclosure".  Mot. 11.  Regardless, this was after most of the misstatements and omissions and Defendants made misstatements in August and October 2019.  *See, e.g.*, ¶¶ 235, 237.

[23] The bespeaks caution doctrine (*see supra* at 13-14) is a judge-made version of the PSLRA's safe harbor but for Securities Act claims.  Defendants' case authorities relating to 10(b)'s safe harbor do not apply here.  *See In re Molycorp*, No. 12-CV-00292, 2015 WL 1540523, at \*25-27 (D. Colo. Mar. 31, 2015) (genuine "uncertainties" about reserve estimates; here, low SQDC store openings and orders were a current and certain fact, as was their imminent adverse effect); *In re WebMD Health Corp. Sec. Litig.*, No. 11 CIV. 5382 JFK, 2013 WL 64511, at \*8-9 (S.D.N.Y. Jan. 2, 2013) (failure to plead "future risk [] ha[d] already transpired); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (same).

inventory issues by claiming that despite HEXO's non-enforcement of the ToP, the SQDC would still meet its first-year commitment one to two months late.

Defendants also claim that "[t]he general risk that a company may decide in the future to make concessions for a key customer exists in virtually any situation where a company relies on its relationships with large customers." Mot. 15. This is ridiculous. Taken to its logical conclusion, any statement to the market about a contract would be meaningless because a company might later change its mind. The argument is particularly weak here as the Agreement was so important to HEXO, HEXO touted the ToP (whose sole purpose was to guarantee first-year revenue), which was negotiated at arms-length with the SQDC, the perfect paying customer, and HEXO competed with other cannabis companies for the contract. Moreover, HEXO's "relationship" with the SQDC, which St. Louis cited as the *only* reason why HEXO was not enforcing the ToP (not hardship etc.), had not changed since April 2018. *See* ¶ 200 (the "relationship [with the SQDC] remains in amazing standing"). The most plausible inference is that HEXO never intended to enforce the ToP or that the clause was superficial.[24]

## V.    PLAINTIFFS SUFFICIENTLY ALLEGE SCIENTER

Under the PSLRA, a plaintiff can sufficiently allege scienter with circumstantial evidence of conscious misbehavior or recklessness, or that defendants had motive and opportunity to

---

[24] Defendants claim some of their statements are inactionable opinions (Mot. 25 n.46), but protected opinions must "fairly align[] with the information in possession" at the time. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 CIV. 10067, 2020 WL 4734989, at *6 (S.D.N.Y. Aug. 14, 2020). Here, they did not. St. Louis' claim that he was "absolutely confident" the SQDC would ramp up orders (by 160%) in March 2019 (*see* ¶ 200) ignored the SQDC's severely low orders and openings. And St. Louis' June 2019 claim that he was "confident" the SQDC would meet its first-year commitment by calendar-end 2019 – although 66% of the year was over with orders at only 25% – was wildly unaligned with then-current information, which showed a 300% shortfall. Defendants' case citations on this issue fall flat. *See Martin v. Quartermain*, 732 F. App'x. 37, 40-42 (2d Cir. 2018) (opinion differing with third party expert protected; any opinions here were HEXO's and not aligned with existing information); *Gray v. Wesco Aircraft Holdings, Inc.*, No. 19-CV-8528 (LJL), 2020 WL 1904019, at *24 (S.D.N.Y. Apr. 16, 2020) (opinion conveyed "tentativeness of its belief"; St. Louis claimed he was "absolutely confident" (*see* Mot. 25 n.46)); *Cement Masons*, 2012 WL 685344, at *7 ("high degree of confidence" when guidance was slightly off; in contrast, HEXO pulled guidance completely).

commit fraud. *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 212–13 (S.D.N.Y. 2019).  "The inquiry…is whether *all* of the facts alleged, taken collectively [support] scienter, not whether any individual allegation [does]." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  The inference of scienter "must be cogent and compelling," but "need not be…the 'most plausible of competing inference[s],'" – only "*at least as likely* as any plausible opposing inference." 551 U.S. at 308, 324, 328. Thus, a tie will go to the plaintiff.  *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010).  A plaintiff is not required to produce direct evidence of scienter because "fraudulent intent is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and… inference[s] arising therefrom." *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d at 222 (S.D.N.Y. 2007), *aff'd*, 354 App'x 496 (2d Cir. 2009).

## A.    Plaintiffs Adequately Allege Conscious Misbehavior or Recklessness

Courts have found that when executives make alleged misstatements about an important contract, that is relevant in the scienter inquiry.  *IOP* is once again on point.  There, defendant Aarowcast had a guaranteed ToP contract with its most important customer, CNH.  This Court found a strong inference of scienter against Aarowcast's Senior VP Charles Armor and Aarowcast where Armor "knew about CNH's overstocking [and] met with [CNH's purchasing agent] to discuss CNH's 'take or pay' contract". 91 F. Supp. 3d at 476.  Here, as in *IOP*, the 10(b) Defendants knew about the serious inventory issues; namely, the SQDC had very low demand throughout the Class Period, was ordering nowhere near enough cannabis to satisfy its first-year commitment, and the ToP was illusory because HEXO had no intention of enforcing it due to HEXO's relationship with the SQDC.  Thus, they knew the guaranteed year one revenues from the Agreement, its second and third year expectations, and HEXO's guidance based on revenues from the Agreement, were baseless. *See* ¶¶ 82-88, 231, 281. St. Louis was also close to

the Agreement and discussed it, and HEXO's guidance, with analysts regularly.  *See* ¶¶ 199-216; 225-232; 282.  *See*, *e.g.*, *New Orleans Emp. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (analysts' inquiries about inventory probative of defendants' knowledge about inventory).

Defendants claim Plaintiffs "allege no particularized facts showing that [] St. Louis knew at the time that [the projections] were unachievable."  Mot. 8. Wrong. Plaintiffs allege the Agreement was to be HEXO's main source of revenues; HEXO was not even close to being on track to sell the SQDC 20,000 kg of product in year one; the SQDC's slow orders would impact the expected 35,000 kg second-year figure; St. Louis admitted HEXO could not timely package and ship goods; and HEXO had no guaranteed revenue from the SQDC because the Company never intended to enforce the ToP and jeopardize its relationship with the SQDC.  ¶ 219.  These are "particularized facts".  *Compare* Mot. 8.

Defendants also argue their slow disclosure of the truth shows candor.  Mot. 8.  As an initial matter, Defendants are not entitled to their own inferences from the FAC's allegations – all reasonable inferences must be accepted as true.  *Tellabs*, 551 U.S. at 322.[25]  The facts and reasonable inferences from the FAC show anything but candor.  On June 12, 2019, St. Louis disclosed that HEXO would not enforce the ToP – but only after an analyst pressed the issue. And even then, St. Louis claimed (in the teeth of all the facts) that the SQDC would fulfill its first year orders by December 31, 2019 rather than October 17, 2019.  ¶ 232.  Similarly, withdrawing FY2020 guidance was not candid – it was a desperate move when HEXO could no longer hide that the guidance was unachievable; restating financial statements is not frankness,

---

[25] Defendants spend the lion's share of their brief trying to recast the narrative and foist their own inferences on the Court.  Defendants also cite dozens of cases with little analysis of why they apply here.

GAAP requires restatements when companies make material errors; and disclosing a CFO resignation was required (*see* Item 5.02 (filing required when senior officer resigns)).

Suspiciously-timed resignations can, in fact, support a finding of scienter, and that is particularly true under these circumstances.[26]  Here, HEXO went through three Chief Financial Officers; its co-founder resigned; it fired its Chief Manufacturing Officer and Chief Marketing Officer; its auditor resigned; and Bourque resigned.  *See* ¶¶ 110-112, 126-129, 140, 169-173. This spate of suspiciously timed resignations/firings – particularly with HEXO having three CFOs within seven months, an auditor resign, and a large part of the alleged fraud relating to HEXO's financials and guidance – supports a strong inference of scienter.[27]

In sum, the most reasonable inference from HEXO's disclosures is not transparency, but that as the fraud unraveled, HEXO said as little as possible as late as possible.  *Cf. In re Intercept Pharm., Inc. Sec. Litig.*, No. 14 CIV. 1123 NRB, 2015 WL 915271, at *10 (S.D.N.Y. Mar. 4, 2015) (this Court "reject[ed]…claim [] that [defendants showed] cautiousness").[28]

---

[26] *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) ("the decision to terminate the defendants…more likely suggests a higher level of wrongdoing approaching recklessness or even conscious malfeasance"); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).

[27] Defendants' case citation on resignations is inapposite here.  *See*, *e.g., Gregory v. ProNAi Therapeutics Inc.*, 297 F Supp. 3d 372, 415 (S.D.N.Y. 2018) (unlike here, resignations unconnected to underlying fraud), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

[28] *Cf. Levy v. Gutierrez*, No. 14-CV-443-JL, 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) ("securities laws prohibit foolish frauds along with clever ones" including "invest[ing] significant resources into an effort they knew was doomed to failure").  Defendants' reliance on *In re Magnum Hunter Res. Corp. Sec. Litig*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) is misplaced as that court rejected scienter allegations based on internal control deficiencies and a restatement.  *See id*. Plaintiffs allege far more, *e.g.*, a severe and existing shortfall in orders and store openings.  Defendants' other cases fare no better.  *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("negligen[ce] in failing to anticipate how the market would respond" not probative of scienter; 10(b) Defendants knew market would respond negatively to impossibility of SQDC first-year commitment and hitting guidance); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (scienter based on roles and small insider sales rejected).

00594673;V1                              23

Defendants also suggest that insider trading, internal reports, and confidential witnesses are required to plead a strong inference of scienter – but none of these are required. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("this Court is aware of no authority requiring [witness] allegations"). As to stock sales, this Court has noted that motive is unnecessary when, like here, "[defendant] 'knew facts'…'suggesting… statements were not accurate.'" *IOP*, 91 F. Supp. 3d at 476. *See also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (scienter was "established [even though] officers …did not sell stock").[29] The same goes for internal reports.[30] The issue is whether Plaintiffs plead scienter – not whether they did so by a certain *kind* of allegation.

### B.  The 10(b) Defendants' Motive Strengthens the Inference of Scienter

Although not required (*Tellabs*, 551 U.S. at 323), Plaintiffs' motive allegations support their other scienter allegations. The 10(b) Defendants wanted to increase HEXO's stock price to raise more money through five Class Period offerings – while HEXO had cash flow problems, *see* ¶¶ 164-168,[31] and certain defendants had HEXO options with high exercise prices (¶ 283).[32]

---

[29] Defendants' citation to *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016), falls flat as those plaintiffs did not allege defendants knew "information contradicting their [] statements." Also, unlike the *Gillis* plaintiffs, Plaintiffs allege a "coherent rational objective" (*id*. at 600); namely, convincing the market HEXO was growing fast in a lucrative new industry, maintaining HEXO's relationship with the SQDC, and, as to acquiring Newstrike, even if HEXO did not need it for production capacity immediately, the Agreement was a five-year (and more) contract. In contrast, the *Gillis* plaintiffs alleged defendants knew "for years" that defendant QRX's drug had a high "proof hurdle…which it could not clear" but still continued to invest time and resources that were "doomed to fail". *Id*. at 600.

[30] Defendants' citations show internal reports are not required. In *Holbrook*, 2019 WL 948809, plaintiffs alleged fraud by hindsight and did not show "what the [d]efendants knew and when they knew it." *Id*., at *21. Here, Plaintiffs identify the "statements containing adverse facts that defendants had access [to when they made] the statements." *See id*. Defendants' other cases fare no better. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp*., 951 F. Supp. 2d 479, 501 (S.D.N.Y. 2013) (this Court found plaintiffs failed to "identify any contemporaneous data" undermining public statements); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd*., 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015) (same); *In re Société Générale Sec. Litig.*, No. CIV. 2495(RMB), 2010 WL 3910286, at *7 (S.D.N.Y. Sept. 29, 2010) (same).

[31] HEXO noted that if it had cash issues, it would need more financing. *See* Batson Decl. Ex. 5 at S-26.

This Court has noted that a motive to complete a significant stock sale is probative of scienter. *IOP*, 91 F. Supp. 3d at 475; *cf. In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275-76 (S.D.N.Y. 2014). Increasing stock option value is also probative of motive. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001).

### C.    Plaintiffs' Allegations Collectively Show A Strong Inference Of Scienter

"The Supreme Court has emphasized that courts 'must review all the [scienter] allegations holistically.'" *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 48-49 (2011). Plaintiffs allege the following particularized allegations that collectively demonstrate scienter:

- The Agreement was critical to HEXO, with the ToP and (¶¶ 85, 279) and slated orders dwarfing those of HEXO's competitors as well as HEXO's other agreements (¶¶ 82-88).

- The 10(b) Defendants knew the SQDC was not ordering enough cannabis to satisfy its 20,000 kg first-year commitment. ¶¶ 94-95, 144, 280.

- The 10(b) Defendants knew HEXO would not enforce the ToP because of its relationship with the SQDC; thus, the guaranteed revenues and guidance were illusory. ¶ 281.

- St. Louis discussed the Agreement and guidance with analysts. ¶¶ 199-216; 225-232.

- The 10(b) Defendants inflated HEXO's stock price to raise more cash for HEXO in five desperately-needed offerings. ¶¶ 164-168.

- St. Louis, Chaplin, Monahan and Burwash were motivated to inflate HEXO's stock price to a level above the exercise price of their options. ¶¶ 285-86.

These allegations jointly provide an inference of scienter at least as strong as that of innocence.[33]

### CONCLUSION

For all these reasons, Defendants' motion to dismiss should be denied in its entirety.[34]

---

[32] In *Skechers*, 2020 WL 1233759, at *17, this Court found incentive compensation allegations lacking where misstatements about expenses were not linked to the bonus trigger of increased sales. Here, there is such a link: inflating HEXO's stock price above option exercise price would lead to personal benefit. ¶ 286.

[33] The inference that the 10(b) Defendants were blissfully ignorant that the SQDC was far behind schedule for year one, that this would affect later years, and that the guidance based on SQDC orders was, thus, dead on arrival, is not only less compelling than the inference of scienter – it is simply untenable.

Dated:  September 14, 2020                    Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: /s/ Laurence J. Hasson

Stanley D. Bernstein
Laurence J. Hasson
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY  10016
Telephone: (212) 779-1414
Facsimile:  (212) 779-3218
bernstein@bernlieb.com
hasson@bernlieb.com
seidman@bernlieb.com

*Lead Counsel for Plaintiffs and the Proposed Class*

---

[34] Because Plaintiffs sufficiently plead Section 11 and Section 10 claims, they also sufficiently plead control person claims under Section 15 and Section 20.  Defendants claim 20(a) claims require pleading culpable participation, but that is an open question.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003). Regardless, since Plaintiffs have pled actual knowledge, they have pled culpable participation.  *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 254 (S.D.N.Y. 2018).

00594673;V1                              26

## CERTIFICATE OF SERVICE

I hereby certify that September 14, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Laurence J. Hasson*
LAURENCE J. HASSON