L2OAAINRC                    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  HEXO SECURITIES
LITIGATION,

                                    19 CV 10965 (NRB)

------------------------------x
                                    New York, N.Y.
                                    February 24, 2021
                                    2:30 p.m.

Before:

                HON. NAOMI REICE BUCHWALD,

                                    District Judge

                         APPEARANCES

BERNSTEIN LIEBHARD, LLP
     Attorneys for Lead Plaintiff Sweeney
BY:  LAURENCE J. HASSON
STANLEY BERNSTEIN
JOSEPH SEIDMAN

NORTON ROSE FULBRIGHT US LLP
     Attorneys for Defendant HEXO
BY:  PETER A. STOKES
THOMAS BATSON

SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
     Attorney for Defendant CIBC
BY:  JAY B. KASNER
ROBERT A. FUMERTON

(Case called)

MR. HASSON:  Laurence Hasson, representing the lead plaintiffs and the proposed class.

MR. BERNSTEIN:  Stanley Bernstein, also from Bernstein Liebhard, for the plaintiffs.

MR. SEIDMAN:  Joseph Seidman, also of Bernstein Liebhard, for the plaintiffs.

MR. STOKES:  Good afternoon.

This is Peter Stokes, from Norton Rose Fulbright, on behalf of HEXO Corporation and the individual defendant. Thomas Batson, my colleague, is also on the line.

MR. FUMERTON:  Good afternoon.

Robert Fumerton and Michael Griffin, from Skadden for the underwriter defendants.

MR. VAILLANCOURT:  Roch Vaillancourt, general counsel for HEXO Corp.

MS. MAURAIS:  Joelle Maurais, assistant general counsel at HEXO Corp.

(Pause)

THE COURT:  Good afternoon.

Sorry to keep you waiting and also thank you for accommodating my schedule and changing the date of this oral argument.

Could we just start by letting me know who will be speaking first on behalf of plaintiffs?

L2OAAINRC                    Conference

MR. HASSON:  Good afternoon.

This is Lawrence Hasson, from Bernstein Liebhard, representing the lead plaintiffs in the proposed class and I will be arguing this motion.

THE COURT:  OK.  And who will be speaking for Norton Rose?

MR. STOKES:  Good afternoon, your Honor.

This is Peter Stokes, of Norton Rose, and I will be speaking on behalf of HEXO Corp and the individual defendant.

THE COURT:  Who do I have from Skadden today?

MR. SUMMERTON:  Good afternoon.

Robert Fumerton, from Skadden, on behalf of the underwriting defendants.

THE COURT:  OK.  If we could, I'd like to begin by asking some questions as is my custom, and if we don't cover something that you may not feel the urge to expand on from your papers at the end of the time that I ask questions, I'm certainly delighted to hear from you.  You recognize I'm sure that your papers have been read and that I am well familiar with the arguments here.  So, let me just begin by confirming something simple.

What is HEXO's fiscal year?

Before you speak, just give your name so the court reporter can get it down.  Thank you.

MR. STOKES:  This is Peter Stokes, of Norton Rose.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  I heard that general counsel for HEXO is on.  This is an easy question.  Maybe he can answer.

MR. VAILLANCOURT:  Yes, your Honor.  Roch Vaillancourt, from HEXO.

It runs from August 1st through July 31st.

THE COURT:  Oh, OK.  I am glad I asked because that was not what was in my head.  Has it always been that way?

MR. VAILLANCOURT:  Yes, your Honor.

THE COURT:  OK.  The next question is just to confirm that there's no real dispute that Mr. Sweeney does not have standing to bring a Section 12 claim.

MR. HASSON:  No, there is no dispute on that matter.

THE COURT:  OK.  Great.  So, let's just switch then to Mr. Medley.  The defendants have challenged the assertion that he has standing to bring a Section 12 claim or under Section 12.

Maybe, Mr. Hasson, could you explain to me why you submit that he does have standing?  And by the way, the fact that I'm asking these questions should not be taken as an indication as to what my views are about the Section 11 claim. This is just something that I'd like to clear up.

MR. HASSON:  Sure, your Honor.  But just to be clear, you were talking about the Section 12 claim, correct?

THE COURT:  Exactly.

MR. HASSON:  OK.  So, you know in response to your

question, our position is that there have been some cases out there, not very many but there have been some including the Evokwa and the Finer case that have some language in there that suggests that Section 12 may also cover standing for after market purchases.

So, Mr. Medley purchased his stock only a few days after the offering and this was, I think it's also important to note that this is also an IPO.  So, there were not other shares out there already.  So, that's the basis for our arguing that standing is appropriate here for Mr. Medley.  Though, I would also add that if the Court agrees with the defendants or disagrees on this standing issue and feels like it's definitive, though, of course, we don't, we would ask the Court under Petrovas, which is the case that I believe defendants cited that we should have the opportunity to amend our pleading to include an unnamed plaintiff or include someone at the class certification stage that has more clear and definitive standing for this particular claim.

THE COURT:  So, let me just make sure that I really understand what you are saying.  You are conceding that Mr. Medley did not buy his shares from the IPO itself?

MR. HASSON:  I'm not conceding that, but his purchase did not occur on the date of the offering.  It occurred a few days after, I believe.

THE COURT:  Right.  So, as a matter of fact, he didn't

L2OAAINRC                    Conference

buy as part of the IPO.

MR. HASSON:  But traceable to the IPO, yes.

THE COURT:  Well, you know, I'm not sure what that means.  There's an IPO and then there's stock in the market.  All stock in the market is very traceable to the IPO?

MR. HASSON:  A few days after the IPO I would say yes because there was no stock trading on the market at that time.  So, the IPO is the introduction of the stock to the market.

THE COURT:  Right.  And then so, the IPO, if I am correct, was on January 25th of 2019, correct?

MR. HASSON:  That's correct, your Honor.

THE COURT:  So, he brought on January 29.  So, that -- I didn't go back and look at the calendar, but let's just assume for a minute that January 25th was a Monday.  So, then there would have been trading on Tuesday, Wednesday, Thursday and he finally buys on Friday?

MR. HASSON:  Yes.  But it's not new shares.  So, it's the shares from the IPO.  Meaning, I think there's a distinction where there's a secondary offering and there is already existing shares on the market.

THE COURT:  I know.

MR. HASSON:  Sorry.

THE COURT:  But the point is somebody else bought the shares before he did, right?

MR. HASSON:  I assume so, yes.

L2OAAINRC                    Conference

THE COURT:  OK.  So, under this principle, where is the cutoff if the stock in the only stock that's available for trading comes from and IPO?  So, under your theory, is it five days, ten days, 20 days, 30 days?  They're all derived from the IPO?

MR. HASSON:  I don't have a specific date or cutoff for that, but I think in this particular circumstance when it's only a short number of days after, I think that would apply in this particular circumstance.  I don't want to make a broadbrush statement about how far this might extend.  But here, you can see that it's a matter of four days.  And again, I can't confirm what those days are.  So, I don't know if there's a weekend in the middle of this or not.  We can go to a calendar to confirm that.  But I think that is important.  This is a very short amount of time.  I'll actually, you know what? Just looking at a calendar really quickly, I believe the 25th was indeed a Friday.  So, you know the interim days are weekend days.

THE COURT:  No.

MR. FUMERTON:  Robert Fumerton.

Your Honor, if I may briefly be heard on this?

THE COURT:  Sure.

MR. FUMERTON:  So, the 25th is a Friday.  The purchase according to the certification did not occur until the Tuesday, the 29th.  Your Honor, the standard is not whether the shares

are traceable under Section 12.  That's the standard under Section 11.  Under Section 12 the shares must be purchased directly from an underwriter in the IPO, not the aftermarket. The Second Circuit in the Sea Containers case 331 F. App'x 14 at 16 to 17 has made clear that whereas here the purchases occur in the aftermarket and not directly in the IPO, plaintiffs lack Section 12 standing.

THE COURT:  Mr. Hasson, do you disagree with that?

MR. HASSON:  Pardon me?

THE COURT:  Are you aware of that case?

MR. HASSON:  I'm not sure that I saw that case in the briefing.  I may have.  There were actually quite a few cases obviously cited here, but I do know that the majority of the law does have similar finding in terms of, you know, you have to buy directly in the offering.  But here, again, this is really a one day gap from the offering to when Mr. Medley made his purchase and under that circumstance and also at the motion to dismiss stage, I would argue that this should be sufficient for standing.

THE COURT:  Really?  You picked your plaintiffs.  I don't understand.  Why should this be sufficient at the motion to dismiss stage?  You picked the plaintiffs before you sued. You could have changed plaintiffs.  This case was filed over a year ago, right?  I mean, I don't understand the at the motion to dismiss stage.  It's not like you need to learn something

else.  You know the facts.  You know exactly when he bought.  I just don't understand that argument in this context.  I can certainly understand the other arguments where a plaintiff by definition cannot know everything when they file the complaint because the defendant is the holder of the information but here, defendants aren't holders of the information any more than you are.

OK.  Let's just go on.  I also have a question about the stock options in this case.  So, obviously, you know that relates to possible issues of scienter.  Do you have a little more information about that?  What was the strike price?  I know if it was the same for all the options.  I don't know enough, so.  Were the options in or out of the money for the time period that we're talking about here?

MR. HASSON:  Your honor, I would refer you to, I believe it's paragraph 285 of the amended complaint where there is a chart reflecting the various exercises prices for the various defendants that you alleged to have scienter based on this options argument.

THE COURT:  OK.  I don't have that in front of me.  I'm sorry.  I don't think I do have your whole complaint in front of me.

MR. HASSON:  On page 86.

THE COURT:  No.  I take it back.  I have been well prepared.  Better prepared than I knew I was.  Just a second.

(Pause)

THE COURT:  OK.  So, those were the options that existed.  Is there an assertion that any of the individual defendants exercised any of these options during the period that you're asserting in this action?

MR. HASSO:  No.  The complaint does not allege that options were exercised.  The allegation is that this is a concrete motive for certain defendants, Mr. Sebastien, Mr. Chaplin, Mr. Monahan and Mr. Burwash.  You know, because they had the motivation to increase the stock price so that they could exercise the option.  They did not allege that they were exercised.

THE COURT:  Could we presume that they were not exercised for purposes of my --

MR. HASSON:  I would imagine we would have alleged that they were exercised if they were exercised.  So, yes.

THE COURT:  Excellent.  Thank you.

MR. HASSON:  But, your Honor, can I actually make one additional point since you were just touching on motive for scienter, which I don't think was articulated as clearly as I guess I would have liked in our brief?  But it is an allegation in the complaint that there is an additional concrete motive here for scienter in that the defendants were motivated to increase the stock price to purchase New Strike.  New Strike was purchased in March of 2019 for $263 million Canadian and it

was in all stock acquisition.

THE COURT: That's the best that you can do? Because if is it's not going to work. That's standard business related motive and you know that's not good enough.

MR. HASSON: Your Honor, I would argue that it is actually a little bit beyond that because if it's really tethered, this isn't just a regular acquisition. It's tethered to the exact fraud here -- or the alleged fraud -- the perpetuating is growth story that HEXO was selling to the market. The need under this adjudice agreement you know, gave the impression that there was demand where there wasn't. It is specifically tied to the issues here. And your Honor, I think has found that increasing a value of stock for purpose of an acquisition was a sufficient allegation in the In Re: Complete Management case. And also referenced to this could be a sufficient motivation for scienter in the Sketchers case which cited Vivende and Geo Pharma.

So, I don't think that it's exactly just the fact that an acquisition was made but this acquisition was really critical to HEXO's growth story. It was essential. It delivered news to the market that demand was truly increasing.

THE COURT: OK. Actually, that segues nicely into another question I had which was, did the fact that there was a portion of the Niagara facility that was unlicensed, did that have any impact on HEXO's ability to fill existing orders?

MR. STOKES:  No.  It's our position that it had absolutely no impact, and I think that's borne out by the allegations themselves.  There's no alleged impact.  The core problem in this case is that the demand in the build out of new stores failed to materialize over time.  And as a result of that there just wasn't any demand for production from that facility.  Of course it was ultimately shut down in October.  So, no, it did not have, it's not alleged to have had, in our view it had no material financial impact on the ability to meet new orders or to generate new business at all.

And if I may address, your Honor, the New Strike issue.  This goes to the heart of why the scienter inputs in this case is extremely non compelling.  The company purchased New Strike for the precise purpose of trying to meet the expected demand.  It would have no rational basis to make that purchase in the first place.  If plaintiff's theory was correct that the company simply never anticipated, never had a good faith belief that demand would materialize, that was the whole point of that acquisition.  It wasn't to create some impression of future demand.

Plaintiff's counsel brings up the stock, the idea that defendants had a motive to increase their stock price.  Not only is that just a common motive of all executives, but in the stock purchase, why would they ever agree to lift their shares making a stock purchase of an acquisition if they knew all

along that that acquisition was unnecessary because it wouldn't materialize?  It's not a compelling narrative.  And not only is this the sort of case where the allegations of motive are insufficient but the allegations just flatly undercut any inference that there was fraud in this case.

THE COURT:  All right.  Let's move on, if we can, to June of 2019 and there are, let me maybe as the question in small bits.

The plaintiffs argue that the statements -- and by the way, is it "San Louie" or is it "St. Louis"?  Since we're in Canada why don't we -- well, I'm in New York.

MR. HASSON:  I am going to defer to Mr.  -- to give the correct Canadian pronunciation before I mangle it.

(Voices speaking at the same time)

THE COURT:  So, there are two aspects of the sort of June claims let's call them.  One involves Mr. St. Louis's comment's touring the earnings call.  So, I guess plaintiff has portrayed that I guess as sort of a guaranty of future sales.

Could I get the defendant's sort of response to plaintiff's arguments with respect to the comments of Mr. St. Louis to the June call.

MR. STOKES:  So, if you look at the full comments that were made, Mr. St. Louis swears that the SQDC, the initial Canada's distributor in Quebec had soiled their store ramps that investors should expect timing risks.  He also discussed

the specific fact that HEXO intended not to enforce the Take or Pay requirement for that quarter payment obligation precisely for that reason, that there was an expectation that there could be timing risks and that putting, if you pushed unwarranted inventory or unneeded inventory into the system, it would have a negative impact on future purchases, having that as a part of the system. So, if you look at those statements. Specifically, disclosing that there is timing risk and that there is a slow down in the store ramp, those statements -- this is a situation over time where the company as issues unfolded on the ground, there were appropriate disclosures acknowledging that the ramp-up had slowed down and that the actual sales made each quarter were what they were. There is no allegation the historical sales that were presented each quarter were falsified in any way.

So, this was not -- I don't think it's a reasonable interpretation of his comments during that call when you consider risk disclosures about timing risks and the slow down as being anything close to a guaranty that HEXO would absolutely, in its commitment it's quite the opposite that the storm clouds were presented to investors. In subsequent periods they became heavier and grayer and the company made and Mr. St. Louis made appropriate disclosures conveying those risks. The fact that things got even worse in the subsequent quarter doesn't show that the statements of the time, the June

statements which were already tinged with a considerable gray and sobriety at that stage that they remotely rises to the level of fraud, particularly, in the context of a forward looking statement where Safe Harbor applies.  And there's no allegation of any contemporaneous facts in support of any inference that Mr. St. Louis or anyone else at HEXO knew that the guidance of that stage was unachievable.

One of the hallmarks of this case, I think that again shows why it fails in its entirety is the fact that virtually all the facts pled in support of plaintiff's claims are from HEXO's own disclosure, simply a case where they point to the October disclosures and say that the guidance was withdrawn and they allege that executives must have known back in June that that was going to happen.  They plead nothing else to support that inference.  And courts time and time again as your Honor did in the Vago case and other similar cases have appropriately rejected that sort of thought by hindsight attempt to plead a claim.  There is just nothing else alleged showing that Mr. St. Louis's claim, his statements at that time were false, let alone knowingly false.

MR. HASSON:  Your Honor, may I respond to that?

THE COURT:  Yes.

MR. HASSON:  I think context is really key here.  And I think it's important for the Court to know that what the defendants are asking the Court to do here is to just ignore

that a Take or Pay clause is defined as a guaranty.  This Court recognizes --

THE COURT:  Don't.  Don't.  Don't.  I really didn't appreciate that argument.  I don't think it's fair to what I said and so, I would pull back from that.

MR. HASSON:  OK.  But, your Honor, beyond the IPO Cast Iron case, if you even look the Investopedia definition for what a Take or Pay clause, it uses the word "guaranty".  It uses the word "obligation".

THE COURT:  But we're now in June and they're disclosing that they are not going to enforce it.

MR. HASSON:  They said they were not going to enforce it, your Honor, for that quarter.

And what defendants just argued that it wouldn't be prudent to put product into the market when demand was slow really doesn't matter because under the Take or Pay clause it doesn't platter whether products went into the market or not, they could still enforce payments and not lose the money that they promised investors they going to have for year one despite weak demands.  The very purpose of the Take or Pay clause here, the very purpose was to address weak demand.  No extenuating circumstances came up here.  Weak demand materialized and they just chose not to pay for it.  That's like somebody saying I have $100 million --

THE COURT:  That's not securities fraud.

MR. HASSON:  Well, it is.

THE COURT:  That's a business judgment that they're long range interest to maximize the ultimate earnings of the company for the benefit of the shareholders was not to stick it to Quebec at this time.

MR. HASSON:  I understand that, your Honor, but my response to that would be that the SQDC agreed to the Take or Pay clause in arms' length negotiations.  They still made HEXO the preferred supplier.  No other cannabis company -- and there were several that also got contracts -- none of them had a Take or Pay clause.  The government has no insolvency risk.  It is not the same as the typical business counter-party who might be going through rough times.  The government literally prints money.  The only purpose of the Take or Pay clause was to address the demands.  There were no extenuating facts here for non enforcement of that Take or Pay.

And quite frankly, your Honor, there also is no fact on the record that the SQDC even sought a concession from HEXO.  So, they're putting a completing inference up, which quite frankly, is not appropriate under Tellabs, not appropriate under this motion.

THE COURT:  All right.  So, let's go back to the transcript.

MR. HASSON:  Your Honor, may I just include one additional thing because you were talking specifically about

L2OAAINRC                          Conference

the June statement?  So, in the June statement we talk about transparency here by the way.  If you believe the Take or Pay clause was in fact a guaranty as plaintiffs allege it is, right, the company discloses, sure, there are 15 stores open. There are 300 percent behind in orders, right?  But yet they still said they remain completely on track and when they were pushed and the question was asked, What's going to happen here? You sold a fraction of what needs to be sold.  St. Louis said, you know, We're on track.  The SQDC is still going to buy 20,000 kilograms of product, just maybe one to two months late instead of fiscal, instead of the contract year end which would have been in October, by calendar year end of December.

So, the conflict confidently reiterated guidance and they confidently said that the SQDC was just going to be one to two months late on orders and that just was frankly not true. They made overstatements about how they're working very closely with the SQDC.  They have a great relationship.  I don't know how any investor could possibly look at that and say oh, you know, this is reasonable here.  No.  They were making very confident affirmative statements.

THE COURT:  Right.  And I don't think it's quite as strong as you say but there is one thing which I would certainly think you should have quoted to me which was 6K which says -- words of one syllable -- we will supply the SQDC with 20 kilograms of product in the first year.  That was quite a

bit more definitive than the statements of Mr. St. Louis in the earnings call.  But there is no question as you look at this the June sequence that there is without question a disclosure that Quebec is not meeting the timely, the purchase targets, that it is that they're behind in the anticipated purchases.  This is disclosure that the number of stores is opening.  There are far fewer stores opening that had been anticipated and that I think there is a disclosure of timing, certainly, timing risk.

MR. HASSON:  Your Honor --

THE COURT:  May I finish?

MR. HASSON:  I apologize.

THE COURT:  And there is also a disclosure about not holding Quebec to the agreement and there certainly is the part that you emphasized appropriately.  I'm not saying not.  But there's optimism and projection.

Here is the question I have for you, Mr. Hasson.  Your argument in this case is that those June disclosures were misrepresentations, that they were omissions and that they were unduly baseless-ly optimistic.  Why'd the stock go down 8 percent that day?

MR. HASSON:  I believe that the stock went down? 8 percent that day because on that day that was the first time that HEXO signaled to investors and to the market that the Take or Pay clause may not be the ironclad guaranty that they had

touted from day one from their perspective.  And I think that at the end of day the drop was mitigated by two things.  One, Mr. St. Louis restricted the in-application, their voiding of Take or Pay clause for that quarter.  Didn't say that we're never going to exercise that clause.  He just said for the quarter or not.  And in addition to that, he doubled down in saying they're still going to make their commitment one to two months late, 20,000 kilograms one to two months late.  And so, investors may have taken a step back and said, hey, you know, there's something going on here.  Why aren't they enforcing this cause they have been talking about from day one which they differentiated in their perspectives, by the way?  And this is at paragraph 187 in our complaint.  They differentiated this clause from any other clause they had and from any other contract they ever had because it was a guaranty.  So, in June the stock drops and it drops eight percent and not a greater drop because, quite frankly, investors were told this is just a quarter.  Maybe it's understandable to make a concession for a quarter.  And the timing is just one to two months off.

But, your Honor, they're saying that there are only 15 stores and they're 300 percent behind doesn't signal anything really to investors when the investors believe, as we allege they do, that they get paid regardless of the number of stores.

THE COURT:  If they believe that, then they don't care what the company says and the stock doesn't go down.  You are

sort of trying to have it both ways.

MR. HASSON:  I don't believe so, your Honor, because this is the first time in June that the company signaled that they weren't going to enforce the Take or Pay clause and that's scary for investors.

THE COURT:  Then that's being truthful.

MR. HASSON:  No.  It was partially truthful because --

THE COURT:  I guess I have a little problem with your suggesting that and I don't know that you have a basis.  Let me say this.  I don't think you have an allegation that says that in June that the HEXO management had decided that they were not going to enforce the clause ever.

MR. HASSON:  Our allegation, your Honor, is that they fundamentally misrepresented the clause as a guaranty.  So, anyone who looked at that and anyone who saw them touting the clause thought that there was a fait accompli, that regardless of what the demand is here the company is going to get paid.  So, this is the first time and now defendants admitted in their motion to dismiss briefing that there was never a guaranty.  Quite frankly, I don't understand any other credible way to read what the Take or Pay clause is based on their public statements.

And I'll add that their argument is also belied by the fact that HEXO amended the contract on March 30, 2020, or they actually amended it in January but they informed the market

that they amended it on March 30, 2020, to relieve the SQDC of its one year commitment. And if this was just an unexercised contract right, why go through the trouble? It's really no purpose to go back and amend the contract. I think they fundamentally misrepresented what this was. I think had they made a risk disclosure and said, hey, this is not, you know, a guaranty or we have a very significant relationship with the SQDC, so there's risk of nonenforcement here, I think we would be dealing with something different. But they've admitted it's not a guaranty now and there is no risk disclosure about the SQDC nonenforcement.

THE COURT: All right. Mr. Stokes, I assume you want to respond. I'm not sure sorry.

Mr. Stokes.

MR. STOKES: Thank you, your Honor.

Again, with respect to the June disclosure, even if you characterize it as "optimistic" and I think your Honor's recitation of the cautionary space and their cut against that stock drop, there are still no allegations. And at that point in time or at any earlier point in time anybody at HEXO had made the decision not to enforce the Take or Pay for the whole year or knew that the guidance would later be withdrawn or the commitment wouldn't be met, again was the context of a ramp up. And it's hard not to mention the vaccine issues right now. I am thinking of issues that arise when a new product is being

ramped up.  There can be disappointments and shortfalls in earlier time periods.  That doesn't mean that the company knows that as time goes on and hopefully things get smoother and stores get opened and product comes online that there's going to be accelerated growth in the future.  There's been no particularized allegations showing at any point in time that prior to the withdrawal of the guidance that HEXO or its executives had made a decision with respect to not to enforce the Take or Pay.

And clearly, back in the IPO context, again, this was before the New Strike acquisition.  There were no allegations at that point in time that any decision had been made to waive the Take or Pay almost a year down the road.  At that point, in time they were just a couple of months into the legalization of the adult-use cannabis.  And there's a host of cases we cite at Footnote 23 of our opening briefs, including cases involving similar situations where companies later decide to forego contractual life based on changing conditions, where the failure to plead facts showing that they had already made that decision had at point in time, number one, that that's fatal to the claim.  And there's nothing offered here to substantiate any inference that HEXO or individual defendants had any knowledge that that in fact would be a shortfall, either at the time of the IPO or through June when they started to make more ominous disclosures based on changing circumstances on the

ground.

And again, the New Strike acquisition which is -- featured today as well, I can't think of anything that cuts more strongly against the inference the plaintiffs are trying to advocate than the fact that the company went out and spent 260 plus million dollars Canadian in stock to increase its production and storage capabilities. The only reason that they would do that is because they legitimately believe that they would need that facility.

So, there's just no, again, no particularized facts or any facts other than the mere fact that later in time the company made a decision to not exercise the contractual life. And characterizing it as a guarantee, I mean the company in the actual disclosures HEXO made it didn't characterize it as a guaranty. It characterized it as a contractual right which is correct. That's what it was. This was a contractual right for year one. HEXO also made clear that there was no contractual right to payment for any time period beyond year one. And virtually any business that there's always a risk that if circumstances are ultimately radically different than what the company has in mind at the time the contract is signed, that a rational business decision could be made to modify or trade or forego a contractual right to get some other benefit.

And I submit, your Honor, that not only does plaintiff's position contradict the cases in Footnote 23 of our

opening brief, but it would just set a bad policy that companies should be punished for exercising their business judgment down the road to waive or modify a contractual right that they deem and conveyed that is in the stockholders' best interests.  But there is no allegation by the way, that it wasn't at the time in the stockholders' best interests.  And again, this is a securities case of course and there's no, securities laws don't, they don't criminalize or make actionable allegations over management decisions.  There is just no allegation in case other than pure hindsight allegation that anybody at HEXO understood that they wouldn't get the commitment at the time of the IPO or in June.

And the fact that the SQDC was a major, an important relationship, that was made clear with prospectus.  Prospectus went on at length about the volume, the business -- That's obviously a very large problem in Canada and that was the only way they could sell cannabis in that jurisdiction.  So, they made clear that it was a major, major relationship and the argument was advanced that the government can print money.

My client unfortunately cannot print money and it has to make, navigate a new market with changing conditions and make the best decisions it can to maximum value before for the stockholders.  that is what happened here.  Nothing more, nothing less.  We submit there were no misstatements and that the prospective itself made clear that the very facts that the

L2OAAINRC                    Conference

plaintiffs say indicate that there's an undisclosed risk.  It was all made clear in the prospectus itself and there was no material misstatement.

THE COURT:  Small question.  At the time of prospectus, the numbers concerning the purchases by Quebec were available in June, the numbers with respect to how much product Quebec had bought, were those numbers available?

MR. HASSON:  Yes, they were, your Honor.  And I think the numbers are actually quite telling.  Earlier in the class period when investors believed that they had a guaranty.  In the face of that number the stock didn't go down.  Stock actually went up.  And in March for example, the company was one of 160 percent behind.  I think they had only purchased 4,200 kilograms in June.  The SQDC had only purchased 6,663 kilograms.  They were now 30 percent behind and eight months had elapsed in the first year.

THE COURT:  OK.  I just want to clarify that all those numbers were available.

MR. HASSON:  Yes, your Honor.

May I make one point?

THE COURT:  Of course.

MR. HASSON:  And it's just again really going back to the point of the guaranty.  So, I would urge your Honor to take a look at a paragraph 187 of the amended complaint which makes reference to HEXO's risk disclosures pertaining to this

L2OAAINRC                       Conference

agreement.  And I think it's quite clear from that paragraph that they were representing this year one as a guaranty.

I think it's also incredibly important for the Court to take notice of the fact that analysts also viewed this Take or Pay clause as a guaranty and as a substantial revenue form. We make those allegations in for example, paragraph 98 and 115 of the amended complaint.

and before the June disclosure, even with sales being so far behind, the stock doesn't drop because investors also deem the Take or Pay clause as a guaranty.  So, they're not spooked by dismissal sales.  they -- by dismissal sales in June when for the first time the company discloses that maybe the Take or Pay clause is not as ironclad as they let them on to believe initially.

THE COURT:  Well, is the big picture take away from that that in order simply to avoid a class action lawsuit that a business which entered into a Take or Pay contract prohibited from changing business its judgment as to whether they ought to enforce that?  That by having entered into it a good thing presumably, that they can never change, you know, make a subsequent business judgment, that enforcing it would not be in their long term interests but actually, would hurt them and therefore, they can't change it because that's the bottom line I think of what you're arguing and that seems like a rather odd connection between class action business judgment rule.

MR. HASSON:  Just responding briefly to that, I wouldn't make a broadbrush statement like and I'm not intending to at all.  But I think context here is really key.  Again, the SQDC agreed to the Take or Pay clause at arms' length.  They still made --

THE COURT:  As a business matter, not to stick it to them, and you're saying that that decision creates a securities fraud.

MR. HASSON:  No, your Honor.  Again, in the cases that I've dealt with this, for example, the IPO Iron Cast case --

THE COURT:  This is different.

MR. HASSON:  Correct, your Honor.  It was different because there was extenuating circumstance.  CNH had an over-bought of product.  Here, the exact circumstance contemplated by Take or Pay clause arose with a counter-party that doesn't have the same --

THE COURT:  Well, I will refrain from what I was about to say.  That's some argument.  All right.  Unless my law clerk tells me that there's something else they need to ask I was finished asking questions at this point.

Actually, Rebecca, if you think there's something, just send me an e-mail

LAW CLERK:  Will do.

THE COURT:  OK.  So, I think you have a sense of from the questions where my areas of concern are and you can

L2OAAINRC                    Conference

understand that I am not concerned about the prospectus and the

greatest area of concern that I have was the month of

June 2019.  So, I don't really have any more questions but as I

always do let me give the plaintiff a chance to speak on

anything that you think is important that wasn't well covered.

MR. HASSON:  Your Honor, I think we've pretty much

covered the ground that we wanted to cover.  I would just

reiterate that plaintiffs believe that what happened here was

there was a guaranty and there was no clarity about it and

saying that there is just a business judgment decision I think

is extremely dangerous where HEXO, the company is making public

statements and is in complete control of that business

decision.  There was no uncertainty.  It was literally just

their decision whether or not they were going to exercise this

right or not.

And in that context I think it's important that

investors have a full picture and full transparency that

there's even a possibility that they are not going to enforce

this clause.  Because again, this clause is different that a

regular contract term.  It's stronger than a contract term.  we

believe that the claims, that the statements that they made

projected that to the market and we believe that the market

reacted when it learned the truth.

So, that's pretty much the sum of it.  I think the

Take or Pay clause as a guarantee muted the import of other

important disclosures like the number of stores that were out and the number of kilograms that had been sold to the SQDC because investors who believed that they were guaranteed payment either way would not have been alarmed by those numbers to same extent that they would be if they didn't have a guaranty and insurance for a rainy day, as was the case here.

I think it's a dangerous position to put investors in to allow a company to make a business decision so willy-nilly without transparency.  Obviously, we disagree with the defendants on the level of transparency.  Here, we think things were not quite so transparent.

The last thing I would want to just say is I think it's important to note that the executives that left the company is also quite telling.  You have the CFO, Mr. Chaplin, resigning just days after this lofty guidance and New Strike deal is announced in March and that's a little bit suspicious if the company is truly on the precipice of greatness for a CFO to resign at that time.  Cofounder of the company, Mr. Mirren, resigned days after the June disclosure.  And that's the time when Mr. St. Louis doubles down on the SQDC satisfying its year one commitment and its lofty guidance.  An additional CFO, Mr. Monahan, who is known to have substantial financial background resigns days before HEXO pulled its guidance.  And then you have the company's auditor, MMPLP, resigning I guess, a month and a half before the March disclosures which would

close the class period, and only two weeks after HEXO's January 17 amendment of the contract to absolve the SQDC of its year one commitment.  Again, the company didn't disclose the amendments of the contract until March but it happened January 17.

And so, I would just add that these resignations are not just the claims and other general resignations.  Much like New Strike these tethered directly to the heart of the alleged fraud here, the financial guidance and the financial statements that the company was making.

THE COURT:  OK.  Anything further from Mr. Stokes or Mr. Fumerton?

MR. STOKES:  Your Honor, I'll just keep it brief.

Number one, with respect to the resignations as cited in our opening briefs, there are legions of cases holding resignations that don't support an inference of scienter especially here, when a company's post IPO.  There's financial difficulties later in the year.  Obviously, executives resign for many, many reasons, as cited in Footnote 42 and 43 of our opening brief.  The allegations here come no where close to supporting inference of fraud.

I'd like to go back just briefly to one overarching comment from my colleagues on the other side.  There was a comment about it being inappropriate to draw inference, non-fraudulent inferences or inferences against their claims.

L2OAAINRC                        Conference

And Tellabs says exactly the opposite, that the Court is required to draw inferences positive and negative from the Holistic facts that are pled.  And I think that is the paradigm case.  When you look at the holistic narrative the plaintiffs have presented, the company's actions at every point in time were consistent with this having an honest belief that things would get better, that the ramp up would succeed.  The facts on the ground changed.  The disclosures became more sober and darker were exactly what you would expect.  We think when you weigh the New Strike acquisition and the complete absence of any particularized factual detail showing any contemporaneous knowledge or adverse information, this case just doesn't come anywhere close to the cut line in terms of showing if the cogent compelling inference of scienter.

So with that, we would stand on our briefing and prefer Court to dismiss.

THE COURT:  I think perhaps we are done unless somebody has anything else that they would like to say.  I don't have any further questions.

OK.  Very good.  Thank you very much.  You'll get a decision in the foreseeable future.

(Adjourned)