UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

In re HEXO Corp. Securities
Litigation

-----------------------------------

**MEMORANDUM AND ORDER**

19 Civ. 10965 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Before the Court is defendants' joint motion to dismiss plaintiffs' First Amended Class Action Complaint ("FAC"). ECF No. 96. In the FAC, lead plaintiffs Timothy Sweeney and John Medley ("plaintiffs") bring claims under Sections 11, 12(a)(2), and 15 of the 1933 Securities Act ("Securities Act"), Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 as promulgated under the Exchange Act.

Plaintiffs are a putative class of individuals and entities that purchased or otherwise acquired HEXO securities between January 23, 2019 and March 30, 2020 (the "Class Period") on the New York Stock Exchange ("NYSE") or the NYSE American exchange, including through or traceable to HEXO's initial public offering ("IPO") on January 25, 2019. Plaintiffs' claims are asserted against each defendant as follows:

| Defendant(s) | Role[1] | Securities Act Claim(s) Asserted | Exchange Act Claim(s) Asserted | Defined Terms Applicable to Defendants |
|---|---|---|---|---|
| HEXO Corp. ("HEXO") | Corporation | Sections 11, 12(a)(2), 15 | Section 10(b) and Rule 10b-5 | Securities Act Defendant  Exchange Act Defendant[2] |
| Sebastian St. Louis | HEXO's president, CEO, director, and co-founder | Sections 11, 12(a)(2), 15 | Section 10(b) and Rule 10b-5; Section 20(a) | Securities Act Individual Defendant  Securities Act Defendant  Exchange Act Individual Defendant  Exchange Act Defendant |
| Adam Miron | Co-founder and HEXO director until July 18, 2019 | Sections 11, 12(a)(2), 15 | | Securities Act Individual Defendant  Securities Act Defendant |
| Michael Munzar | HEXO director and chairman | Sections 11, 12(a)(2), 15 | | Securities Act Individual Defendant  Securities Act Defendant |
| Jason Ewart | HEXO director | Sections 11, 12(a)(2), 15 | | Securities Act Individual Defendant  Securities Act Defendant |
| Vincent Chiara | HEXO director | Sections 11, 12(a)(2), 15 | | Securities Act Individual Defendant  Securities Act Defendant |
| Nathalie Bourque | HEXO director until February 6, 2020 | Sections 11, 12(a)(2), 15 | | Securities Act Individual Defendant  Securities Act Defendant |

---

[1] Unless otherwise specified, the defendant was in the role specified throughout the Class Period.

[2] Together with the Exchange Act Individual Defendants, HEXO is an "Exchange Act Defendant."

| Ed Chaplin | HEXO's CFO until April 30, 2019 | Sections 11, 12(a)(2), 15 | Section 10(b) and Rule 10b-5; Section 20(a) | Securities Act Individual Defendant |
|---|---|---|---|---|
| | | | | Securities Act Defendant |
| | | | | Exchange Act Individual Defendant |
| | | | | Exchange Act Defendant |
| Steve Burwash | Vice President, Strategic Finance; HEXO's interim CFO, May 1-28, 2019; CFO, Oct. 5, 2019 through Class Period | | Section 10(b) and Rule 10b-5; Section 20(a) | Exchange Act Individual Defendant |
| | | | | Exchange Act Defendant |
| Michael Monahan | HEXO's CFO from May 28 – October 4, 2019 | | Section 10(b) and Rule 10b-5; Section 20(a) | Exchange Act Individual Defendant |
| | | | | Exchange Act Defendant |
| Underwriter Defendants[3] | | Sections 11, 12(a)(2) | | Securities Act Defendants |

For the reasons set forth below, the Court grants defendants' motion to dismiss in its entirety.

## I.   Background[4]

This lawsuit arises from HEXO's collapse during the year-and-a-half following Canada's legalization of adult-use recreational

---

[3] The Underwriter Defendants consist of CIBC World Markets Inc., BMO Nesbitt Burns Inc., Oppenheimer & Co. Inc., Altacorp Capital Inc., Beacon Securities Limited, Bryan, Garnier & Co Ltd., Cormark Securities Inc., Eight Capital, GMP Securities L.P., Laurentian Bank Securities Inc., PI Financial Corp., and Roth Capital Partners, LLC.  Together with HEXO and the Securities Act Individual Defendants, they are the "Securities Act Defendants."

[4] The following facts, which are drawn from the operative complaint, are accepted as true for purposes of the Court's ruling on defendants' motion to

cannabis on October 17, 2018 ("Legalization").   HEXO, a Quebec-based cannabis supplier, FAC ¶¶ 1, 81, anticipated that the Legalization would create a new market and increase demand for its products, and engaged in a number of actions in order to capitalize on the anticipated growth in demand.   First, HEXO entered into supply agreements with major Canadian cannabis dispensaries, including Quebec's government-run dispensary, Société Québécoise du Canabis (the "SQDC").   The "SQDC Agreement," entered into between HEXO and the SQDC, contained a "take-or-pay" provision, which provided that the SQDC would either order or pay for a certain amount of product from HEXO in the first year following Legalization.   Second, between December 2018 and January 2019, HEXO circulated a registration statement and a prospectus, and in January 2019, conducted an IPO.   Third, HEXO invested in new greenhouse facilities in order to meet the anticipated growth in demand by acquiring Newstrike, another cannabis company.

Unfortunately for HEXO, demand for cannabis — in particular, by the SQDC — fell far short of expectations, and this was reflected in HEXO's performance.   Following a series of setbacks suffered by HEXO, plaintiffs brought this suit, asserting Securities Act and Exchange Act claims against HEXO, individual directors and officers of HEXO, and underwriters of the IPO.

---

dismiss.  The Court draws all reasonable inferences in plaintiffs' favor.  See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

Central to plaintiffs' federal securities claims are (a) the SQDC Agreement; (b) HEXO's offering prospectus; and (c) HEXO's acquisition of Newstrike, each of which are described in greater detail below.

### A. October 2018: SQDC Agreement

Canada legalized adult-use recreational cannabis on October 17, 2018. FAC ¶ 86. In Quebec, the recreational cannabis market is controlled by the government-run cannabis dispensary, the SQDC. On April 11, 2018, in anticipation of the increased demand for its product following Legalization, HEXO entered into a five-year supply agreement with the SQDC, the SQDC Agreement, to become the preferred supplier of the SQDC, which had an option to renew for a sixth year.[5] FAC ¶¶ 13, 82.

The SQDC Agreement provided, in relevant part, that the SQDC would purchase from HEXO 20,000 kilograms of cannabis during the first year after Legalization, i.e., October 17, 2018 through October 17, 2019 ("Purchase Obligation"). FAC ¶¶ 13, 84. This provision was subject to a "take-or-pay ("ToP") feature," which allows a supplier to collect payment even if the purchaser does not fulfill its contractual purchase obligation. Declaration of Todd Batson ("Batson Decl."), ECF No. 115, Ex. 4 at 16.[6] Based on

---

[5] The SQDC Agreement is not on the record, and according to plaintiffs is not publicly available. Defendants did not provide a copy of the SQDC Agreement.

[6] The Court may take judicial notice of those exhibits attached to the Batson Decl. and the Declaration of Peter Strokes, ECF No. 117 ("Stokes Decl."),

the Purchase Obligation, using a price of $5.45[7] per gram – the price for cannabis at the time — plaintiffs estimate that the SQDC Agreement should have generated over $100 million in revenues for HEXO in the first year following Legalization.   FAC ¶¶ 13, 86. Per the SQDC Agreement, in the second and third years that cannabis was legal, the SQDC was expected to purchase from HEXO volumes of 35,000 kilograms and 45,000 kilograms respectively (however the second and third years were not governed by a ToP provision).   FAC ¶¶ 13, 84.  Purchase volumes for the final two years of the contract would be based on the volumes in the first three years.   FAC ¶¶ 13, 84.

### B. December 2018 - January 2019: Initial Public Offering & Prospectus

Two months after Legalization, on December 20, 2018, in anticipation of its IPO, HEXO filed a Registration Statement on Form F-10[8] with the SEC (the "Registration Statement"), which was signed by the Securities Act Individual Defendants.   FAC ¶ 90. The Registration Statement registered $600 million worth of HEXO shares for trading on the Toronto Stock Exchange and NYSE American Exchange.   Id.

---

which were filed with the Securities and Exchange Commission ("SEC").   Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 462 (2d Cir. 2019).

[7] "$" refers to US dollars.   "C$" refers to Canadian dollars.

[8] The SEC requires certain publicly traded Canadian foreign private issuers to complete Form F-10 in order to register and sell securities in the United States.

On January 25, 2019, HEXO filed a prospectus with the SEC (the "Prospectus"), which incorporated the Registration Statement, and which stated that HEXO would conduct an IPO of 7.7 million shares (which ultimately amounted to 8.8 million shares including the underwriters' over-allotment). FAC ¶¶ 15, 92. The shares were to be listed in the United States on the NYSE American exchange at $5.15 per share. FAC ¶ 15.[9] The IPO was underwritten by the Underwriter Defendants. FAC ¶ 184.

The Prospectus described the SQDC Agreement, providing details about the SQDC's Purchase Obligation and the ToP provision that was effective in the first year. FAC ¶ 185. According to the Prospectus, HEXO's agreements with other companies did not contain a similar ToP provision. FAC ¶ 187. The Prospectus also stated that HEXO "believes this agreement is the largest forward supply agreement in the history of the cannabis industry in Canada, based on year one volume." FAC ¶ 185. HEXO closed the IPO on January 30, 2019, having raised approximately C$58 million from investors. FAC ¶ 17.

According to plaintiffs, defendants St. Louis (co-founder, president, and CEO), Chaplin (HEXO's CFO until April 30, 2019), Burwash (HEXO's interim CFO from May 1 – 28, 2019, and again from October 2019 through the end of the Class Period), and Chaplin

---

[9] HEXO switched from the NYSE American exchange to the NYSE on July 16, 2019. FAC ¶ 91.

(HEXO's CFO from May 28 – October 4, 2019) possessed stock options, entitling them to at least 325,000 securities each upon exercise. FAC ¶ 285. For the majority of these options, the strike prices were above trading prices during the Class Period, FAC ¶¶ 283, 285, and in fact, as was disclosed at oral argument, no options were exercised, Tr. of Oral Arg., Feb. 24, 2021 at 10:15-16.

By the time of the IPO, HEXO had been delivering product to the SQDC for over three months, i.e., from the Legalization on October 17, 2018 until January 25, 2019, the date of the Prospectus. FAC ¶¶ 16, 94. During this time, the SQDC ordered from HEXO an average of 840 kilograms of cannabis per month, which constituted 90% of HEXO's sales in Quebec. FAC ¶¶ 16, 17, 95. At this rate, the SDQC was not on track to fulfill the Purchase Obligation. FAC ¶¶ 17, 95. Moreover, the SQDC was behind in its plans to open stores, having opened only 12 stores by December 2018 and 24 stores by December 2019. FAC ¶¶ 101-02. According to plaintiffs, however, HEXO conveyed that it was not concerned about these short orders or delayed openings because the ToP feature provided that the SQDC would pay for the 20,000 kilograms of product notwithstanding demand. FAC ¶¶ 17, 96.

### C. March 2019: Newstrike Acquisition and Revenue Guidance

In anticipation of increased demand for cannabis following Legalization and the formation of its supply agreements, HEXO sought to expand its operations. FAC ¶ 18. Accordingly, in a

press release dated March 13, 2019, issued on Form 6-K,[10] HEXO announced that it would acquire Newstrike in an all-stock transaction for C$263 million.  FAC ¶¶ 18, 99, 104, 190-91. Newstrike was another publicly traded Canadian cannabis company. FAC ¶ 18.  Through this acquisition, HEXO acquired a number of facilities, including the Niagara Facility.  The Niagara Facility conducted 90% of Newstrike's production and, according to HEXO, would ultimately account for 40% of HEXO's production capacity. FAC ¶¶ 18, 105.  In its March 13, 2019 press release, HEXO stated, "[b]ased on the completion of the [Newstrike] Transaction, for fiscal 2020, HEXO estimates net and gross revenues from the sale of cannabis in Canada will be in excess of [C]$400 million and [C]$479 million respectively."  FAC ¶ 19.

On March 14, 2019, during an earnings conference call (the "March Call"), President and CEO St. Louis reiterated HEXO's C$400 million revenue guidance for the 2020 fiscal year, stating that such guidance was "conservative."  FAC ¶ 20.  Also on the March Call, St. Louis explained that there was a licensing delay with respect to a new part of the Niagara Facility.  FAC ¶¶ 106, 205. Further, St. Louis spoke positively about the Purchase Obligation, noting:

> [T]he SQDC 20-ton commitment is fully on
> track.  Our relationship remains in amazing

_____
[10] Foreign issuers are required to submit Form 6-K as a cover page when filing reports with the SEC.

> standing, and we're really excited about all
> the stores they're opening, the education
> programs they're setting up, and the
> additional products we'll be introducing in
> October.

FAC ¶ 213.  Later, during the question and answer portion of the
call, when asked whether he was confident that the SQDC would reach
its Purchase Obligation, St. Louis explained:

> I'm absolutely confident about that . . . if
> you look at the multiples we put forth on
> previous sales, I think there's always been a
> doubt for HEXO's ability to ramp up, and we've
> executed every single time.  So I'm telling
> everybody now we will execute again.

FAC ¶ 200.  He continued, "Are there risks? Yes[,]" and then
proceeded to explain some of those risks.  Id.

Also on March 13, 2019, HEXO published its Management's
Discussion and Analysis ("MD&A"), which was attached to its Form
6-K of the same date (the "March MD&A").  See Stokes Decl., ECF
No. 117, Ex. 15.  In its "Company Overview," the March MD&A set
forth HEXO's sales to date, and also described its current supply
agreements, stating, "We currently possess the single largest and
longest Canadian forward supply amount among all licensed
producers, based upon announced provincial supply agreements."
Stokes Decl., Ex. 15, at 3.  Referencing the SQDC Agreement, the
March MD&A continued, "In Quebec alone, we will supply 20,000 kg
in the first year of legalized adult-use cannabis. . ."  FAC ¶

195; Stokes Decl., Ex. 15, at 3.  HEXO further explained that it "believe[s] all of this positions us to become one of the two top companies in Canada serving the legal adult-use market."  Stokes Decl., Ex. 15, at 3.

The March MD&A also set forth a number of risk disclosures. The first page of the March MD&A provides a disclosure ("Disclosure"), which states that certain information in the MD&A "contains or incorporates comments that constitute forward-looking information . . .[which] are not historical facts but instead represent management beliefs regarding future events, many of which, by their nature, are inherently uncertain and beyond management control" and which are based on reasonable assumptions that "are subject to a number of risks beyond [its] control." Stokes Decl., Ex. 15 at 2.  The Disclosure proceeds to list a number of those risks, including industry competition, product development, changes to government laws, regulations or policies, and supply risks.

The "Risk Factors" section of the March MD&A further provides a long list of specific risks, including that HEXO "operate[s] in a dynamic, rapidly changing environment that involves risks and uncertainties," and that HEXO "expect[s] to derive a significant portion of [its] future revenues from the recently legalized adult-use cannabis industry and market in Canada, including through its agreements with the SQDC in Quebec, the OCRC in Ontario, and the

11

BCLDB in British Columbia." Stoke Decl., Ex. 15, at 28-30. The March MD&A continues to explain that the "SQDC has agreed to purchase 20,000 kg of HEXO's products for the first year of the agreement," but that the agreements with the SQDC, the OCRC, and the BCLDB do not otherwise contain purchase commitments or obligate purchasers to buy minimum or fixed volumes. Id. at 29.

### D. June 2019: ToP Amendment, Revenues, and Target

On June 13, 2019, St. Louis participated on HEXO's third quarter earnings conference call (the "June Call"). During the question and answer portion of the call, an analyst asked whether, in light of the fact that HEXO had sold only 5,500 kilograms to the SQDC in the first half of the contractual year, there was a risk that the SQDC would not need the full Purchase Obligation. FAC ¶ 231. The analyst further wondered if taking the product anyway would lead to "significant inventory builds." FAC ¶ 231.

St. Louis responded as follows: "Yes, so definitely, a risk. I think the demand is there in Quebec. I think the SQDC has been doing a fantastic job." Id. He continued to explain that the SQDC's store roll-out was slower than expected, but that the SQDC had added stores and "gone back to 7 days of full-time selling" which "adds significant demand." Id. He further explained that HEXO would relieve the SQDC of its Purchase Obligation for that quarter:

> I do think there could be some timing
> risk around a few of those tons — of those 20 tons.
> Now, of course, as you pointed out, it is a
> take-or-pay contract, but we value our
> relationship with SQDC more than a few million
> dollars in revenue we could get this quarter.
> So we're working very closely with them.

Id. St. Louis nevertheless remained optimistic about HEXO's trajectory, explaining that he thought that it was a "reasonable assumption" that the SQDC would fulfill the Purchase Obligation by the end of 2019 (rather than by the end of the contractual year on October 17, 2019):

> We plan on launching a whole bunch of new
> products over the following couple of
> quarters, which we think will help that, but
> expect some timing risk whether it's in
> October, November, December time line to hit
> the full 20, I think, would be a reasonable
> assumption. We're confident we can completely
> offset that and more, of course, in other
> provinces.

Id. ¶ 232. St. Louis also stated that HEXO was going to double its revenues generated between May and July 2019 in the fourth quarter of the year. FAC ¶ 23. He said, "We're going to reach the target." FAC ¶¶ 23, 228.

On June 13, 2019, HEXO also published its MD&A attached to Form 6-K ("June MD&A"). On the topic of the Purchase Obligation, the MD&A stated:

> The strategic value of our SQDC relationship
> cannot be understated. We hold the single
> largest forward contract in the history of the

> emerging cannabis industry with the SQDC and
> are the preferred supplier for cannabis
> products for the Quebec market for the first
> five years following legalization. We will
> supply the SQDC with 20,000 kg of products in
> the first year . . .

FAC ¶ 221; <u>see also</u> Stokes Decl., Ex. 16 at 5.[11]

The June MD&A also sets forth a number of risk disclosures. The first page of the June MD&A provides an identical Disclosure to that contained on the first page of the March MD&A, which, in summary, explains that certain statements contained therein are forward-looking in nature and subject to risks beyond HEXO's control. Stokes Decl., Ex. 16 at 2. The June MD&A also contains a long list of Risk Factors, including that HEXO expects to "derive a significant portion of [its] future revenues from the recently legalized adult-use cannabis industry and market in Canada, including through [its] agreements [with] various provincial governing bodies" and that HEXO "operates in a dynamic, rapidly changing environment." Stokes Decl., Ex. 17, at 31-32.

On June 13, 2019, HEXO's stock fell 8%, from $6.45 per share to $5.90 per share. FAC ¶¶ 24, 120.

**E. October 2019: Disclosures, Debt Offering, and Lay-Offs**

From this time forward, HEXO experienced a series of setbacks.

---

[11] The June 6-K was signed by Chaplin, the former CFO, but an amended version was signed by St. Louis later the same day. FAC ¶ 218 n.13. The amended 6-K stated that "the wrong signature page was included" with the original Form 6-K. <u>Id.</u> Because Chaplin is alleged to have left his position as CFO on April 30, 2019, FAC ¶ 53, this amendment is not suspect.

First, on October 4, 2019, HEXO's CFO, Defendant Monahan, resigned.  FAC ¶ 29.[12]  That day, the stock price fell 6.4%, from $4.06 to $3.80.  FAC ¶ 300.

Then, on October 10, 2019, HEXO announced preliminary revenue for its fiscal fourth quarter and, inter alia, withdrew its C$400 million net revenue guidance.  FAC ¶¶ 26, 239.  On the same day, HEXO estimated that its fourth-quarter revenues were approximately 40% lower than expected.  FAC ¶ 131.  In a press release dated October 10, 2019, St. Louis attributed the reversal with respect to the guidance to "lower than expected product sell through, . . . [s]lower than expected store rollouts, a delay in government approval for cannabis derivative products and early signs of pricing pressure."  FAC ¶ 133.  That day, HEXO's stock fell 35%, from $3.66 to $2.85 per share.  FAC ¶ 134.

On October 23, 2019, HEXO announced that it entered into a $70 million private placement debt offering with a group of investors.  FAC ¶ 139.  On October 24, 2019, HEXO announced that it was laying off 200 employees, including its Chief Manufacturing Officer and its Chief Marketing Officer.  FAC ¶ 140.  That day, HEXO's stock fell 6.3%, from $2.69 to $2.52 per share.  FAC ¶ 142.

On October 29, 2019, in its Annual Report, HEXO announced net revenues 40% below original guidance and substantial impairment

---

[12] HEXO's first CFO, Defendant Chaplin, resigned on April 30, 2019.  FAC ¶ 110.

loss on inventory arising from price compression in the market. FAC ¶ 143. Most importantly, HEXO disclosed that it was "temporar[ily]" suspending operations at the Niagara Facility and that to date, it had sold to the SQDC a little over 10,000 kilograms – about half of the Purchase Obligation. FAC ¶¶ 30, 144, 247, 249, 254. On its earnings call of the same date, however, St. Louis explained that since the SQDC purchased less than half of the amount that it initially estimated from all producers, HEXO had maintained its target market share. Batson Decl., Ex. 2 at 6. That day, HEXO's stock fell 5%, from $2.32 to $2.25 per share. FAC ¶ 147.

### F. November 2019: Niagara Facility Closure

In a press release on November 15, 2019, HEXO provided additional details about the closure of the Niagara Facility, namely that on July 30, 2019, HEXO had learned that a section of the Niagara Facility was unlicensed. FAC ¶ 153. HEXO also announced that it was "winding down" the Niagara Facility. Id. On November 15, 2019, HEXO's stock fell 5%, from $1.89 to $1.79 per share. FAC ¶ 154.

### G. December 2019 – February 2020: Financial Disclosures, Debt Offerings, Resignations

On December 16, 2019, HEXO issued financial results for the first quarter of 2020, which reported net losses of C$62.4 million, low sales of C$18.3 million, and an inventory impairment of C$25.5

million.  FAC ¶ 156.[13]  The Company's auditor, MNP LLP, issued a reservation of opinion regarding errors related to HEXO's tax liability.  FAC ¶ 156.  On January 2, 2020, HEXO restated its financials for the fiscal year ending July 31, 2019, which, among other things, corrected errors in HEXO's deferred tax liability, net loss, and inventory impairment.  FAC ¶ 159.  That day, the stock price fell from $1.67 to $1.57 per share.  FAC ¶ 160.

Meanwhile, between December 5, 2019 and January 22, 2020, HEXO completed a private placement of unsecured convertible debentures and multiple offerings in order to obtain cash for working capital, for general corporate purposes, and for business expansion in the United States.  FAC ¶¶ 163-66.[14]  According to plaintiffs, the Exchange Act Individual Defendants were motivated to inflate HEXO's stock price to facilitate successful offerings.  FAC ¶ 287.  Meanwhile, on January 31, 2020, HEXO's auditor, MNP LLP, resigned.  FAC ¶ 170.  On February 6, 2020, Defendant Bourque, a director, resigned.  FAC ¶ 173.

### H. March 2020: Financial Disclosures, Niagara Facility Sale, and SQDC Agreement Amendment

On March 17, 2020, HEXO announced that it was taking another inventory impairment of up to $280 million, selling the Niagara Facility, and delaying its financial reporting for the second

---

[13] HEXO regularly disclosed inventory impairments between October 2019 and March 2020.  See, e.g., FAC ¶¶ 245, 262, 267, 269, 272.

[14] HEXO closed two additional offerings later in 2020, on April 13 and May 21.  FAC ¶¶ 167-68.

quarter of 2020.  FAC ¶ 174.  HEXO also disclosed that the Ontario Securities Commission was reviewing its filings and that "there were questions as to whether HEXO could continue as a going concern."  FAC ¶¶ 174, 269.  That day, the stock price fell 30%, from 77 cents to 45 cents per share.  FAC ¶ 270.

On March 23, 2020, HEXO filed a Form 6-K indicating that it was unlikely that the SQDC would purchase the product estimated in the SQDC Agreement for the second and third years.  FAC ¶ 177. HEXO noted that the estimates were "non-binding targets."  Id.  On March 30, 2020, also on Form 6-K, HEXO announced its second quarter financials, reporting a net loss of C$298.2 million, including an impairment loss related to the Niagara Facility and other intangible assets acquired from Newstrike.  FAC ¶¶ 178, 272.

In the MD&A attached to the March 30, 2020 Form 6-K, HEXO also reported that "[b]y amendment effective on January 17, 2020, [HEXO] contractually relieved the SQDC of the 1st year obligation to purchase the full 20 tons of the outstanding commitment."  FAC ¶¶ 180, 273.  HEXO explained that it amended the ToP provision in order to maintain a positive relationship with the SQDC:

> While the Company had a right under the contract to require the SQDC to purchase the full 20 tonnes of the outstanding commitment during the first year of the agreement, the Company did not seek to enforce this right on the belief that it would be short sighted given the general results in the industry and the SQDC's initial sell-through and from the perspective of its overall business

>relationship with the SQDC and its position in Quebec.

HEXO MD&A, March 30, 2020, at 14.[15]

Following these announcements, on March 30, 2020, the stock price fell over 35%, from $1.09 to 79 cents per share.  FAC ¶¶ 183, 275.

## II.  <u>**Procedural Background**</u>

The initial complaint in this action was filed by plaintiff Ronnie Perez on November 26, 2019.  ECF No. 1.  After review of eleven lead plaintiff motions as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Court appointed John B. Medley and Timothy Sweeney lead plaintiffs and appointed Bernstein Liebhard LLP lead counsel.  ECF No. 78.  Plaintiff Chi Fung Wong filed a motion urging the Court to reconsider its appointment of lead plaintiffs, ECF No. 85, which the Court denied, ECF No. 121.  On June 15, 2020, plaintiffs filed their First Amended Complaint, ECF No. 96, which is the operative complaint ("FAC") throughout this Memorandum and Order.  On July 30, 2020, defendants filed a joint motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 114.

---

[15] The Court may take notice of the contents of documents referenced in the complaint.  <u>City of Brockton Ret. Sys. v. Shaw Grp. Inc.</u>, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008).

## III. __Legal Standard__

To withstand a Rule 12(b)(6) motion, the non-movant's pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] fact[s] . . . allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court accepts the truth of the pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. (citation and quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

## IV. __Discussion__

### A. Securities Act Claims[16]

Plaintiffs bring claims pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act arising from HEXO's Prospectus, which incorporated HEXO's Registration Statement. Plaintiffs allege that the Prospectus contained untrue statements of material fact

---

[16] Plaintiffs do not allege Securities Act claims arising from HEXO's financial restatement or financial statements in the offering documents. Instead, their Securities Act claims are based on the Registration Statement, which was incorporated into the Prospectus. FAC ¶¶ 184-89.

regarding the SQDC's Purchase Obligation.[17]   For the reasons set forth below, the Court grants defendants' motion to dismiss with respect to its Sections 11, 12(a)(2), and 15 claims.

### 1. Section 11

Plaintiffs argue that the Securities Act Defendants are liable under Section 11 of the Securities Act because, notwithstanding the representations in the Prospectus, the Securities Act Defendants must have known at the time of the IPO that HEXO would not sell the Purchase Obligation to the SQDC. Plaintiffs reach this conclusion for the reasons that, <u>inter alia</u>, (a) in the first three months of the SQDC Agreement HEXO had not sold to the SQDC sufficient product to be on pace to meet its goals and (b) the SQDC had opened significantly fewer stores than planned.   Additionally, plaintiffs argue that the Securities Act

---

[17] Plaintiffs insist that their Securities Act allegations do not sound in fraud.  FAC ¶¶ 338, 343.  Defendants dispute this, arguing that the "gravamen of Plaintiffs' claim is that the Registration Statement misleadingly touted the SQDC Agreement as a guaranteed driver of revenues[.]"  ECF No. 116 at 20-21 (citing FAC ¶¶ 14, 187, 325(b)).  When a Securities Act claim sounds in fraud, it is subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).  <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d. Cir. 2004). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Though plaintiffs separate their claims under the Securities Act and the Exchange Act and disclaim fraud as a basis for their Securities Act claims, their claims rest on the same theory – that defendants knew that the SQDC would not fulfill the Purchase Obligation and HEXO would not so enforce – such that they are "almost a mirror image" of one another.  <u>City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.</u>, 450 F. Supp. 3d 379, 402 (S.D.N.Y. 2020).  Accordingly, the Securities Act claims are assessed in accordance with Rule 9(b).  <u>In re Fuwei Films Sec. Litig.</u>, 634 F. Supp. 2d 419, 436 (S.D.N.Y. 2009) ("[C]ourts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient to avoid Rule 9(b) standards when Securities Act claims sound in fraud.") (internal quotation marks omitted).

Defendants knew at the time of the IPO that HEXO would not enforce the ToP provision.

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Id. at 358-59 (internal quotation marks omitted).

Plaintiffs alleging actionable omissions under Section 11 must "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." Scott v. Gen. Motors Co., 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014); see also Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) (alterations in original) ("The veracity of a registration statement which may give rise to liability under [Section 11] is determined by assessing the facts as they existed

when the statement became effective"). Moreover, to plausibly allege a Section 11 claim based on an omission, the pleading "must pass two distinct hurdles: it must identify an omission that is (1) unlawful and (2) material." In re ProShares Tr. Sec. Litig., 728 F.3d 96, 101 (2d Cir. 2013). Omissions are considered material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988) (citation omitted).

As an initial matter, there is no dispute that plaintiffs have alleged the first two elements of a Section 11 claim: plaintiffs allege that plaintiffs purchased HEXO securities and the Securities Act Defendants participated in the IPO. Morgan Stanley Info. Fund, 592 F.3d at 358-59. The parties also do not dispute the materiality of the alleged misrepresentations.

The analysis, however, does not end here. Plaintiffs' Section 11 claim cannot survive the motion to dismiss because their allegations with respect to the third element – that the Prospectus contained false or misleading statements or omissions – are based on hindsight pleading. In re TVIX Secs. Litig., 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) ("Plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment

of the registration statement") (internal quotation marks
omitted). Plaintiffs do not allege that the Securities Act
Defendants knew any information in January 2019, when they issued
the Prospectus, upon which to conclude that HEXO would not sell
the Purchase Obligation to the SQDC by October 2019. After all,
January 2019 was just three months after the Legalization, when it
was reasonably difficult to anticipate demand. Specifically,
plaintiffs do not allege that the Securities Act Defendants knew
in January 2019 that the SQDC could not meet its commitment by
October 2019, or that the Securities Act Defendants should have
had any reason to know that demand for their product would not
increase. Nor do plaintiffs allege any particular facts indicating
that the Securities Act Defendants knew at the time of the IPO
that they would later exercise their business judgment and relieve
the SQDC of its obligations under the ToP provision.[18] <u>Uxin Ltd.</u>
<u>Sec. Litig. v. XXX</u>, 66 Misc. 3d 1232(A), 125 N.Y.S.3d 537 (N.Y.
Sup. Ct. 2020) ("the post-IPO change simply did not retroactively
render anything in the Offering Documents false or misleading").
Accordingly, plaintiffs' Section 11 claim must be dismissed. <u>See,</u>

---

[18] The Court notes that the SQDC's failure to deliver on its end of the
bargain appears to have been the precipitating factor in most of HEXO's
setbacks. HEXO anticipated that the SQDC would be a major customer in a growing
market and it structured its business, in part, on this premise, including by
entering into the SQDC Agreement. Had the SQDC, a government entity, purchased
product from HEXO as it committed itself to do, and opened stores as planned,
the SQDC presumably would have fulfilled the Purchase Obligation. But without
knowing that the SQDC would fail to deliver on its projections, HEXO could not
possibly have known that it would be unable to meet its targets.

e.g., Luo v. Sogou, Inc., No. 19 Civ. 230, 2020 WL 3051019, at *13 (S.D.N.Y. June 8, 2020), appeal filed (July 2, 2020) (dismissing Section 11 claim where allegations did not "show[] that such decision was made at the time the Registration Statement became effective"); Hi-Crush Partners L.P. Sec. Litig., No. 12 Civ. 8557, 2013 WL 6233561, at *7-8 (S.D.N.Y. Dec. 2, 2013) (dismissing Section 11 claim where relationship with key customer who had contract with ToP provision soured after offering).

Plaintiffs' reliance on IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC, 91 F. Supp. 3d 456 (S.D.N.Y. 2015), is misplaced because the facts of this case are readily distinguishable. ECF No. 122 at 17-18. There, prior to a sale, a key customer indicated — in no uncertain terms — that it was considering reducing its orders significantly or renegotiating its contract, which contained a minimum purchase requirement. IOP, 91 F. Supp. at 465. Notwithstanding, the issuer represented in the Stock Purchase Agreement that no material customer had any intention to modify its relationship with the issuer. Id. at 463. There, this Court sustained plaintiff's claim that this representation was false. Id. at 472-73. Here, by contrast, plaintiffs do not allege that defendants were aware of the SQDC's inability to fulfill the Purchase Obligation at the time that they issued the Prospectus. Moreover, to the extent that there were any causes for concern — for example, low sales in the first three

25

months of the SQDC Agreement — HEXO disclosed these facts.  Batson
Decl., Ex. 5 at 17; see also Davidoff v. Farina, No. 04 Civ. 7617,
2005 WL 2030501, at *10 (S.D.N.Y. Aug. 22, 2005) (dismissing claim
predicated on IPO statements where the "risk and the facts
underlying it were fully disclosed to potential investors").

     Nor is the Court persuaded by plaintiffs' insincere
extrapolation from IOP.  A predominant theme of plaintiffs'
argument is that the ToP provision in the SQDC Agreement was a
"guarantee" that the SQDC would pay a certain amount of money to
HEXO.  To bolster this argument, plaintiffs cite IOP's reference
to a contract containing a ToP provision as a "guaranteed-order"
contract.  ECF No. 122 at 17-18 (citing 91 F. Supp. 3d at 473).
But plaintiffs' reliance on a passing reference in a factually-
distinguishable case is disingenuous, if not offensive.
Certainly, in IOP, the Court did not hold that a contract with a
ToP provision necessarily contains a guarantee, and thus
plaintiffs cannot rely on such a conclusion here.

     Plaintiffs' reliance on Meyer v. JinkoSolar Holdings Co., 761
F.3d 245 (2d. Cir. 2014), is similarly unavailing.  There, in their
prospectus, defendants described prophylactic steps they took to
prevent pollution.  Id. at 247-48.  The Court found that the
defendants violated Section 11 because they failed to disclose
that the prophylactic steps they employed were not working — facts
that defendants knew when they issued the prospectus.  Id. at 250-

51.  Here, by contrast, plaintiffs have not alleged facts detailing defendants' contemporaneous knowledge of future insufficient demand or even how the defendants could have told the future.

Because "post hoc description[s]" of events "do[] not speak to what the Company knew or should have known at the time of time of the Offering," plaintiffs' Section 11 claim must be dismissed as to all defendants.  Holbrook v. Trivago N.V., No. 17 Civ. 8348, 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019), aff'd sub nom. Shetty v. Trivago N.V., 796 F. App'x 31 (2d Cir. 2019).[19]

### a. Regulation S-K

Regulation S-K is a set of rules that sets forth reporting requirements applicable to various filings under the Securities Act, including registration statements.  Plaintiffs allege that defendants violated Items 105 and 303 of Regulation S-K because they failed to disclose in their Prospectus that the SQDC was behind on its Purchase Obligation.  FAC ¶ 189.  Both claims fail.

Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires that an issuer "disclose the most significant factors that make an investment in the registrant or offering speculative or risky." In re Proshares Trust II Sec. Litig., No. 19 Civ. 886, 2020 WL

---

[19] Plaintiffs' attempts to distinguish Holbrook from this case fall flat. There, plaintiff did not allege any fact from which to infer that an advertiser's violations of company standards to date were of the "scope and magnitude necessary to impute knowledge of likely materiality."  2019 WL 948809, at *12-13.  Here, too, the SQDC's product demand to date was not sufficient to impute upon the Securities Act Defendants knowledge of the SQDC's future inability to meet the Purchase Obligation.

71007, at *9 (S.D.N.Y. Jan. 3, 2020) (internal quotation marks
omitted).   "Plaintiffs must demonstrate actual knowledge of an
existing trend, event, or risk to allege violations of Section 303
and 105."   Rubinstein v. Credit Suisse Grp. AG, 457 F. Supp. 3d
289, 300 (S.D.N.Y. 2020) (citation omitted).   As above, plaintiffs
do not allege with particularity that the Securities Act Defendants
knew at the time of the IPO that there was a significant risk that
the SQDC would not fulfill its Purchase Obligation or open
sufficient stores.   Nor do plaintiffs allege that the Securities
Act Defendants knew at the time of the IPO that HEXO would — nearly
twelve months later — amend the SQDC Agreement.   In any event, as
required, HEXO did disclose known risks associated with demand.
In its Prospectus, HEXO explained that the cannabis industry in
Canada was new and that its success was dependent on demand by
government dispensaries such as the SQDC.   Batson Decl., Ex. 5 at
24.   Though HEXO mentions the ToP provision in this section, HEXO
also notes that its "revenues could fluctuate materially in the
future and could be materially and disproportionately impacted by
the purchasing decisions of the SQDC, the OCRC, and the BCLDB."
Id.

In their opposition to defendants' motion to dismiss,
plaintiffs raise for the first time HEXO's alleged violation of
Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303.   Under Item
303, "[d]isclosure is required where the trend is both (1) known

to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 39 (2d Cir. 2017) (internal quotation marks omitted).  As an initial matter, it is not at all clear to the Court that the SQDC's lack of demand in the first three months following Legalization was a "trend" requiring disclosure.  Id.  In any event, plaintiffs' argument that HEXO did not properly disclose trends and uncertainties is belied by the fact that plaintiffs' allegations regarding the SQDC's store openings and HEXO's sales to date are based on HEXO's disclosures themselves.[20]  See, e.g., FAC ¶¶ 94-95; see also Singh v. Schikan, 106 F. Supp. 3d 439, 449 (S.D.N.Y. 2015) ("The conclusion that defendants were not required to posit that their study might fail is all the more appropriate where, as here, such speculation would have been based solely on facts disclosed in the Registration Statement, from which investors were equally free to assess the study's likelihood of success").

### b. Bespeaks Caution Doctrine

In any event, even if plaintiffs had alleged misrepresentations in the Prospectus, they would not be actionable under the bespeaks caution doctrine.  "Under the bespeaks caution

---

[20] Plaintiffs correctly observe that HEXO's disclosures regarding the SQDC's orders in the first three months of the SQDC Agreement required the application of simple math to be useful, ECF No. 122 at 20 n.9, but the numbers reflecting orders were nevertheless available to investors.  ECF No. 124 at 9-10; see also Batson Decl., Ex. 5 at 17.

doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach, 355 F.3d at 173 (internal quotation marks omitted; alterations in original).

As discussed supra, plaintiffs do not allege any facts to support the notion that the Securities Act Defendants knew that the SQDC would not fulfill the Purchase Obligation with HEXO, such that statements about the Purchase Obligation in the Prospectus amounted to misrepresentations.  HEXO, for its own part, made clear to its investors in its Prospectus that it was operating within a newly legalized industry and that revenues were dependent on the "purchasing decisions of the SQDC, the OCRC, and the BCLDB." Batson Decl., Ex. 5, at 23-24.  Nor have plaintiffs alleged any facts showing that HEXO knew at the time of the IPO that the ToP provision was "illusory" such that HEXO should have included cautionary language regarding the vitality of the ToP provision. Cf. ECF No. 122 at 22 n.13.  Where, as here, "[t]he cautionary language addresses the relevant risk directly," the offering memorandum is not considered misleading.  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 360 (2d Cir. 2002).  Accordingly, the bespeaks caution doctrine applies and plaintiffs' Section 11

claims are dismissed as to HEXO, the Individual Securities Act Defendants, and the Underwriter Defendants.

### 2. Section 12(a)(2)

"Section 12(a)(2) imposes liability on anyone who 'offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact.'" In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) (citing 15 U.S.C. § 77l). Claims under Sections 11 and 12(a)(2) of the Securities Act are "siblings with roughly parallel elements." Morgan Stanley Info. Fund, 592 F.3d at 359. Only persons who "directly purchase securities from the defendant in a public offering, rather than on the secondary market," have standing to bring a claim under Section 12(a)(2). Petrobras, 116 F. Supp. 3d at 384; see also Caiafa v. Sea Containers Ltd., 331 F. App'x 14, 16 (2d Cir. 2009). The defendants, moreover, must qualify as "statutory sellers," defined as "the person who (1) passes title to the plaintiff, or (2) solicits such security purchases for his financial gain." In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003).

Defendants maintain that plaintiffs lack standing to bring a Section 12(a)(2) claim because the complaint does not allege that plaintiffs purchased their HEXO securities in the IPO. Plaintiffs

disagree, arguing that a plaintiff can allege Section 12(a)(2) standing by pleading that the seller is a statutory seller, i.e., passed title to the plaintiff or otherwise solicited the security purchases for financial gain.

Defendants do not dispute that they were statutory sellers. See ECF No. 24 at 12. However, statutory seller status alone is insufficient. A nexus to a plaintiff purchaser is necessary. Here, plaintiffs lack standing to bring their Section 12(a)(2) claim because neither plaintiff purchased HEXO securities in the IPO. The complaint makes no allegations with respect to when lead plaintiff Sweeney purchased HEXO shares, and he certifies that he did not purchase HEXO stock until July 26, 2019. ECF No. 96-1 at 24. The complaint alleges that lead plaintiff Medley "bought some of his HEXO shares pursuant or traceable to the Offering." FAC ¶ 50. While it is true that allegations that a plaintiff "purchased securities . . . 'pursuant to' the relevant offerings" could suffice to establish standing at the motion to dismiss stage, In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 324 (S.D.N.Y. 2013), here, Medley's Certification forecloses that possibility.[21] In his Certification, Medley provides that his

---

[21] In MF Glob. Holdings, the Court permitted plaintiff's Section 12(a)(2) claim to proceed past the motion to dismiss phase, finding that it was possible that plaintiff would later show that he purchased stock during the IPO. 982 F. Supp. 2d at 324 ("Should it become apparent after a full factual record is established during discovery that Plaintiffs cannot prove direct purchases from certain individual underwriters, those underwriters will have the opportunity to seek judgment as a matter of law in a motion for summary judgment"); cf.

first purchase of HEXO was on January 29, 2019 for the price of $5.34 — which is not the $5.15 cost of HEXO stock on the NYSE during the IPO.  ECF No. 96-2 at 3; FAC ¶ 92.  Plaintiffs, moreover, conceded during oral argument that Medley did not purchase shares of HEXO stock on the date of the offering.  Tr. of Oral Arg., Feb. 24, 2021, at 5:22-23.  Because neither lead plaintiff purchased HEXO securities on the date of the IPO, they lack standing to bring a claim under Section 12(a)(2).  See Caifa, 331 F. App'x at 16-17 (dismissing    Section    12(a)(2)    claim    where    plaintiffs' certifications   confirm   that   they   acquired   securities   in   a secondary market); Fuwei Films, 634 F. Supp. 2d at 445 (finding that plaintiffs who did not purchase their shares directly in the IPO do not have standing).[22]   Accordingly, plaintiffs' Section 12(a)(2) claim must be dismissed.  Goldberger v. Bear, Stearns & Co., No. 98 Civ. 8677, 2000 WL 1886605, at *1 (S.D.N.Y. Dec. 28, 2000) ("If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts

_____

City of Omaha, 450 F. Supp. 3d at 403 (finding Section 12(a)(2) could survive motion to dismiss where plaintiff's purchase was "traceable to" the IPO, but where plaintiff did not specify precise date of stock purchase).  Here, however, Medley will not be able to show that he purchased HEXO stock on the day of the offering.

[22] Plaintiffs request a chance to "cure" their standing deficiency with respect to their Section 12(a)(2) claim.  ECF No. 122 at 21.  The Court declines to permit amendment where, as here, the lead plaintiffs were appointed over a year ago, on February 25, 2020, ECF No. 78, and where their stock purchase certifications were submitted to the Court prior to that, ECF No. 55-2.  In any event, because plaintiffs' Section 12(a)(2) claim would fail on the merits for the same reasons that their Section 11 claim fails, the addition of a new named plaintiff would not remedy plaintiffs' claim.

set forth in the complaint may show that others might have a valid claim.").[23]

### 3. Section 15

Section 15 of the Securities Act "provides for 'control person' liability, and requires that a plaintiff show (1) a primary violation of the Securities Act and (2) 'control' by the defendant." Singh, 106 F. Supp. 3d at 447. Plaintiffs' claim under Section 15 for control person liability fails because a Section 15 claim is "necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 177-78. Here, no such primary violation exists, and accordingly plaintiffs' Section 15 claim must be dismissed as to each of the Individual Securities Act Defendants.

### B. Exchange Act Claims

Defendants move to dismiss plaintiffs' Exchange Act claims on the basis that plaintiffs did not allege facts sufficient to show that defendants (1) made misstatements of material fact or (2) acted with scienter. The Court grants defendants' motion to dismiss plaintiffs' Exchange Act claims in its entirety.

---

[23] Neither plaintiffs nor defendants put forth any specific argument with respect to the merits of plaintiffs' Section 12(a)(2) claim. Even if, arguendo, plaintiffs did have standing under Section 12(a)(2), their claim would not survive the motion to dismiss because "if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)." In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011).

### 1. Section 10(b) and Rule 10b-5

#### a. Legal Standard

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, plaintiffs must satisfy the heightened pleading requirements under the Federal Rule of Civil Procedure 9(b) and the PSLRA.  ATSI Comm., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); 15 U.S.C. § 78u-4(b).  Rule 9(b) requires plaintiffs asserting securities fraud claims to "(1) specify the statements that the plaintiff[s] contend[ ] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach, 355 F.3d at 170.  The PSLRA further requires "that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted).  "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

To survive a motion to dismiss on Section 10(b) and Rule 10b-5 claims, plaintiffs must allege that defendants "(1) made

misstatements or omissions of material fact; (2) with scienter;
(3) in connection with the purchase or sale of securities; (4)
upon which plaintiffs relied; and (5) that plaintiffs' reliance
was the proximate cause of their injury." Gamm, 944 F.3d at 463
(citation omitted).  Here, because defendants move to dismiss the
FAC on the basis of the first and second elements, the Court
addresses only these elements below.

### i.    Misstatement or Omission of Material Fact

For a statement to be actionable under Section 10(b) of the
Exchange Act and Rule 10b-5 promulgated thereunder, it must be
both (1) false, and (2) material.  In re Lululemon Sec. Litig., 14
F. Supp. 3d 553, 571 (S.D.N.Y. 2014).  A statement is false for
the purpose of Section 10(b) and Rule 10b-5 if it was false "at
the time it was made."  Id.  To state a claim, "plaintiffs must do
more than say that the statements [at issue] were false and
misleading; they must demonstrate with specificity why and how
that is so."  Rombach, 355 F.3d at 174.  "Statements regarding
projections of future performance may be actionable under Section
10(b) or Rule 10b-5 if they are worded as guarantees or are
supported by specific statements of fact, or if the speaker does
not genuinely or reasonably believe them."  In re IBM Corp. Sec.
Litig., 163 F.3d 102, 107 (2d Cir. 1998) (internal quotation marks
and citations omitted).  An omission is also actionable under
Section 10(b) and Rule 10b-5, but only when the defendants had a

duty to disclose the allegedly omitted information.  Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 465 (2d Cir. 2013).  Such duty to disclose "may arise when there is a corporate insider trading on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading."  Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 110 (2d Cir. 2015) (citation and internal quotation marks omitted).

To be actionable under Section 10(b) and Rule 10b-5, the alleged misstatement or omission must also be material.  This requirement is satisfied if "there is a substantial likelihood that a reasonable person would consider [the allegedly misstated or omitted fact] important in deciding whether to buy or sell" the securities at issue.  Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994).  "When contingent or speculative future events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity."  Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks omitted).

### ii.  Scienter

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must determine "whether all of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegations, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." Id. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Plaintiffs can satisfy this standard "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). "Motive . . . could be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98, 108 (2d Cir. 2009). "Where motive is not apparent . . . the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." In re Citigroup

38

Inc. Sec. Litig., 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010).
"Defendants' conduct must be highly unreasonable and . . .
represent[ ] an extreme departure from the standards of ordinary
care to the extent that the danger was either known to the
defendant or so obvious that the defendant must have been aware of
it." Sinay v. CNOOC Ltd., No. 12 Civ. 1513, 2013 WL 1890291, at
*7 (S.D.N.Y. May 6, 2013), aff'd, 554 F. App'x 40 (2d Cir. 2014)
(citing Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 336
(S.D.N.Y. 2011)) (alterations in original; internal quotation
marks omitted).

### iii.  PSLRA Safe Harbor

The PSLRA established a statutory safe harbor for forward-
looking statements.  Under the safe harbor, a defendant "shall not
be liable with respect to any forward-looking statement," which,
in relevant part, is:

> Identified as a forward-looking statement, and
> is accompanied by meaningful cautionary
> statements identifying important factors that
> could cause actual results to differ
> materially from those in the forward-looking
> statement.

15 U.S.C. § 78u-5(c)(1)(A)(i).  "To avail themselves of safe harbor
protection under the meaningful cautionary language prong,
defendants must demonstrate that their cautionary language was not
boilerplate and conveyed substantive information." Slayton v. Am.
Exp. Co., 604 F.3d 758, 772 (2d Cir. 2010).  "To determine whether

cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials — including the cautionary language — to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" In re Delcath Sys., Inc. Sec. Litig., 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting Halperin, 295 F.3d at 359). "Cautionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss" is insufficient. Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), aff'd, 757 F. App'x 35 (2d Cir. 2018).

### b. Application

Plaintiffs allege that the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because they misstated facts with scienter in connection with (i) the Purchase Obligation and ToP provision, (ii) revenue guidance and inventory and impairment loss figures, and (iii) the Niagara Facility. For the reasons set forth below, the Court dismisses each of plaintiffs' Section 10(b) and Rule 10b-5 claims.

### i. Misstatements of Material Fact

#### 1. Purchase Obligation and ToP Provision

First, plaintiffs allege that the Exchange Act Defendants'
statements regarding the SQDC's Purchase Obligation and the ToP
provision constitute actionable misstatements.   Specifically,
plaintiffs point to the following statements.   On the March Call,
despite lower-than-anticipated demand for the first six months of
the SQDC Agreement, St. Louis, HEXO's co-founder, CEO, and
president, stated that he was "absolutely confident" that the SQDC
would fulfill the Purchase Obligation and that the Purchase
Obligation was "fully on track."  FAC ¶¶ 200, 213.   Further, the
March MD&A reiterated HEXO's plan to supply the SQDC with 20,000
kilograms of product in the first year after Legalization.  FAC ¶
195.   The March MD&A also disclosed that HEXO was subject to
certain risks outside of its control, including changes to
government policies and its dependence on government-run
dispensaries.  Stokes Decl., Ex. 15, at 2, 29.

On the June Call, St. Louis disclosed that HEXO would not
enforce the ToP provision of the SQDC Agreement for that quarter
because HEXO wanted to maintain its positive relationship with the
SQDC and did not want the SQDC to have inventory builds.  FAC ¶¶
21, 118, 231.   Nevertheless, St. Louis explained that he thought
that it was a "reasonable assumption" that the SQDC would fulfill
the Purchase Obligation by the end of 2019.  FAC ¶ 232.   He
cautioned that there was some "timing risk," but explained that
HEXO could offset any shortage in demand from the SQDC with demand

in other provinces.  FAC ¶ 232.  Echoing St. Louis' optimism, the June MD&A provided that HEXO "will supply the SQDC with 20,000 kg of products in the first year."  FAC ¶ 221.  Like the March MD&A, the June MD&A also made clear that HEXO was subject to certain risks outside of its control, including changes to government policies and its dependence on government-run dispensaries. Stokes Decl., Ex. 16, at 2, 31-32.

When the SQDC's demand did not increase as hoped, either by the end of the contractual year in October 2019 or by the end of 2019, HEXO decided to relieve the SQDC of its commitment to pay for the Purchase Obligation altogether, and amended the SQDC Agreement to eliminate the ToP provision.  FAC ¶¶ 180, 273.

In their most recent iteration of their argument articulated during oral argument, plaintiffs assert that since investors relied on revenue guaranteed by the ToP provision, HEXO's failure to enforce that provision was therefore fraudulent.  See, e.g., Tr. of Oral Arg., Feb. 24, 2021, at 15:24-16:1; 16:7-9; 19:22-20:1; 21:13-22:11.  Relatedly, plaintiffs argue that St. Louis' statements on the March and June Calls and HEXO's statements in the March and June MD&As constitute actionable misstatements because they assured the market that the SQDC would fulfill the Purchase Obligation when this was not the case.  The Exchange Act Defendants, meanwhile, maintain that amending the SQDC Agreement was a business judgment intended to sustain a positive relationship

42

with the government-run SQDC and, in turn, to maximize value for shareholders in the future. Tr. of Oral Arg., Feb. 24, 2021, at 24:10-25:6. The Exchange Act Defendants, moreover, argue that HEXO and St. Louis remained optimistic that the SQDC would fulfill the Purchase Obligation because the cannabis market was in the process of a "ramp up." Id. at 22:19-23; 32:3-7.

Plaintiffs' central argument is that the contractual ToP provision amounted to a guarantee and thus became a misrepresentation when HEXO decided in January 2020 to amend the ToP term by not enforcing it. Viewed closely, there are two versions of plaintiffs' argument, each of which borders on the risible. One version is that, having described the ToP provision, HEXO could not later make a decision considered to be in the best interest of the company (i.e., its shareholders) to relieve its counterparty, the SQDC, of an initial commitment in order to preserve a long-term business opportunity without committing securities fraud.[24] However, "[p]laintiffs' 'fundamental disagreements with Defendants' business judgments . . . are not actionable under Section 10(b) and Rule 10b-5.'" In re Weight Watchers Int'l Inc. Sec. Litig., No. 19 Civ. 2005, 2020 WL 7029134,

---

[24] Plaintiffs also suggest that defendants' expectations regarding sales to the SQDC in the second and third years of the SQDC Agreement constitute actionable misrepresentations. ECF No. 122 at 29. They do not. Second and third year sales were never subject to a ToP provision, and thus any statements regarding these sales targets were at most reasonable estimates under the circumstances.

at *9 (S.D.N.Y. Nov. 30, 2020) (citing <u>Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce</u>, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010)); <u>see also</u> HEXO MD&A, March 30, 2020, at 14 (explaining that HEXO's decision to amend the SQDC Agreement was motivated by a desire to maintain its "overall business relationship with the SQDC and its position in Quebec").[25]

The second version of plaintiffs' argument is that in order to make the initial description of the ToP provision <u>not</u> misleading, HEXO needed to openly state at the outset that it might not enforce the ToP provision. Tr. of Oral Arg., Feb. 24, 2021, at 22:5-11. Such a disclosure would, of course, have weakened HEXO's bargaining position with the government of Quebec, thereby reducing the pressure on the SDQC to fulfill its commitment to buy 20,000 kilograms of product from HEXO. This Court was unaware that compliance with the securities laws required a corporate suicide pact.

Relatedly, the Court finds that none of plaintiffs' allegations regarding the Purchase Obligation are actionable. St. Louis' statements on the March and June Calls are reasonably classified as optimistic. On the March Call, St. Louis stated

---

[25] Although not necessary to this Opinion, it is nonetheless interesting to note that the relationship between HEXO and the SQDC continues to exist today, with HEXO remaining a "preferred supplier" of the SQDC "with an approximately 33% market share based on volume." HEXO's Form 40-F, October 29, 2020, Section entitled "Supply Channels." HEXO also is working on expanding its product offerings with the SQDC. <u>Id.</u>

that he was "confident" about reaching the Purchase Obligation and that HEXO was "on track" to do so.  FAC ¶¶ 200, 213.  Neither of these statements are guarantees.  Likewise, on the June Call, St. Louis allegedly stated that he was "confident" that the SQDC would fulfill the Purchase Obligation by the end of 2019, but nevertheless qualified that this was a "reasonable assumption" and that he expected to encounter "some timing risk."  FAC ¶ 232. Exuding confidence while acknowledging risk does not constitute a misstatement.  Jones v. Perez, 550 F. App'x 24, 26 (2d Cir. 2013) (finding that "misguided optimism" is not a cause of action). Further, as plaintiffs themselves concede, throughout the course of 2019, HEXO openly disclosed its sales numbers to the public, such that investors could have discerned for themselves whether the Exchange Act Defendants' projections were overly-confident. Tr. of Oral Arg., Feb. 24, 2021, at 26:8-16.  It also bears noting that plaintiffs allege that following the June Call, HEXO's stock price actually decreased 8%.  FAC ¶ 299.  Far from indicating that investors were erroneously encouraged by St. Louis' statements on the June Call, this decline in stock price suggests that the market accurately reflected his message: that the SQDC's demand for HEXO's product was lower than expected, and that there was a risk that this low demand would persist.[26]

---

[26] Plaintiffs argue that the decline in stock price is attributable to St. Louis' announcement that HEXO would not enforce the ToP provision that quarter,

Nor do HEXO's statements in the March and June MD&As, to the effect that HEXO "will supply" 20,000 kilograms to the SQDC in the first year, constitute actionable misstatements.  FAC ¶¶ 195, 221.  Context, here, is important: the Exchange Act Defendants couched these statements alongside explanations of HEXO's various supply agreements, and at the times when the March and June MD&As were filed, the SQDC Agreement provided that HEXO would provide 20,000 kilograms of product to the SQDC in the first year.  See Stokes Decl., Ex. 15 at 5 ("We <u>hold</u> the single largest forward contract in the history of the emerging cannabis industry with the SQDC.") (emphasis added); Ex. 16 at 3 ("We <u>currently</u> possess the single largest and longest Canadian forward supply amount") (emphasis added).  HEXO's later amendment to the SQDC Agreement to remove the ToP provision does not render these statements retroactively untrue.  As the ToP provision was in effect at the times that the March and June MD&As were filed, the statements made therein were accurate, and thus do not constitute actionable misstatements.

In any event, the statements in the March and June MD&As are protected by the PSLRA Safe Harbor because the Exchange Act Defendants provided ample cautionary language.  <u>Slayton</u>, 604 F.3d at 772.  Here, the Disclosure, which appeared in both the March and June MD&As, specifically identified that HEXO's statements

rather than the disclosures about disappointing sales.  Tr. of Oral Arg., Feb. 24, 2021 at 19:22-20:19.  This is an obvious stretch.

could be affected by risks relating to "changes to government laws, regulations or policies," as well as "supply risks." Stokes Decl., Ex. 15 at 2; Ex. 16 at 2. As plaintiffs allege, the low demand for HEXO's product arose at least in part from the Quebec government's slow roll-out of stores and avoidance of inventory builds. Moreover, both the March and June MD&As openly state that HEXO operates in a new, "rapidly changing environment" and that HEXO is dependent on contracts with government dispensaries. Stokes Decl., Ex. 15 at 28-29, Ex. 16 at 31-32.[27] These risk disclosures should have suggested to a reasonable investor that supply projections were not guaranteed. Accordingly, even if HEXO's statements in the March and June MD&As constituted misstatements — and they do not — they would be protected under the PSLRA Safe Harbor.

### 2. Renewed Guidance and Inventory and Impairment Loss Figures

Plaintiffs allege that HEXO's revenue guidance and inventory and impairment loss figures — which account for reductions in the carrying value of assets in a company's financials — amount to misstatements because they were inaccurate or delayed. The Court disagrees.

---

[27] Both the March and June MD&As reference the ToP provision, but as above, this provision was in effect at the time of these filings and thus these statements do not constitute misrepresentations.

With respect to the guidance, plaintiffs allege that during the March Call, St. Louis expressed confidence, stating, "when we hit that $400 million net next year . . . that's supported by very strong demand.  That's why we're confident putting out numbers." FAC ¶ 207.  On the June Call, St. Louis further stated, "We're going to reach the [4Q] target  . . . We're delivering a double this quarter."  FAC ¶ 228.  But then, on October 10, 2019, HEXO withdrew its C$400 million net revenue guidance and announced that its fourth-quarter revenues were approximately 40% lower than expected.  FAC ¶¶ 26, 239, 131.  Plaintiffs argue that HEXO's initial guidance – which St. Louis called "conservative" on the March Call, FAC ¶ 210 — "lacked any reasonable basis," ECF No. 122 at 24.

The Exchange Act Defendants correctly maintain that plaintiffs fail to allege that the Exchange Act Defendants made false statements about HEXO's revenue guidance; to the contrary, plaintiffs' allegations demonstrate that the Exchange Act Defendants disclosed information with respect to HEXO's declining position in real time.  From the complaint, it appears to the Court that HEXO withdrew and adjusted its guidance only after observing low demand and slow store roll-out.  And as the Second Circuit has held, even amidst "disclosures and warnings" regarding "deteriorating financial condition," "misguided optimism is not a

cause of action, and does not support an inference of fraud."
Jones, 550 F. App'x at 26.

With respect to inventory and impairment loss figures,
plaintiffs allege that the Exchange Act Defendants misstated
HEXO's inventory and that the figures were misleading because HEXO
did not (i) account for slow SQDC orders, (ii) intend to enforce
the ToP provision, (iii) write down or write off stale or
depreciated product, or (iv) perform an inventory impairment on
the Niagara Facility until five months after acquiring Newstrike.
ECF No. 122 at 26.

From plaintiffs' allegations, HEXO's inventory and loss
impairment adjustments appear to be reactionary to new
information. For example, in its October 29, 2019 Annual Report,
HEXO recorded an impairment arising from "price compression in the
market." FAC ¶¶ 143, 304. After market close on January 2, 2020,
HEXO restated its 2019 financial statements and its interim results
for Q12020, and disclosed that it understated its FY2019 inventory
impairment by $2.4 million. FAC ¶ 309. On March 17, 2020, HEXO
recorded another impairment when it announced that it was selling
the Niagara Facility. FAC ¶ 312. Crucially, plaintiffs do not
allege, in connection with any of the above examples, that the
Exchange Act Defendants withheld information about which they were
aware with respect to the guidance or impairment loss figures prior
to releasing such information publicly. Hutchinson v. Perez, No.

12 Civ. 1073, 2013 WL 1775374, at *1 (S.D.N.Y. Apr. 25, 2013) ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").

In any event, even if, _arguendo_, HEXO's accounting during the Class Period were incorrect, allegations regarding accounting irregularities are not sufficient to state a securities fraud claim. _SEC v. Price Waterhouse_, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (stating that the recklessness standard in a securities fraud action "requires more than a misapplication of accounting principles"). "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." _Novak v. Kasaks_, 216 F.3d 300, 309 (2d Cir. 2000) (internal quotation marks and citations omitted). As will be established _infra_, plaintiffs fail to allege scienter with respect to revenue guidance and inventory and impairment loss figures.

### 3. Niagara Facility

Plaintiffs' allegations about the Niagara Facility fare no better.[28]  Plaintiffs allege that the Exchange Act Defendants were

---

[28] The parties dispute whether plaintiffs allege a "pure omission" or a misrepresentation in connection with the Niagara Facility.  Plaintiffs argue that St. Louis made a misleading representation because he failed to disclose an ongoing licensing violation at a large facility while discussing other licensing issues.  ECF No. 122 at 26 n.21.  The Court rejects plaintiffs' argument.  Of course, "corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements." _In re_

not forthright about the licensing issues at the Niagara Facility. During the March Call, St. Louis indicated that "250,000 feet" of the Niagara Facility were "licensed operational" but that there was a licensing delay with respect to another part of the Niagara Facility.  FAC ¶ 106.  In a press release dated October 28, 2019, HEXO announced that it obtained licenses for a different facility in Bellevue without mentioning licensing issues at the Niagara Facility.  FAC ¶ 243.  In a November 15, 2019 press release, HEXO disclosed that the Niagara Facility's Block B had been operating without a license — a fact that HEXO learned on July 30, 2019. FAC ¶ 153.  In refuting plaintiffs' argument, the Exchange Act Defendants assert that they disclosed the existence of licensing issues at the Niagara Facility in March 2019 and took corrective action to remedy the licensing oversight.  See FAC ¶ 106; ECF No. 116 at 31.

The Court agrees with the Exchange Act Defendants.  In the interest of transparency, HEXO perhaps should have disclosed its licensing issues when it discovered them in July 2019.  However, sight should not be lost of the bottom line reality.  There is no

---

Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).  But here, discussing licensing at one location – a critical aspect of a regulated business such as HEXO – does not necessitate simultaneous discussion of all licensing issues at all locations.  Accordingly, defendants' characterization of the Niagara Facility licensing issue as an omission is accurate.  A duty to disclose an omission may exist where "there is a corporate insider trading on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading."  Stratte-McClure, 776 F.3d at 101 (internal quotation marks omitted).

allegation that the inability of part of the the Niagara Facility to operate had any effect on HEXO's supply chain operations, when, in fact, this entire lawsuit is premised on insufficient demand for HEXO's product.  "[A]llegations that defendants should have . . . made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." Novak, 216 F.3d at 309; see also Marsh & Mclennan, 501 F. Supp. 2d at 469.  Here, plaintiffs do not allege particularized reasons that the Exchange Act Defendants should have disclosed the licensing issue immediately in July 2019.  Accordingly, plaintiffs' claim with respect to the Niagara Facility is not actionable.  See In re Centerline Holdings Co. Sec. Litig., 613 F. Supp. 2d 394, 404 (S.D.N.Y. 2009), aff'd sub nom. In re Centerline Holding Co. Sec. Litig., 380 F. App'x 91 (2d Cir. 2010) (dismissing claim where it was "arguable that they did not have a duty to disclose such information before they actually did").[29]

*   *   *

In summary, plaintiffs have failed to allege actionable misstatements or omissions pursuant to Section 10(b) and Rule 10b-5.  For the sake of completion, the Court will nevertheless assess plaintiffs' scienter allegations.

---

[29] The Court need not address the applicability of the PSLRA safe harbor to the Exchange Act Defendants' representations regarding revenue guidance and inventory and impairment loss figures or the Niagara Facility because plaintiffs have failed to state viable claims on either.

### ii. Scienter

Even assuming, <u>arguendo</u>, that plaintiffs had adequately alleged actionable misstatements or omissions with respect to the Purchase Obligation and ToP provision, HEXO's revenue guidance and inventory and impairment loss figures, or the Niagara Facility, plaintiffs' failure to plead facts giving rise to an inference of scienter provides an independent ground on which to dismiss plaintiffs' Section 10(b) and Rule 10b-5 claims.

The "court must review all the [scienter] allegations holistically." <u>Matrixx Initiatives Inc. v. Siracusano</u>, 563 U.S. 27, 48 (2011) (internal quotation marks and citations omitted). According to the Second Circuit, at least four circumstances may give rise to a strong inference of the requisite scienter:

> where the complaint sufficiently alleges that the defendants (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

<u>ECA</u>, 553 F.3d at 199 (internal quotation marks omitted). Here, in their attempt to allege scienter, plaintiffs rely on the first and third categories.

With respect to the first, plaintiffs allege that the Exchange Act Defendants were motivated by a desire to increase HEXO's stock price to increase their personal options holdings. But as the

Second Circuit has held, incentive-based compensation is typically insufficient to support an inference of scienter. Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers"). "[I]f performance-based compensation were a sufficient predicate for fraud, then "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). That some of the individual defendants held options with high strike prices is not enough to support a strong inference of scienter, particularly where, as here, it is not ever alleged that the Exchange Act Individual Defendants exercised their options. See Tr. of Oral Arg., Feb. 25, 2021, at 10:15-16.

For the most part, plaintiffs rely on the third prong in ECA, alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate." 553 F.3d at 199. Given the nature of plaintiffs' theory of scienter, their abject failure to identify any reports or statements containing adverse facts to which defendants had access at the time the statements at issue were made is itself fatal to plaintiffs' Section 10(b) claims. See Novak, 216 F.3d at 309

54

("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information"). Put simply, plaintiffs failed to establish "what the [d]efendants knew and when they knew it." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 176 (S.D.N.Y. 2010).

First, with respect to the Purchase Obligation and the ToP provision, we have repeatedly rejected plaintiffs' arguments that HEXO knew at the outset and during the relevant disclosures that the SQDC would not fulfill its commitment and that HEXO knew from the start that it would not enforce the ToP provision. We need not reiterate these arguments again here, but do emphasize once more that the "fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness." Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000). Moreover, as the Exchange Act Defendants argue, we note that the purchase of the Niagara Facility in March 2019 undermines the theory that the Exchange Act Defendants knew that the SQDC would not fulfill the Purchase Obligation. Tr. of Oral Arg., Feb. 24, 2021, at 24:2-9. If the Exchange Act Defendants knew that they would not sell 20,000 kilograms of product to the SQDC in the first year, it would be nonsensical for them to invest in the Niagara Facility — which

cost C$263 million — and which was intended to generate significant product.

Further, though plaintiffs boldly argue that the Exchange Act Defendants committed fraud on the basis of their renewed guidance and inventory and impairment loss figures, plaintiffs have not alleged particular facts showing that any Exchange Act Defendant was aware of contemporaneous information contradicting their disclosures.[30]  See In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278, 298 (S.D.N.Y. 2014), aff'd, 616 F. App'x 442 (2d Cir. 2015) (inaccurate financial results that were restated within the year "cannot support a strong inference of scienter sufficient to maintain a claim").  Clearly, HEXO made a number of changes with respect to reporting its inventory and impairment loss figures.  See, e.g., FAC ¶¶ 143, 304, 312.  However, these facts alone do not give rise to a strong inference that defendants were acting fraudulently.  See Sjunde AP-Fonden v. Gen. Elec. Co., 417 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (internal quotation marks omitted) ("a company's incremental strategy of taking successive write-downs during a class period contradicts an inference of scienter").  In fact, "that these disclosures occurred in 'dribs

---

[30] Plaintiffs' most concrete argument in this respect is that defendants did not timely perform an inventory impairment on the Niagara Facility.  ECF No. 122 at 26.  But these allegations are not accompanied by any alleged facts that this delay was perpetrated with fraudulent intent.  Rather, as set forth in the FAC, defendant Burwash openly disclosed on a conference call the timing of the inventory impairment attributable to the Niagara Facility.  FAC ¶ 264.

and drabs' suggests poor accounting and prognostication, not fraud." Id. at 400 (citing Magnum, 26 F. Supp. 3d at 297-98).

In any event, the cases on which plaintiffs rely are unavailing. While the Court in Davidoff, 2005 WL 2030501, at *7 n.13, *14, stated that the allegations regarding delayed impairments were "sufficiently specific to avoid dismissal on grounds of particularity," there the company allegedly waited multiple months to record an impairment about which it was aware. Here, plaintiffs do not allege with particularity that the Exchange Act Defendants knew that any impairment should have been taken earlier. Moreover, there, the Court ultimately dismissed the entire complaint with prejudice. Id. at *18. In Novak, 216 F.3d at 311, defendants adopted a scheme to disguise their inventory issues. Plaintiffs' allegations were thus sufficient, as defendants stated that the "inventory situation" was "under control" even though "they knew the contrary was true." Id. at 315. Plaintiffs here do not allege any similar scheming by the Exchange Act Defendants to conceal issues with inventory.

In one final attempt to allege scienter, plaintiffs rattle off a list of resignations, arguing that "suspiciously-timed resignations" can support a finding of scienter. ECF No. 122 at 31. Plaintiffs point to the resignations of two of HEXO's CFOs, the co-founder's resignation, a director's resignation, and the firings of the Chief Manufacturing and Marketing Officers during

the Class Period.  FAC ¶¶ 110, 126-27, 140, 173.  Plaintiffs also allege that HEXO's auditor resigned.  FAC ¶ 170.  With respect to the employee resignations, plaintiffs do not provide any non-conclusory allegations regarding the reasons for the resignations. "Abrupt" resignations, FAC ¶ 42, amidst bad financial news — such as that which HEXO was disclosing — are not surprising.  After all, it is "axiomatic that nascent companies with uncertain futures are especially prone to turnover."  Gregory, 297 F. Supp. 3d at 415.

Further, plaintiffs have not alleged facts sufficient to show that the auditor's resignation amounts to the level of fraud. Plaintiffs allege, "[a]pparently, MNP had clashed with HEXO over the restatement the Company announced on January 2, 2020."  FAC ¶ 36.  But plaintiffs allege nothing more.  See City of Brockton, 540 F. Supp. 2d at 474 (dismissing case where auditor that resigned agreed with the Company on accounting and financial disclosures).[31] Because "plaintiffs fail to plead facts non-speculatively linking the resignations of corporate personnel to the company's alleged fraud," their claim predicated on executive and auditor resignations cannot survive.  Gregory, 297 F. Supp. 3d at 415.[32]

---

[31] We note that defendants have provided exhibits showing that there were "no modified opinions" in MNP's reports.  Batson Decl., Exs. 12-14.

[32] Plaintiffs rely on cases that are not analogous.  In re OSG Sec. Litig., 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014), the Court averred that resignations were suggestive of recklessness.  But there, one of the resignations followed the IRS's announcement of a "massive amendment" to its Proof of Claim in bankruptcy court and the other occurred a few months later for a "seemingly

For the reasons set forth above, plaintiffs' allegations do not raise "a cogent and compelling" inference of scienter. <u>Tellabs</u>, 551 U.S. at 324.   Ultimately, plaintiffs' allegations suggest that "defendants were in a constant game of 'Catch up' — acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more." <u>Magnum</u>, 616 Fed. App'x at 445.   This is insufficient to plead scienter.

### 2. Section 20(a)

Section 20(a) provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).   "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful

---

pretextual reason." <u>Id.</u> at 632.  In <u>Hall v. The Children's Place Retail Stores,</u> <u>Inc.</u>, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008), the "forced resignation" in question occurred during the "wake of [an] SEC investigation" and the company's admission that it had material weaknesses in its internal controls.  No similar catalyst is alleged here.

sense, a culpable participant in the controlled person's fraud." ATSI Communications, 493 F.3d at 108.

Plaintiffs' claim under Section 20 for control person liability fails because a Section 20 claim is "necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 177-78. Here, no such primary violation exists, and accordingly plaintiffs' Section 20 claim must be dismissed as to each of the Individual Exchange Act Defendants.

**V.   Conclusion**

For the reasons set forth above, the Court grants defendants' motion to dismiss in its entirety.

**SO ORDERED.**

Dated:  New York, New York
        March 8, 2021

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE